UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JONATHAN B. FREEMAN,

              Plaintiff,

    – *versus* –

UNITED STATES CENSUS BUREAU and
UNITED STATES DEPARTMENT OF
COMMERCE,

            Defendants.

Civil Action No. 25-7834 (LJL)

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

JAY CLAYTON
United States Attorney for the
Southern District of New York
Counsel for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2699
rachael.doud@usdoj.gov

Of Counsel:

RACHAEL DOUD
Assistant United States Attorney

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ..........................................................................................................1

I.     Plaintiff's Requests ..........................................................................................1

II.    Information Concerning the Requested Records ..............................................3

ARGUMENT ...............................................................................................................5

I.     Standard of Review...........................................................................................5

II.    The Draft Report and Response Data Are Protected from Disclosure by
       Exemption 3 ......................................................................................................7

       A.     13 U.S.C. §§ 8 and 9 Bar Release of the Draft Report
              and Response Data.................................................................................7

       B.     Defendants Are Not Required to Further Process the Requested
              Information, Which Would Still Be Exempt ..........................................9

III.   The Draft Report Is Also Protected from Disclosure by Exemption 5 .................13

IV.    There Is No Segregable Information That Could Be Released...........................17

CONCLUSION...........................................................................................................18

TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(s)**

*Baldrige v. Shapiro,*
    455 U.S.  (1982)..................................................................................... 8, 9, 11

*Carney v. DOJ,*
    19 F.3d 807 (2d Cir. 1994)............................................................................ 6

*CIA v. Sims,*
    471 U.S. 159 (1985)...................................................................................... 6

*Dep't of the Interior v. Klamath Water Users Protective Ass'n,*
    532 U.S. 1 (2001)...................................................................................... 5. 16

*Fair Lines American Foundation, Inc., v. Commerce,*
    1:21-cv-01361-AB, 619 F.Supp.3d 212 (D.D.C. Aug. 2, 2022)..................... 10

*Ferguson v. FBI,*
    No. 89 Civ. 5071 (RPP), 1995 WL 329307 (S.D.N.Y. June 1, 1995),
      *aff'd* 83 F.3d 41 (2d Cir. 1996) ............................................................... 6

*Grand Cent. P'ship v Cuomo,*
    166 F.3d 473 (2d Cir. 1999) ............................................................. 14, 15, 17

*Halpern v. FBI,*
    181 F.3d 279 (2d Cir. 1999)......................................................................... 6

*Hodge v. FBI,*
    703 F.3d 575, 582 (D.C. Cir. 2013) ........................................................... 17

*Hopkins v. HUD,*
    929 F.2d 81 (2d Cir. 1991)...................................................................... 14, 15

*John Doe Agency v. John Doe Corp.,*
    493 U.S. 146 (1989)................................................................................. 5, 6

*Kissinger v. Reporters Comm. for Freedom of Press,*
    445 U.S. 136 (1980)........................................................................ 10, 11, 12

*Mapother v. Dep't of Justice,*
    3 F.3d 1533 (D.C. Cir. 1993)..................................................................... 16

*Martin v. DOJ,*
    488 F.3d 446 (D.C. Cir. 2007).................................................................... 6

*New York Times Co. v. DOJ*,
    872 F. Supp. 2d 309 (S.D.N.Y. 2012)..................................................................... 5, 6

*New York Times Co. v. DOJ*,
    915 F. Supp. 2d 508 (S.D.N.Y. 2013)......................................................................... 6

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975)................................................................................................ 13, 14

*NRDC v. EPA*,
    954 F.3d 150 (2d Cir. 2020) ......................................................................................... 17

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
    421 U.S. 168 (1975)...................................................................................................... 14

*Seife v. FDA*,
    43 F.4th 231 (2d Cir. 2022) ...................................................................................... . 16

*Seymour v. Barabba*,
    559 F.2d 806 (1977)................................................................................................ 10, 11

*Tigue v. DOJ*,
    312 F.3d 70 (2d Cir. 2002)...................................................................................... 14, 15

*United States Fish and Wildlife Service v. Sierra Club, Inc.*,
    592 U.S. 261 (2021)................................................................................................ 14, 15

*Wilner v. NSA*,
    592 F.3d 60 (2d Cir. 2009)........................................................................................ 6, 7

## STATUTES

5 U.S.C. § 552........................................................................................................ 1, 5

5 U.S.C. § 552(b) ............................................................................................. 2, 7, 14, 17

13 U.S.C. § 9 .................................................................................................... *passim*

13 U.S.C. § 8 .................................................................................................... *passim*

## RULES

Fed. R. Civ. P. 56(a) ................................................................................................. 6

**OTHER AUTHORITIES**

Executive Order 14168 ............................................................................................... *passim*

Defendants United States Census Bureau ("Census" or "Census Bureau") and United States Department of Commerce ("Department" and together with Census, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment in this action brought pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

## PRELIMINARY STATEMENT

Plaintiff's FOIA requests seek Census data files related to testing of sexual orientation and gender identity questions and an incomplete, unfinalized draft report regarding those questions. As explained further below and in the declaration accompanying this memorandum, both are protected by law from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Defendants have appropriately declined to release them. Specifically, the data files and draft report at issue contain sensitive data about American citizens' personal lives that 13 U.S.C. §§ 8 and 9 specifically prohibit from disclosure. These records therefore may be withheld under FOIA exemption 3, which allows Defendants to withhold requested documents if their release to the public is specifically prohibited by another statute. Moreover, the draft report is also protected from disclosure pursuant to FOIA exemption 5 because it is a predecisional draft report subject to deliberative process privilege protection. Contrary to Plaintiff's suggestions in his Complaint, the Census Bureau has not previously disclosed similar information, and indeed is prohibited from doing so by 13 U.S.C. §§ 8 and 9.

Accordingly, the Court should grant Defendants' motion for summary judgment.

## BACKGROUND

### I.    Plaintiff's Requests

This case concerns two FOIA requests made by Plaintiff Jonathan B. Freeman. Both requests concern data collected as part of a test survey performed in 2024 concerning sexual

1

orientation and gender identity ("SOGI") questions to evaluate their suitability for inclusion in the annual American Community Survey ("ACS") of the U.S. population (the "2024 ACS SOGI Test").  Complaint ("Compl."), Dkt. No. 1, ¶¶ 7-10.  Specifically, the Census Bureau asked survey respondents aged 15 or older to identify their sex assigned at birth, their current gender and their sexual orientation.  Declaration of Elizabeth Poehler ("Poehler Decl.") ¶ 9.  The 2024 ACS SOGI Test consisted of two forms of testing: (1) cognitive testing, which involved interviews with a sample of respondents to explore, among other things, how they interpret SOGI questions, and (2) field testing, which involved administering experimental SOGI questions to a large, nationally representative sample of households.  Compl. ¶ 12; Poehler Decl. ¶ 10.

On May 30, 2025, Plaintiff made a FOIA request to the Census Bureau for:

> Copy of all non-data elements within the American Community Survey (ACS) Sexual Orientation and Gender Identity (SOGI) Cognitive Testing Report, produced by RTI International in or around November 2024.

Compl. ¶ 19.

The request stated:

> This request excludes any data tables, verbatim respondent quotes, or other data elements that may be protected from disclosure under Title 13.  If the Disclosure Review Board has not yet evaluated the report's data elements for disclosure risk, I request the release of all non-data narrative content.  Because the data and non-data elements of the report are reasonably segregable, I request that all non-exempt, non-data elements be segregated and released pursuant to 5 U.S.C. § 552(b).

*Id.* ¶ 20.

On June 18, 2025, the Census Bureau denied the request on the ground that it seeks material protected from disclosure by FOIA exemption 3, because 13 U.S.C. § 9 prohibits the disclosure of the requested data.  Compl. ¶ 21.  Plaintiff appealed the denial and the Department had not yet decided the appeal at the time he filed this case.  *Id.* ¶¶ 22-23.

On July 21, 2025, Plaintiff sent a FOIA request to the Census Bureau seeking:

Copies of the following two internal data files related to the American Community
Survey (ACS) Sexual Orientation and Gender Identify (SOGI) Test, which are currently
in possession by Elizabeth Poehler (Elizabeth.poehler@census.gov) and Donna Daily
(donna.m.daily@census.gov):

Self-Response File (CSV or JSON format) – This file contains individual-level
deidentified self-response data from ACS SOGI Test respondents.  Each row corresponds
to a respondent, and each column corresponds to an individual survey item.

Web Paradata File (CSV or JSON format) – This file contains individual-level
deidentified web paradata from ACS SOGI Test respondents.  Each row corresponds to a
timestamp (concatenated across respondents), and each column represents web
navigation-related information through the survey.

Compl. ¶ 24.

On August 1, 2025, the Census Bureau denied this request on the ground that it seeks

records containing information protected from disclosure by 13 U.S.C. § 9 and is therefore

protected from disclosure by FOIA's exemption 3.  Compl. ¶ 25.  Plaintiff appealed the denial

and the Department had not yet decided the appeal at the time he filed this case.  *Id.* ¶ 26.

## II.    Information Concerning the Requested Records

As noted above, in 2024 Census conducted a survey concerning SOGI questions to

evaluate their suitability for inclusion in the annual ACS.  Poehler Decl.  ¶¶ 9-10.  The ACS

collects detailed social, economic, housing, and demographic information from a sample of

households across the 50 states, the District of Columbia, and Puerto Rico.  *Id.* ¶ 2.  In or around

August 2024, Census began conducting ACS SOGI field testing.  *Id.* ¶ 10.  In or around February

2024, Census began conducting ACS SOGI cognitive testing in collaboration with RTI

International, a Census Bureau contractor.  *Id.*

RTI International prepared a draft report concerning the cognitive testing for review and

comments from the Census Bureau.  *Id.*  The draft RTI report includes the wording that was

tested, an overview of recruiting methods and interview procedures, research results, and

working recommendations.  *Id.*  ¶ 12.  The research results address specific research objectives

and describe in detail difficulties with question wording or responses, including quotes from respondents along with summary counts, such as the number of respondents who identify as a sexual or gender minority. *Id.* Data and quotes from respondents are integrated into the draft narrative portions of the report; they are not segregated solely into tables or appendices. *Id.*

On January 20, 2025, the President issued Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government. *Id.* ¶ 11. In relevant part, the EO directs Executive Branch agencies to use the term "sex" and not "gender" in all applicable Federal policies and documents and take all necessary steps to end the Federal funding of gender ideology. *Id.* Following the issuance of the EO, the Census Bureau suspended RTI's cognitive testing work and the Census Bureau's work on the gender identity question, including any work on the draft RTI report. *Id.* ¶ 12. The draft RTI report and the respondent information from the test instrument are not available to Census employees for additional research or additional editing in accordance with EO 14168. *Id.*

Any final report that would be released to the public based on testing of Census questions—including the RTI report, if it were ever finalized for release—would contain no raw data, but instead only tabulations and other statistical materials which do not disclose the information reported by, or on behalf of, any particular respondent. *Id.* ¶ 15. Further, before any Census response information or reports from the ACS SOGI testing could be released to the public, the Census Bureau would apply disclosure avoidance techniques to ensure that no data are released in violation of 13 U.S.C. § 9. *Id.*; *see also id.* ¶ 24. Among other steps, to ensure that the Census Bureau does not release information protected from release by 13 U.S.C. § 9, the Census Bureau convenes a Disclosure Review Board (DRB) to review a planned data release to ensure that data confidentiality is maintained. *Id.* ¶ 15. A DRB is comprised of twelve voting

members and is responsible for reviewing proposed external releases of information products to prevent unauthorized disclosure of confidential respondent information; overseeing the development of confidentiality protection policies and methodologies; communicating approved policy and approved techniques to the subject matter areas for application in producing data for public dissemination; and assisting in the coordination of disclosure review policy. *Id.* The draft RTI report had not yet been subject to these techniques at the point work on it ceased. *Id.* ¶ 24.

The only component of the 2024 SOGI testing on which the Census Bureau is continuing work after the issuance of the EO is the sexual orientation field test evaluation. *Id.* ¶ 12 n.2. However, no such work has been completed and no report concerning that testing has been finalized. *Id.*

In response to previous FOIA requests, Plaintiff obtained reports on SOGI-related questions on the National Survey of College Graduates (NSCG). *Id.* ¶ 30. Unlike the materials sought in the requests at issue here, the reports that Plaintiff obtained through these prior FOIA requests had been completed and reviewed to ensure that the data was being released in accordance with the restrictions set forth in 13 U.S.C. § 9 and approved for release by the DRB before the time of release. *Id.* ¶¶ 30-31.

## ARGUMENT

### I. Standard of Review

The Freedom of Information Act, 5 U.S.C. § 552, represents a balance struck by Congress "'between the right of the public to know and the need of the Government to keep information in confidence.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. 89-1497, 89th Cong., 2d Sess. 6 (1966)); *New York Times Co. v. DOJ*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012). Thus, while FOIA requires disclosure under certain circumstances, the statute recognizes "that public disclosure is not always in the public interest,"

*CIA v. Sims*, 471 U.S. 159, 166-67 (1985), and mandates that records need not be disclosed if

"the documents fall within [the] enumerated exemptions," *Dep't of the Interior v. Klamath Water*

*Users Protective Ass'n*, 532 U.S. 1, 7 (2001); *see also Martin v. DOJ*, 488 F.3d 446, 453 (D.C.

Cir. 2007) ("Recognizing . . . that the public's right to information was not absolute and that

disclosure of certain information may harm legitimate governmental or private interests,

Congress created several exemptions to FOIA disclosure requirements."); *John Doe Agency*, 493

U.S. at 152 (FOIA exemptions are "intended to have meaningful reach and application").

　　Most FOIA actions are resolved by summary judgment.  *See, e.g.*, *Carney v. DOJ*, 19

F.3d 807, 812 (2d Cir. 1994); *New York Times Co. v. DOJ*, 915 F. Supp. 2d 508, 531 (S.D.N.Y.

2013).  Summary judgment is warranted if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In FOIA cases,

the government meets its burden of demonstrating that it properly withheld documents if it

produces declarations "giving reasonably detailed explanations why any withheld documents fall

within an exemption."  *Carney*, 19 F.3d at 812.  An agency's declarations in support of its

withholdings are "accorded a presumption of good faith."  *Id.*; *see Halpern v. FBI*, 181 F.3d 279,

295 (2d Cir. 1999).  "[A]n agency's justification for invoking a FOIA exemption is sufficient if it

appears logical or plausible."  *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009) (citation and

internal quotation marks omitted).  For the reasons set forth below, the Government's declaration

logically and plausibly establishes that the requested materials are exempt from disclosure under

FOIA exemptions 3 and 5.[1]

---

[1] Defendants have not submitted a Local Rule 56.1 statement, as "the general rule in this Circuit
is that in FOIA actions, agency affidavits alone will support a grant of summary judgment," and
a Local Rule 56.1 statement "would be meaningless."  *Ferguson v. FBI*, No. 89 Civ. 5071 (RPP),
1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995), *aff'd*, 83 F.3d 41 (2d Cir. 1996); *New York*

## II.    The Draft Report and Response Data Are Protected from Disclosure by Exemption 3

### A.    13 U.S.C. §§ 8 and 9 Bar Release of the Draft Report and Response Data

Under exemption 3, matters "specifically exempted from disclosure by [a] statute" that "leave[s] no discretion on the issue" or "refers to particular types of matters to be withheld" need not be disclosed.  5 U.S.C. § 552(b)(3).   Exemption 3 "differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage."  *Wilner v. NSA*, 592 F.3d 60, 72 (2d Cir. 2009) (quotation marks omitted); *accord C.I.A. v. Sims,* 471 U.S. 159, 167 (1985).

The Census Bureau properly asserted exemption 3 with respect to Plaintiff's requests because the draft report and response data are protected from disclosure by 13 U.S.C. §§ 8 and 9. Section 9 provides:

> (a) Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, … may, except as provided in section 8 … of this title … --
>     (1) use the information furnished under the provision of this title for any purpose other than the statistical purposes for which it is supplied; or
>     (2) make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or
>     (3) permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports.

Section 8(b) of Title 13 states that "the Secretary may furnish copies of tabulations and other statistical materials which do not disclose the information reported by, or on behalf of, any particular respondent . . . ."

---

*Times*, 872 F. Supp. 2d at 314 (noting Local Civil Rule 56.1 statement not required in FOIA actions in this Circuit).

Furthermore, Plaintiff does not contest the adequacy of Defendants' search for records. Thus, this brief does not address that issue; instead, it addresses solely Defendants' assertion of exemptions.

In *Baldrige v. Shapiro*, 455 U.S. 345 (1982), the Supreme Court held that Sections 8 and 9 of Title 13 qualify as withholding statutes under FOIA exemption 3. In that case, the Court held that information on Census Bureau address registers—which included the occupancy status of an address, which was obtained through the collection process and not directly from respondents—was "information reported by, or on behalf of individuals" and "part of the raw census data—the information—intended by Congress to be protected." *Id.* at 358.

In concluding that the address registers were protected from disclosure under Title 13, the Court reasoned that:

> The language of each section refers to protection of the "information" or "data" compiled. In addition, the provisions of § 8(b) prohibit disclosure of data provided "by, or on behalf of," any respondent. By protecting data revealed "on behalf of" a respondent, Congress further emphasized that the data itself was to be protected from disclosure. The legislative history also makes clear that Congress was concerned not solely with protecting the identity of individuals.

*Id.* at 356.

The Court found that 13 U.S.C. §§ 8(b) and 9(a) "embody explicit congressional intent to preclude all disclosure of raw census data reported by or on behalf of individuals." *Id.* at 361. The Court also flatly rejected the *Baldrige* plaintiffs' assertions that disclosure could be made because they intended statistical uses of their own, including for purposes of increasing the accuracy of the census data. The Court stated that:

> Under the clear language of the Census Act, it is not relevant that the municipalities seeking the data will use it only for statistical purposes. Section 9(a)(1) permits use of the data only for "the statistical purposes for which it is supplied." There is no indication in the Census Act that the hundreds of municipal governments in the 50 states were intended by Congress to be the "monitors" of the Census Bureau. In addition, limiting use of data only for "statistical" purposes in no way indicates that raw data may be revealed outside the strict requirements of the Census Act that data be handled by census employees sworn to secrecy.

*Id.* at 359.

These same provisions, as explained by the Supreme Court in *Baldridge*, bar disclosure of the requested information at issue here. With respect to the two files identified in Plaintiff's second FOIA request, the self-response file (as its name suggests) contains survey responses, that is, information or data collected from respondents during the test collection. Poehler Decl. ¶ 16. The web paradata file contains the behaviors captured from respondents during their interaction with the test collection instrument. *Id.* Like the occupancy status information considered by the Court in *Baldridge*, this information is obtained as a result of conducting the survey and part of the raw census data protected from disclosure. As such, both files are wholly comprised of raw census data protected from disclosure by 13 U.S.C. §§ 8 and 9. Further, the draft RTI report sought by Plaintiff's first FOIA request contains quotations from respondents along with summary counts, such as the number of respondents who identify as a sexual or gender minority, with the data and quotations from respondents integrated into the draft narrative portions of the report. *Id.* ¶ 12. At the point worked on it ceased, the incomplete draft report had not yet undergone the Census Bureau's disclosure avoidance techniques to ensure that no data protected under Title 13 was released. *Id.* ¶ 24.

### B. Defendants Are Not Required to Further Process the Requested Information, Which Would Still Be Exempt

Plaintiff does not appear to dispute the applicability of 13 U.S.C. §§ 8 and 9, but suggests that the Census Bureau could eliminate the bar on disclosure by applying "confidentiality safeguards" pursuant to its "disclosure avoidance protocols." Compl. ¶¶ 6, 27. To the extent Plaintiff is suggesting that the Census Bureau could respond to his request by converting the data files to "copies of tabulations and other statistical materials which do not disclose the information reported by, or on behalf of, any particular respondent," as permitted by 13 U.S.C. § 8(b), this argument fails. As an initial matter, FOIA does not as a general rule require

9

responding agencies to create new documents or materials in response to a request.  *See*

*Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 152 (1980) ("The [Freedom

of Information] Act does not obligate agencies to create or retain documents; it only obligates

them to provide access to those which it in fact has created and retained.").  Further, Plaintiff is

effectively proposing a wholly new FOIA request, as the FOIA requests at issue did not request

summary statistics or tabulations.  Rather, Plaintiff specifically requested "individual-level" data.

Compl. ¶ 24.  Plaintiff cannot change the substance of his requests in an attempt to move the goal

posts at this stage.  Moreover, even if Plaintiff had requested summary statistics, the Census

Bureau cannot undertake any further processing of any kind in regard to the gender identity

portion of the ACS test, pursuant to Executive Order 14168.

At any rate, Section 8(b) only permits the publication of "tabulations and other statistical

materials."  On its face, the statute thus limits the Census Bureau to publishing certain types of

statistics and statistical products.  In *Seymour v. Barabba*, 559 F.2d 806 (1977), the Supreme

Court interpreted "tabulations" to be "a computation to ascertain the total of a column of figures,

or perhaps counting the names listed in a certain group . . ."  and explained that "the authority of

the Secretary here to disclose is an authority to disclose numerical statistical data which does not

identify any person, corporation, or entity in any way.  Totals, perhaps subtotals and divisions by

categories, but nevertheless merely numerical figures are within this meaning."  *Id.* at 809.  In

short, Section 8(b) contemplates an aggregation, estimate, or other summary data product.  Here,

Plaintiff is not requesting totals or aggregations, but information that has been reported by or that

is "tethered to" respondents to the ACS test instrument.  *Compare Fair Lines American*

*Foundation, Inc., v. Commerce*, 1:21-cv-01361-ABJ, 619 F.Supp.3d 212, 220 (D.D.C. Aug. 2,

2022) (holding that requested aggregate data was not subject to 13 U.S.C. § 8(b) because

"Plaintiff has not asked for 'raw census data' submitted by any individual" but instead "an aggregated count of 'imputed' individuals – just the total number without any further elaboration or identification" (quoting *Baldrige*, 455 U.S. at 358)).

Moreover, even the application of Census's disclosure avoidance techniques to the requested data files would not yield a statistical product as described in *Seymour v. Barabba*. Because these files are wholly comprised of raw census data, disclosure review would not result in a "tabulation" and would not eliminate raw census data. The Census Bureau does not itself submit raw data files for disclosure review to the DRB; the Census Bureau creates tabulations and other statistical products from the data contained in these files that are then submitted for disclosure review to the DRB. Poehler Decl. ¶ 15. To produce a statistical product for which disclosure is permitted by 13 U.S.C. § 8(b), the Census Bureau would thus need to perform statistical analysis of the data and then subject it to disclosure avoidance. Further, contrary to Plaintiff's suggestion, disclosure avoidance analysis is not simply the removal of personally identifiable information, *see* Compl. ¶¶ 7, 17, but instead requires the exercise of additional expertise and discretion in the selection and application of statistical methods. Poehler Decl. ¶ 28. Accordingly, Census Bureau cannot simply sort a pre-existing database or readily reproduce the data in the requested format while meeting its statutory obligations to protect the confidentiality of the data as required by 13 U.S.C. §§ 8(b) and 9. *Id.* The Census Bureau is not required to create a new data file in response to a FOIA request. *See Kissinger*, 445 U.S. at 152. Further, because the entire data file is protected from disclosure, the Census Bureau cannot simply release a portion of the raw data files with certain data fields removed, such as name or address. Poehler Decl. ¶ 28. Accordingly, the Census Bureau cannot, as a matter of law, release the Census Bureau's raw data files to the public.

The Census Bureau also cannot release the draft RTI report as, in its current form, it contains data protected from release by 13 U.S.C. §§ 8 and 9. *Id.* ¶ 14. When the Census Bureau chooses to create a report from raw data, it must ensure that no data protected from release by 13 U.S.C. §§ 8 and 9 is disclosed. *Id.* ¶ 15. To ensure that no such data is disclosed, the Census Bureau currently may decide to remove, modify, or disguise the original data to protect confidentiality. *Id.* At present, these statistical methods include techniques such as suppression, data swapping, or noise injection. *Id.* The Census Bureau, however, has not yet applied any of these techniques to the draft RTI report. *Id.* ¶ 14. Any report produced following the application of these techniques would be a new document, unique from the records subject to the requests that are subject to this litigation, and therefore beyond the scope of this litigation. *See Kissinger*, 445 U.S. at 152. Further, as noted above, the Census Bureau cannot review the draft RTI report and apply disclosure avoidance techniques, as all work on the draft RTI report stopped after the issuance of Executive Order 14168, and the Census Bureau is not permitted to resume additional work on it. Poehler Decl. ¶ 12.

Plaintiff asserts that "[t]he Census Bureau routinely releases the individual-level data ((*i.e.*, microdata) from the official ACS survey on an annual basis as a 1-Year ACS Public Use Microdata Sample ("PUMS") file, where millions of respondents' individual data are made available to the public after being deidentified and processed through the DRB's disclosure avoidance protocols (*e.g.*, data suppression, data coarsening, and/or noise infusion) to ensure no respondent can be reidentified," and can simply undertake the same measures here. Compl. ¶ 27. However, the Census Bureau never releases PUMS files for ACS *testing*, such as the SOGI testing. Poehler Decl. ¶ 27. Further, the PUMS files Plaintiff references are not simply "deidentified" and then released. Rather, these files require reduction of the full ACS sample,

suppression of geographic areas, removal of identifiers, and the application of disclosure

avoidance methodologies prior to publication. *See* https://www.census.gov/content/dam

/Census/library/publications/2021/acs /acs_pums_handbook_2021_ch01.pdf. This work is not

merely sorting or summing, but the creation of a new data file—which is what Plaintiff

effectively asks the Census Bureau to do. Poehler Decl. ¶ 28. FOIA does not require the Census

Bureau to create new data files.

Plaintiff also notes that the Census Bureau previously released records regarding the

National Survey of College Graduates ("NSCG") in response to his prior FOIA requests. Compl.

¶¶ 16, 18. However, the NSCG data that the Census Bureau previously provided in response to

Plaintiff's requests were summary-level statistics of web paradata for each question, such as the

percentage of respondents who exited the interview before completing it. Poehler Decl. ¶ 30.

The previously provided NSCG information did not include any individual response data or

individual paradata, as Plaintiff requested for the ACS. *Id.* Further, while the Census Bureau

provided Plaintiff with NSCG reports on evaluation and testing in response to his FOIA request,

the reports were complete, final deliverables that had gone through disclosure review and did not

contain any information protected by Title 13. *Id.* ¶ 31. The Census Bureau did not provide

incomplete or draft reports comparable to the RTI report in response to these prior requests. *Id.*

Accordingly, the requested materials were properly withheld pursuant to exemption 3.

## III. The Draft Report Is Also Protected from Disclosure by Exemption 5

As further explained in the declaration submitted in support of this summary judgment

motion, Defendants have also properly asserted exemption 5 to withhold the draft report as

subject to deliberative process protection.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or

letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. §

552(b)(5).  "By this language, Congress intended to incorporate into the FOIA all the normal

civil discovery privileges."  *Hopkins v. HUD*, 929 F.2d 81, 84 (2d Cir. 1991).  "Stated simply,

agency documents which would not be obtainable by a private litigant in an action against the

agency under normal discovery rules (*e.g.*, attorney-client, work-product, [the deliberative

process] privilege) are protected from disclosure under Exemption 5."  *Tigue v. DOJ*, 312 F.3d

70, 76 (2d Cir. 2002) (quoting *Grand Cent. P'ship v Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999)).

Exemption 5 incorporates the "'deliberative process' or 'executive' privilege, which protects the

decisionmaking processes of the executive branch in order to safeguard the quality and integrity

of governmental decisions."  *Hopkins*, 929 F.2d at 84; *accord NLRB v. Sears, Roebuck & Co*.,

421 U.S. 132, 150-51 (1975) ("those who expect public dissemination of their remarks may well

temper candor with a concern for appearances . . . to the detriment of the decision making

process" (quotation marks omitted)).

    Documents are predecisional if they were generated before the agency's final decision on

the matter and they are deliberative if they were prepared to help the agency formulate its

position.  *See United States Fish and Wildlife Service v. Sierra Club, Inc.*, 592 U.S. 261 (2021).

Deliberative process protection also protects documents that may have been the last created

version but "die[d] on the vine" before an agency adopted them as a final action or position.  *Id.*

at 272.

    An agency record must satisfy two criteria to qualify for deliberative process protection: it

"must be both 'predecisional' and 'deliberative.'"  *Grand Cent. P'ship*, 166 F.3d at 482 (citations

omitted).  A document is "predecisional" when it is "prepared in order to assist an agency

decisionmaker in arriving at his decision."  *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,

421 U.S. 168, 184 (1975).  The government need not "identify a specific decision" made by the

agency to establish the predecisional nature of a particular record, *Sears*, 421 U.S. at 151 n.18; *accord Tigue*, 312 F.3d at 80.  So long as the document "was prepared to assist [agency] decisionmaking on a specific issue," it is predecisional.  *Id*.

"A document is 'deliberative' when it is actually related to the process by which policies are formulated."  *Grand Cent. P'ship*, 166 F.3d at 482 (quotation marks and alteration omitted).  In determining whether a document is deliberative, courts inquire whether it "formed an important, if not essential, link in [the agency's] consultative process," whether it reflects the opinions of the author rather than the policy of the agency, and whether it might "reflect inaccurately upon or prematurely disclose the views of [the agency]."  *Id.* at 483; *accord Hopkins*, 929 F.2d at 84.  The privilege "focus[es] on documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *Hopkins*, 929 F.2d at 84-85 (quoting *Sears*, 421 U.S. at 150).

The draft RTI report is plainly subject to deliberative process protection.  The draft report was an incomplete document intended to guide the Census Bureau in deciding whether to include SOGI questions on the ACS, and it "die[d] on the vine" before being finalized.  *United States Fish and Wildlife Service*, 592 U.S. at 272; *see* Poehler Decl. ¶ 17.  Census Bureau employees are no longer allowed to work on the report or the underlying data related to gender identity.  *Id.* ¶ 18.  Work on this incomplete, unpublished report was suspended before any final document was created or final decision rendered.  *Id.* ¶ 17.  In its current state, it is an incomplete, unpublished report, where no final version exists.  Additionally, to the extent that the draft report contains factual information that is not protected by Title 13, the choice of what factual information to include in the report is also pre-decisional and deliberative.  *Id.* ¶ 25; *see*

15

*Mapother v. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) ("Given the need for deliberation to inform discretion and for confidentiality to protect deliberation, we have felt bound to shelter factual summaries that were written to assist the making of a discretionary decision").

The report is predecisional. *Id.* ¶ 19. Portions of the draft report concerning the gender identity questions reflect consideration of questions that the Census Bureau no longer plans to adopt. *Id.* Portions of the draft report concerning the sexual orientation questions are predicisional because they do not reflect the Census Bureau's final analysis of the questions. *Id.* The reports are also deliberative, as they were meant to guide the Census Bureau's consideration of potential sexual orientation and gender identity questions, but do not reflect the Census Bureau's final decisions or recommendations. *Id.* ¶¶ 17-19.

Releasing the draft analysis and recommendations would foreseeably harm an interest protected by exemption 5. *See Seife v. FDA*, 43 F.4th 231, 234 (2d Cir. 2022). Release could result in public confusion, particularly as the Administration changed priorities after RTI began drafting the report but before the report was completed and before the Census Bureau made any final decisions or recommendations. *Id.* ¶ 19. It would also have a chilling effect on agency employees and contractors' willingness to share candid or controversial opinions and recommendations regarding future Census Bureau survey approaches and data collection. *Id.* ¶ 20. The Census Bureau and its employees are likely to suffer an injury to the decision-making process as ideas that did not bear fruit and incomplete data analysis will be subject to scrutiny even where no final decision occurred. *Id.* These are the precise harms deliberative process protection is intended to avoid. *See Klamath Water Users Prot. Ass'n*, 532 U.S. at 8-9 ("The deliberative process privilege rests on the obvious realization that officials will not communicate

candidly among themselves if each remark is a potential item of discovery and front page news."); *NRDC v. EPA*, 954 F.3d 150, 158 (2d Cir. 2020) ("The key question we keep in mind when assessing the application of the deliberative process privilege to an agency record is whether disclosure would tend to diminish candor within an agency." (internal quotation marks omitted)); *Grand Cent. P'ship*, 166 F.3d at 481 (the deliberative process privilege protects "against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action" (citation omitted)).

Accordingly, the RTI report was properly withheld pursuant to exemption 5, in addition to exemption 3.

## IV.    There Is No Segregable Information That Could Be Released

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  An agency is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material."  *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013) (quotation marks omitted).

Here, no portion of the records could be segregated for release because they are entirely exempt from disclosure.  The requested self-response and paradata files consist entirely of raw data exempt from disclosure under Title 13.  Poehler Decl. ¶ 26.  The requested draft report also contains data, protected from release by Title 13, that is interspersed throughout the report, including in the narrative portions.  *Id.* ¶ 24.  Additionally, no portion of the report can be released because, before a finalized version of the report could be released, if one existed, it would have to be subjected to review by the DRB to ensure that no protected data is improperly

17

released.  *Id.*  Finally, no portion of the draft report can be released because the entire report is protected by deliberative process privilege.  *Id.* ¶ 25.

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment should be granted.

Dated: January 12, 2026
New York, New York

Respectfully submitted,

JAY CLAYTON
United States Attorney
Southern District of New York

By:    */s/ Rachael Doud*
RACHAEL DOUD
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2699
E-mail: rachael.doud@usdoj.gov

18