UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JONATHAN B. FREEMAN, PH.D.,

*Plaintiff*,

– *versus* –

Civil Action No. 25-cv-7834-LJL

U.S. CENSUS BUREAU, et al.,

*Defendants*.

**PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Daniel A. McGrath
Amy C. Vickery[†]
Anisha Hindocha*
Robin Thurston*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 812-7824
dmcgrath@democracyforward.org

*Counsel for Plaintiff*

[†] *S.D.N.Y. pro hac vice forthcoming*
*\* Admitted pro hac vice*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 2

   I.  The Census Bureau's 2024 ACS Sexual Orientation and Gender Identity Test Was a Landmark Data Collection. ..................................................................................... 2

   II.  The Trump Administration Forbids the Bureau from Releasing the Results. ...................... 4

   III. The Census Bureau Has Long Released Microdata and Cognitive Testing Reports ............ 5

   IV. The Census Bureau Withholds in Full Records Responsive to Plaintiff's Cognitive Testing FOIA Request. ...................................................................................................... 6

   V.  The Census Bureau Withholds in Full Records Responsive to Plaintiff's Field Testing Data FOIA Request. ...................................................................................................... 7

LEGAL STANDARDS ........................................................................................................ 7

ARGUMENT ....................................................................................................................... 8

   I.  The Census Bureau Has Not Met Its Burden to Withhold the Cognitive Testing Report in Full. ........................................................................................................................... 8

     A.  The Census Bureau Has Undertaken No Reasonable Effort to Segregate Any Confidential Title 13 Information from the Cognitive Testing Report. ........................... 9

     B.  The Census Bureau Has Not Met Its Burden for Withholding the Cognitive Testing Report in Full Under Exemption 5 .......................................................................... 12

       1.  The Cognitive Testing Report is Not the Type of Document Protected by the Deliberative Process Privilege. .......................................................................... 13

       2.  At a Minimum the Bureau Must Segregate and Release the Factual Information Within the Cognitive Testing Report. ................................................................. 15

       3.  Even if the Report Were Subject to the Deliberative Process Privilege, the Bureau Has Not Shown There is a Foreseeable Harm in Disclosure. ................................... 17

   II.  The Census Bureau Has Not Met Its Burden to Withhold the ACS SOGI Field Testing Data in Full. ............................................................................................................... 19

     A.  The Requested Data is "Statistical Material" That is Releasable under Title 13 When Confidentiality is Maintained. .......................................................................... 19

     B.  At Least Some Portions of the Data Files Are Reasonably Segregable. ......................... 24

       1.  Basic Redaction of Information Would Allow for the Disclosure of at Least Some Information. ...................................................................................................... 25

2.   Application of More Advanced Disclosure Avoidance Techniques to Release
Substantial Data is Feasible and Required under FOIA. ........................................... 26

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

**CASES**                                                                 Page(s)

*ACLU v. DOD,*
    543 F.3d 59 (2d Cir. 2008)........................................................................... 19

*ACLU v. USCIS,*
    58 F.4th 643 (2d Cir. 2023) ............................................................ 7, 8, 9, 27, 28

*Adelante Alabama Worker Ctr. v. DHS,*
    376 F. Supp. 3d 345 (S.D.N.Y. 2019).................................................................. 8

*Austin Sanctuary Network v. USCIS, No. 20-CV-01686 (LJL),*
    2022 WL 4356732 (S.D.N.Y. Sept. 19, 2022).......................................... 10, 26

*Baldrige v. Shapiro,*
    455 U.S. 345 (1982)........................................................ 19, 20, 22, 23, 24, 25

*Baser v. Veterans Affairs,*
    No. 13-CV-12591, 2014 WL 4897290 (E.D. Mich. Sept. 30, 2014).............................. 29

*Bob Jones Univ. v. United States,*
    461 U.S. 574 (1983)................................................................................ 22

*Borowski v. CBP,*
    733 F. Supp. 3d 171 (W.D.N.Y. 2024).................................................... 10, 15

*Brown & Williamson Tobacco Corp. v. FDA,*
    153 F.3d 155 (4th Cir. 1998) ...................................................................... 22

*Carney v. DOJ,*
    19 F.3d 807 (2d Cir. 1994)......................................................................... 8

*Evans v. Fed. Bureau of Prisons,*
    951 F.3d 578 (D.C. Cir. 2020)................................................................... 29

*Gallant v. NLRB,*
    26 F.3d 168 (D.C. Cir. 1994)..................................................................... 8

*Grand Cent. P'ship, Inc. v. Cuomo,*
    166 F.3d 473 (2d Cir. 1999).............................................................. 8, 11, 13

iii

*Halpern v. FBI*,
    181 F.3d 279 (2d Cir. 1999)............................................................................................ 7

*Johnson v. Exec. Office for U.S. Attorneys*,
    310 F.3d 771 (D.C. Cir. 2002) ..................................................................................... 10

*Mapother v. Department of Justice*,
    3 F.3d 1533 (D.C. Cir. 1993) ....................................................................................... 16

*Marks v. CIA*,
    590 F.2d 997 (D.C. Cir. 1978)..................................................................................... 10

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977)....................................................................................... 8

*N.Y. Times Co. v. Dep't of Educ.*,
    658 F. Supp. 3d 171 (S.D.N.Y. 2023).............................................................. 13, 14, 15

*NRDC v. EPA, No. 17-CV-5928 (JMF)*,
    2019 WL 3338266 (S.D.N.Y. July 25, 2019) ......................................................... 17, 18

*NRDC v. EPA*,
    954 F.3d 150 (2d Cir. 2020)...................................................................................... 15, 18

*Petroleum Info. Corp. v. U.S. Dep't of Interior*,
    976 F.2d 1429 (D.C. Cir. 1992)..................................................................................... 8

*Phillips v. U.S. Bureau of Census, No. 22-CV-9304 (JSR)*,
    2024 WL 230854 (S.D.N.Y. Jan. 22, 2024) ....................................................... 11, 24, 27

*Playboy Enters., Inc. v. DOJ*,
    677 F.2d 931, 936 (D.C. Cir. 1982)............................................................................. 16

*Rosenberg v. DOD*,
    342 F. Supp. 3d 62 (D.D.C. 2018)............................................................................... 17

*Seife v. FDA*,
    43 F.4th 231 (2d Cir. 2022) ................................................................................ 17, 18, 19

*Seymour v. Barabba*,
    559 F.2d 806 (D.C. Cir. 1977)............................................................................ 20, 22, 23

iv

*Stahl v. DOJ*, No. 19-CV-4142 (BMC),
    2021 WL 1163154 (E.D.N.Y. Mar. 26, 2021) ................................................................ 29

*Wilner v. NSA*,
    592 F.3d 60 (2d Cir. 2009) ........................................................................................ 8, 12

*Wolfe v. Dep't of Health & Hum. Servs.*,
    839 F.2d 768 (D.C. Cir. 1988) ........................................................................................ 16

**FEDERAL STATUTES**

5 U.S.C.
    § 552(a)(8)(A) ................................................................................................................ 17
    § 552(a)(8)(A)(ii) ..................................................................................................... 8, 10
    § 552(b) ................................................................................................................... 24, 28

13 U.S.C.
    § 8 ....................................................................................................... 1, 5, 7, 9, 12
    § 8(b) ...................................................................................................................... 21, 24
    § 9 ..................................................................................................... 1, 5, 6, 7, 9, 12
    § 9(a) ............................................................................................................................ 24

**OTHER AUTHORITIES**

Darryl T. Cohen, Population Distribution Inside and Outside Incorporated Places:
    2000 (U.S. Census Bureau, Working Paper No. POP-WP082, Nov. 2007),
    https://perma.cc/EM2G-YZ3D ........................................................................................ 6

Hansi Lo Wang, Census Bureau stopped work on data for protecting trans rights,
    former director says, NPR (updated Feb. 21, 2025), https://perma.cc/2Z74-
    2HG3 ................................................................................................................................ 2

Jennifer Pace et al., Cognitive Pretesting of 2025 American Housing Survey Module
    (U.S. Census Bureau, Dec. 2024), https://perma.cc/XRM3-NQZM ........................... 6, 14

Karen Stein et al., American Community Survey Respondent Burden Testing:
    Cognitive Testing of American Community Survey Recipients During a
    Decennial Year (U.S. Census Bureau, Working Paper No. ACS24-RER-02,
    Jan. 21, 2021), https://perma.cc/X4HE-5BVB ................................................................ 3

League of Women Voters of the United States, *LWVUS Joins Comments Supporting Census Bureau Testing Sexual Orientation and Gender Identity Measures on the American Community Survey (ACS)* (May 30, 2024), https://perma.cc/SN6J-UGDZ .............................................................................. 2

Letter from Kristin Clarke, Assistant Att'y Gen., U.S. Dep't of Justice, to Albert E. Fontenot, Jr. & Victoria Velkoff, U.S. Census Bureau (Dec 9, 2022), https://perma.cc/P9CM-A4HX ............................................................................... 3

Marcus Berger et al., Cognitive and Usability Testing Results of the 2023 Census Test Instrument in English and Spanish (U.S. Census Bureau, Working Paper No. RSM 2025-10, July 2025), https://perma.cc/RH7F-FKBY ............................ 6, 14, 15

Mary H. Mulry et al., Using Administrative Records for Enumeration in the 2020 U.S. Census (U.S. Census Bureau, Working Paper No. RRS2025-02, Apr. 17, 2025) https://perma.cc/4PXY-E3TP .................................................................... 6

Peter Gottschalk & Martha Stinson, The Impact of a Mother's Decision to Work on the Development of a Child's Human Capital (U.S. Census Bureau, Working Paper No. SIPP-WP-259, Nov. 2012), https://perma.cc/CX8K-E85V .............................. 6

Rachel Stenger et al., Cognitive Testing for an Internet Self-Response Mode of the Current Population Survey: Findings and Recommendations (U.S. Census Bureau, Mar. 2025), https://perma.cc/JEL4-NCZ7 ...................................................... 6, 14

Roberto R. Ramirez, Analysis of Multiple Origin Reporting to the Hispanic Origin Question in Census 2000 (U.S. Census Bureau, Working Paper No. POP-WP077, Nov. 2005), https://perma.cc/P44U-TKKH ........................................... 6

SOGI Questions on the American Community Survey), https://perma.cc/P9CM-A4HX .............................................................................................................................. 3

Stephanie Galvin, U.S. Census Bureau, Testing and Implementing Sexual Orientation and Gender Identity (SOGI) Questions in the American Community Survey (ACS) at 17-19 (Presentation at the National Advisory Committee Fall Meeting, Nov. 7–8, 2024), https://perma.cc/B989-5WTW ............................................ 3, 9

Submission to the Office of Management and Budget (OMB) for Review and Approval; Comment Request; American Community Survey Methods Panel: 2024 Sexual Orientation and Gender Identity Test, 88 Fed. Reg. 64404 (Sept. 19, 2023), available at https://perma.cc/LP3J-9Y4H .......................................... 3

Technology Committee of the Chief FOIA Officers Council Video Redaction
    Working Group, *Technology Committee - Best Practices for Video Redaction
    Report*, FOIA (July 29, 2021), https://perma.cc/2KGY-UXX7...................................... 29

U.S. Census Bureau, *2024 ACS Code Lists* (Excel spreadsheet),
    https://www2.census.gov/programs-
    surveys/acs/tech_docs/code_lists/2024_ACS_Code_Lists.xlsx .................................... 20

U.S. Census Bureau, *2024 American Community Survey 1-Year Public Use
    Microdata Sample (PUMS) Data* (last updated Dec. 4, 2025),
    https://perma.cc/P5VM-N87E ...................................................................................... 5

U.S. Census Bureau, Am. Cmty. Surv. Rsch. and Evaluation Program, ACS Research
    & Evaluation Analysis Plan (REAP) Sexual Orientation and Gender Identity
    Test (Apr. 17, 2024), https://perma.cc/G4NM-7DRD ...................................................... 4

U.S. Census Bureau, *American Community Survey and Puerto Rico Community
    Survey Design and Methodology*, at 145 (Dec. 2024), https://perma.cc/S7KQ-
    CATY ............................................................................................................................ 20

U.S. Census Bureau, *American Community Survey Resources for Researchers*,
    https://perma.cc/Q6UA-TBZK ...................................................................................... 3

U.S. Census Bureau, *American Community Survey Resources for State and Local
    Governments* (last updated Feb. 3, 2025) https://perma.cc/C79S-HB8M ...................... 3

U.S. Census Bureau, *Data Release Rules*, (last revised Nov. 1, 2024)
    https://perma.cc/ZZ3N-AMHA ...................................................................................... 5

U.S. Census Bureau, *Frequently Requested Records – 2020 CBAMS Survey Data File*
    (last revised Aug. 1, 2025), https://perma.cc/W5AQ-MXED ............................................ 5

U.S. Census Bureau, *Public Use Microdata Sample (PUMS)*, https://perma.cc/F8H4-
    Y24P ............................................................................................................................ 5

U.S. Census Bureau, *Steven Ruggles, Census Data Processing, Part 2,* U.S. Census
    Bureau (Aug. 2, 2012), https://perma.cc/4NSQ-9NZ3 .................................................... 21

U.S. Census Bureau, *Supporting Statement A: American Community Survey Methods
    Panel: 2024 Sexual Orientation and Gender Identity Test*, OMB Control No.
    0607-0936 (2024), https://perma.cc/VW3R-7WGF ...................................................... 3, 4

vii

U.S. Census Bureau, Understanding and Using the American Community Survey
    Public Use Microdata Sample Files: What Data Users Need to Know 2, 3–4
    (2021), https://perma.cc/T9SK-Q9JE ............................................................ 5, 21, 22, 23

U.S. Census Bureau, What We Do (last revised Mar. 25, 2024),
    https://perma.cc/7439-B6UN ............................................................................................. 1

Y. Patrick Hsieh, Katherine Blackburn & Patty LeBaron, Research on Public Opinion
    of Administrative Records: Cognitive Testing Report (U.S. Census Bureau,
    Working Paper No. RSM 2023-12, Dec. 2023), https://perma.cc/WDZ5-
    CTAL ....................................................................................................................... 6, 14

## INTRODUCTION

When the Census Bureau invests $10 million in a data collection, as it has here, it does not throw that data in the trash. To the contrary, the Bureau collects data expressly so that information can be shared with the public to fulfill its mission as "the nation's leading provider" of data about the nation's people and economy.[1] But this case presents a unique circumstance. After years of advocacy led the Bureau to expend millions of dollars to collect data on sexual orientation and gender identity ("SOGI") from half a million households, the Administration has ordered the Bureau to drop its work and leave this data permanently inaccessible to the public.

Faced with this unprecedented secrecy and waste, Plaintiff requested the existing Cognitive Testing Report ("the Report") and deidentified data files from the Bureau's SOGI collection under the Freedom of Information Act ("FOIA"). The Bureau has withheld every word and figure of these files in full, with no attempt to segregate and release any of the information in the records. The Bureau has not met its burden for demonstrating that none of this information can be released after undertaking required segregation efforts.

*First*, the Bureau does not explain—nor could it—why confidential information protected under 13 U.S.C. §§ 8 and 9, cannot be redacted from the Report in order to release the rest of the record. Instead, the Bureau has only now, in litigation, also asserted that the report is wholly subject to FOIA Exemption 5 through the deliberative process privilege. But the Report is a type of record that the Bureau regularly releases publicly to disseminate research and foster discussion without ascribing views to the Bureau. Given this context, the Bureau's conclusory assertions that the report is deliberative in nature and that its release would chill candor cannot support its blanket

---

[1] U.S. Census Bureau, *What We Do* (last revised Mar. 25, 2024), https://perma.cc/7439-B6UN (last visited Feb 9, 2026).

withholding. Even if the document were deliberative, the Bureau cannot justify withholding every shred of factual information in it.

*Second*, the Bureau asserts that the deidentified SOGI data files are categorically exempt from disclosure under Title 13 because they contain "raw" data at an individual level. But this blanket assertion does not fit with the agency's longstanding practice of disclosing microdata that reflects responses at the individual level. And the agency does not explain why it cannot release *any* of the information in those files—indeed, the agency will not even release the names of the fields of data collected. Moreover, the agency does not show why it cannot apply reasonable confidentiality techniques to modify the files into a form that protects confidentiality.

Plaintiff asks this Court to grant summary judgment in his favor and require the Bureau to segregate and release non-exempt information from these records of national importance.

## FACTUAL BACKGROUND

### I.  The Census Bureau's 2024 ACS Sexual Orientation and Gender Identity Test Was a Landmark Data Collection.

In August 2024, the Census Bureau began a landmark collection of SOGI data costing $10 million as part of the American Community Survey ("ACS") known as the "2024 ACS SOGI Test."[2] This decision followed sustained requests from federal agencies, researchers, and advocates that the Bureau collect SOGI data to provide critical demographic information necessary to understand the U.S. population and support policy through the foundational source for such

---

[2] Hansi Lo Wang, *Census Bureau stopped work on data for protecting trans rights, former director says,* NPR (updated Feb. 21, 2025), https://perma.cc/2Z74-2HG3; League of Women Voters of the United States, *LWVUS Joins Comments Supporting Census Bureau Testing Sexual Orientation and Gender Identity Measures on the American Community Survey (ACS)* (May 30, 2024), https://perma.cc/SN6J-UGDZ (last visited Feb. 9, 2026).

data: the ACS.[3] This test collection included three main questions: sex assigned at birth, current

gender identity, and sexual orientation (collectively referred to as "SOGI questions").[4]

The SOGI test consisted of two components: Cognitive Testing and Field Testing. The

Cognitive Testing component involved structured, in-depth interviews conducted with a diverse

set of respondents.[5] These interviews examined how respondents understood and interpreted

proposed SOGI questions, whether translations functioned as intended across English and Spanish,

and whether respondents could accurately report SOGI information for other members of their

households.[6] The Bureau engaged the contractor RTI International to conduct the Cognitive

Testing and create a report on its efforts. Declaration of Elizabeth Poehler ("Poehler Decl.") ¶ 10.

The Bureau publicly discussed this engagement.[7] The Bureau often releases cognitive testing

reports generated by contractors that describe the scope and methodology of testing, as well as

observations, issues encountered, and recommendations.[8]

The Field Testing component of the test involved administering SOGI questions to a large

---

[3] *See e.g.* Letter from Kristin Clarke, Assistant Att'y Gen., U.S. Dep't of Justice, to Albert E. Fontenot, Jr. & Victoria Velkoff, U.S. Census Bureau (Dec 9, 2022) (requesting SOGI Questions on the American Community Survey), https://perma.cc/P9CM-A4HX; U.S. Census Bureau, Supporting Statement A: American Community Survey Methods Panel: 2024 Sexual Orientation and Gender Identity Test, OMB Control No. 0607-0936 (2024),
https://perma.cc/VW3R-7WGF; U.S. Census Bureau, *American Community Survey Resources for State and Local Governments* (last updated Feb. 3, 2025) https://perma.cc/C79S-HB8M; U.S. Census Bureau, *American Community Survey Resources for Researchers*, https://perma.cc/Q6UA-TBZK (last visited Jan. 21, 2026).
[4] *See* Agency Information Collection Activities; Submission to the Office of Management and Budget (OMB) for Review and Approval; Comment Request; American Community Survey Methods Panel: 2024 Sexual Orientation and Gender Identity Test, 88 Fed. Reg. 64404 (Sept. 19, 2023), available at https://perma.cc/LP3J-9Y4H; Declaration of Elizabeth Poehler ¶ 9.
[5] U.S. Census Bureau, Supporting Statement A, *supra* note 3, at 8.
[6] Stephanie Galvin, U.S. Census Bureau, *Testing and Implementing Sexual Orientation and Gender Identity (SOGI) Questions in the American Community Survey (ACS)* at 17–19 (Presentation at the National Advisory Committee Fall Meeting, Nov. 7-8, 2024), https://perma.cc/B989-5WTW.
[7] *Id.* at 17.
[8] *See e.g.*, Karen Stein et al., American Community Survey Respondent Burden Testing: Cognitive Testing of American Community Survey Recipients During a Decennial Year (U.S. Census Bureau, Working Paper No. ACS24-RER-02, Jan. 21, 2021), https://perma.cc/X4HE-5BVB.

nationally representative sample of approximately 480,000 housing units.[9] This component mirrored normal ACS data collection of all existing questions while testing alternative SOGI question formulations under real world conditions. The field test collected two principal categories of information: (1) data reflecting respondents' answers to SOGI and other survey questions, and (2) web paradata (data about respondents' engagement) capturing how respondents interacted with the survey, including timing, keystrokes, navigation behavior, and use of help features.[10]

## II.    The Trump Administration Forbids the Bureau from Releasing the Results.

After undertaking this $10 million effort to collect SOGI data from hundreds of thousands of households,[11] the Census Bureau now indicates that data will never be released. The Census Bureau declares that, due to the January 20, 2025 "Executive Order (EO) 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," this data and the associated Cognitive Testing Report will not be released because Census Bureau employees are purportedly prohibited from working on the RTI report or the collected gender identity data. Poehler Decl. ¶ 23. The Census Bureau had previously publicly indicated that it would "release at least one report discussing the aggregate results of the 2024 ACS SOGI Test."[12] Consistent with this representation, the Census Bureau's contractor, RTI International, created a report describing the results of the Cognitive Testing. Poehler Decl. ¶ 10.

Despite prior representations that results would be released, the Census Bureau has not published either the Cognitive Testing report or any findings from the Field Testing. Nor has the Census Bureau released deidentified microdata or paradata from the Field Testing component.

---

[9] U.S. Census Bureau, Am. Cmty. Surv. Rsch. and Evaluation Program, ACS Research & Evaluation Analysis Plan (REAP) Sexual Orientation and Gender Identity Test (Apr. 17, 2024), https://perma.cc/G4NM-7DRD.
[10] *Id.*
[11] Wang, *Census Bureau stopped work*, *supra* note 2; League of Women Voters, *LWVUS Joins Comments*, *supra* note 2.
[12] U.S. Census Bureau, Supporting Statement A, *supra* note 3.

### III. The Census Bureau Has Long Released Microdata and Cognitive Testing Reports.

The Census Bureau's release of statistical information is governed by 13 U.S.C. §§ 8 and 9. Broadly, § 9 protects confidentiality by restricting disclosure of personally identifiable information; while § 8 expressly authorizes the release of statistical data subject to confidentiality safeguards. Consistent with these provisions, the Census Bureau has long released microdata reflecting individual respondents' responses following the application of disclosure avoidance measures to protect confidentiality. These measures include suppression, which is essentially deletion of some data, such as directly identifying information like names and addresses.[13]

Most prominently, the Census Bureau annually releases ACS Public Use Microdata Sample ("PUMS") files containing individual-level microdata for hundreds of thousands of respondents. The PUMS files for persons "contain[] individual responses to the full range of topics on the ACS (without individually identifiable information)."[14] For example, this data includes respondents' data for specific questions about the number of bathrooms in their home and whether they have broadband computer access.[15] The Bureau has also released microdata in its public FOIA library from the Census Barriers, Attitudes, and Motivators Study ("CBAMS"), a nationwide Bureau survey to assess attitudes and behaviors related to census participation.[16]

The Census Bureau also consistently releases full cognitive testing reports drafted by contractors, including RTI, with the explicit intention of disseminating research and informing

---

[13] U.S. Census Bureau, *Protecting Confidentiality* (last revised Dec. 16, 2024),  https://perma.cc/SYE4-N75Q; U.S. Census Bureau, *Public Use Microdata Sample (PUMS)* (last revised Dec. 15, 2025), https://perma.cc/F8H4-Y24P; U.S. Census Bureau, *Data Release Rules* (last revised Nov. 1, 2024), https://perma.cc/ZZ3N-AMHA.

[14] U.S. Census Bureau, Understanding and Using the American Community Survey Public Use Microdata Sample Files: What Data Users Need to Know 2, 3–4 (2021), https://perma.cc/T9SK-Q9JE.

[15] *See* U.S. Census Bureau, *2024 American Community Survey 1-Year Public Use Microdata Sample (PUMS) Data* (last updated Dec. 4, 2025), https://perma.cc/P5VM-N87E.

[16] U.S. Census Bureau, *Frequently Requested Records – 2020 CBAMS Survey Data File* (last revised Aug. 1, 2025), https://perma.cc/W5AQ-MXED.

public discussion, and with the understanding that the reports do not represent the agency's views. The Bureau's cognitive testing reports regularly contain the statement below (or similar):

> This report is released to inform interested parties of research and to encourage discussion. The views expressed are those of the authors and not those of the U.S. Census Bureau.[17]

## IV. The Census Bureau Withholds in Full Records Responsive to Plaintiff's Cognitive Testing FOIA Request.

On May 30, 2025, Plaintiff submitted a FOIA request seeking all non-data narrative content from the ACS SOGI Cognitive Testing Report produced by RTI International ("the Report").[18] The request expressly excluded data tables and other elements potentially protected by Title 13 and requested segregation and release of all non-exempt narrative material.

On June 18, 2025, the Census Bureau denied the request in full, citing 13 U.S.C. § 9 under FOIA Exemption 3, without describing any effort to segregate non-exempt content. The Census Bureau did not assert Exemption 5 or reference the deliberative process privilege in that response. Plaintiff timely appealed that determination on June 19, 2025.[19]

For the first time in litigation, the Census Bureau has now also asserted that the report is

---

[17] See, e.g., Y. Patrick Hsieh et al., Research on Public Opinion of Administrative Records: Cognitive Testing Report (U.S. Census Bureau, Working Paper No. RSM 2023-12, Dec. 2023), https://perma.cc/WDZ5-CTAL; Marcus Berger et al., Cognitive and Usability Testing Results of the 2023 Census Test Instrument in English and Spanish (U.S. Census Bureau, Working Paper No. RSM 2025-10, July 2025), https://perma.cc/RH7F-FKBY; Rachel Stenger et al., Cognitive Testing for an Internet Self-Response Mode of the Current Population Survey: Findings and Recommendations (U.S. Census Bureau, Mar. 2025), https://perma.cc/JEL4-NCZ7; Jennifer Pace et al., Cognitive Pretesting of 2025 American Housing Survey Module (U.S. Census Bureau, Dec. 2024), https://perma.cc/XRM3-NQZM; Peter Gottschalk & Martha Stinson, The Impact of a Mother's Decision to Work on the Development of a Child's Human Capital (U.S. Census Bureau, Working Paper No. SIPP-WP-259, Nov. 2012), https://perma.cc/CX8K-E85V; Darryl T. Cohen, Population Distribution Inside and Outside Incorporated Places: 2000 (U.S. Census Bureau, Working Paper No. POP-WP082, Nov. 2007), https://perma.cc/EM2G-YZ3D; Roberto R. Ramirez, Analysis of Multiple Origin Reporting to the Hispanic Origin Question in Census 2000 (U.S. Census Bureau, Working Paper No. POP-WP077, Nov. 2005), https://perma.cc/P44U-TKKH; Mary H. Mulry et al., Using Administrative Records for Enumeration in the 2020 U.S. Census (U.S. Census Bureau, Working Paper No. RRS2025-02, Apr. 17, 2025) https://perma.cc/4PXY-E3TP.

[18] Pl.'s Ex. 5, May 30, 2025 request for the Report, ECF No. 1-5.

[19] Pl.'s Ex. 7, Appeal of the Census Bureau's response to his May 30, 2025 request for the Report, ECF No. 1-7.

exempt in its entirety under Exemption 5 because it is purportedly subject to the deliberative process privilege and foreseeable harm would result if *any* portion of the report were disclosed. Poehler Decl. ¶¶ 17-21. The Census Bureau asserts that none of the report—even factual information—can be segregated and released. *Id.* at ¶ 25.

### V.    The Census Bureau Withholds in Full Records Responsive to Plaintiff's Field Testing Data FOIA Request.

On July 21, 2025, Plaintiff submitted a second FOIA request seeking two deidentified data files generated as part of the ACS SOGI Field Testing: (1) self-response file and (2) web paradata file.[20] On August 1, 2025, the Bureau denied the request in full citing 13 U.S.C. § 9.[21] Plaintiff appealed on August 4.[22] The Bureau did not respond and Plaintiff initiated this litigation.

In litigation, the Bureau has also now asserted that these data records are exempt under 13 U.S.C. § 8. Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") at 7. The Bureau declares that it withheld the files in full because they are "wholly comprised of raw census data that are protected from disclosure," Poehler Decl. ¶ 16, and "nothing is segregable because the entire files are exempt" "and/or [would] require the creation of a wholly new data file," *id.* ¶ 26. The Bureau asserts that microdata released as PUMS files is distinct because it does not stem from "*testing* efforts." *Id*. ¶ 27.

### LEGAL STANDARDS

FOIA's "most basic premise [is] a policy strongly favoring public disclosure of information in the possession of federal agencies." *ACLU v. USCIS*, 58 F.4th 643, 651 (2d Cir. 2023) (quoting *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999)). Consequently, the agency "has the burden of

---

[20] Pl.'s Ex. 8, July 21, 2025 request for the ACS SOGI Test (Field Testing) Data, ECF No. 1-8.
[21] Pl.'s Ex. 9, Bureau's response to July 21, 2025 request for the ACS SOGI Test (Field Testing) Data, ECF No. 1-9.
[22] Pl.'s Ex. 10, Appeal of the Census Bureau's response to his July 21, 2025 request for the ACS SOGI Test (Field Testing) Data, ECF No. 1-10.

showing . . . that any withheld documents fall within an exemption to the FOIA." *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994). An agency fails to carry its burden when its justification for withholding is not plausible or logical. *See Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009).

Agencies, moreover, must disclose "non-exempt portions [of records] unless they are inextricably intertwined with exempt portions." *ACLU*, 58 F.4th at 653–54 (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)). The FOIA Improvement Act of 2016 "specifically requires agencies to 'consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible' and to 'take reasonable steps necessary to segregate and release nonexempt information.'" *Id*. at 654 (quoting 5 U.S.C. § 552(a)(8)(A)(ii)).

An agency affidavit is insufficient to support summary judgment in a FOIA case when it lacks "*reasonable specificity* of detail," relies "merely [on] conclusory statements," or is "called into question by contradictory evidence in the record." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quoting *Gallant v. NLRB,* 26 F.3d 168, 171 (D.C. Cir. 1994). "[S]ummary judgment in favor of the FOIA plaintiff' is appropriate '[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption," *Adelante Alabama Worker Ctr. v. DHS*, 376 F. Supp. 3d 345, 354 (S.D.N.Y. 2019) (quoting *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992)).

## ARGUMENT

### I.    The Census Bureau Has Not Met Its Burden to Withhold the Cognitive Testing Report in Full.

Plaintiff sought the narrative portions of the RTI Cognitive Testing Report concerning the methodology and factual observations of the Census Bureau's contractor in testing through

interviews the way people answered questions about SOGI.[23] Despite the Bureau's obligation to segregate non-exempt information, *ACLU*, 58 F.4th at 653–54, it has not released a scintilla of information within the Report. The Bureau's extreme position asserts that releasing so much as a section heading concerning methodology would disclose confidential information protected by 13 U.S.C. §§ 8, 9 and deliberative information protected by Exemption 5. This position cannot survive scrutiny, as the agency has failed to take any reasonable steps to segregate and disclose any non-exempt information from the Report.

The Census Bureau only now, in litigation, tacks on an argument that Exemption 5 also shields the Report from disclosure because it is covered in its entirety by the deliberative process privilege. Defs.' Mem. at 13. To support this full withholding, the Bureau asserts that the report is a "draft." But the Report contains substantial factual information and is of a type that the Bureau regularly prepares for public awareness, not attribution of agency views or sole internal deliberation. Given this context, the Bureau's conclusory assertions cannot sustain withholding of every shred of factual information in the record as covered by that privilege or explain why a document of this nature is deliberative in character. Nor can the generalized assertion that disclosure of any part of the report will foreseeably chill employees' candor support full withholding of the Report when the agency regularly releases such reports *for* public discussion.

### A. The Census Bureau Has Undertaken No Reasonable Effort to Segregate Any Confidential Title 13 Information from the Cognitive Testing Report.

Plaintiff sought the narrative portions of the RTI Cognitive Testing Report to understand the methodology and observations RTI gained in testing questions about SOGI. The FOIA requires the Bureau to "take reasonable steps necessary to segregate and release nonexempt information."

---

[23] Galvin, Testing and Implementing Sexual Orientation and Gender Identity, *supra* note 6.

5 U.S.C. § 552(a)(8)(A)(ii)).[24] But the Bureau maintains that producing *any* of the report would require the application of unspecified "disclosure avoidance techniques" that would necessarily require the creation of a "new, unique document." Poehler Decl. ¶ 24. The Bureau attests that the protected information includes "data and quotations from respondents, as well as text describing those materials." *Id.*

But nowhere does the Bureau explain how redaction of such quotations and data would not be possible. The Bureau simply has not met the requirement that "the agency must provide a 'detailed justification' for its [documents'] non-segregability." *Austin Sanctuary Network v. USCIS*, No. 20-CV-01686 (LJL), 2022 WL 4356732, at *23 (S.D.N.Y. Sept. 19, 2022) (quoting *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002)).

The Bureau has not, as other agencies regularly do, undertaken a line-by-line analysis to determine what information is exempt and subject to redactions and what is disclosable. Indeed, even where agencies *have* applied a "line-by-line" segregability analysis to redact exempt sentences within responsive records, courts have expressed skepticism of the adequacy of the agencies' segregability efforts. *See, e.g.*, *id.* (ordering *in camera* review even where agency had conducted a "line-by-line review of each document for segregable content"); *Borowski v. CBP*, 733 F. Supp. 3d 171, 177 (W.D.N.Y. 2024) (finding agency failed to support exemption assertions even where it had conducted "line-by-line" review).

Rather than provide a convincing argument that the Report does not contain any segregable non-confidential material, Defendants only advance the bare assertion that because data protected

---

[24] The agency declares that it is "prohibited from working on the report or the underlying data" by EO 14168. Poehler Decl. ¶ 18. But FOIA imposes a reasonable segregation obligation on agencies, 5 U.S.C. § 552(a)(8)(A)(ii), and "[o]f course, an executive order cannot supersede a statute," *Marks v. CIA*, 590 F.2d 997, 1003 (D.C. Cir. 1978). Indeed, the EO expressly recognizes as much. *See* EO 14168 ("This order shall be implemented consistent with applicable law.").

by Title 13 "is interspersed throughout the report," segregation is not possible. Defs.' Mem. at 17. But they ignore, as a court in this district recently observed in a FOIA case against the Census Bureau, that it "is standard practice for the Government to remove confidential data from documents produced pursuant to FOIA" to meet the statute's segregability obligations. *Phillips v. U.S. Bureau of Census*, No. 22-CV-9304 (JSR), 2024 WL 230854, at *3 (S.D.N.Y. Jan. 22, 2024).

The Bureau does not describe the sections of the Report that it withholds in full. This alone shows the Bureau has failed to meet its burden of supporting the withholding with "*reasonable specificity*" rather than "conclusory" assertions. *Grand Cent. P'ship, Inc.*, 166 F.3d at 478. Given this lack of basic information about the contents of the Report, it is instructive to look at an example of a similar record—a cognitive testing report—released by the Bureau in recent years that was created by the same contractor as is the case in this matter. In 2023, the Bureau released a cognitive testing report from RTI concerning questions measuring public opinion on the use of administrative records.[25] The report contained extensive sections about methodology that did not discuss individual participants, including sections titled "Methods of Participant Recruitment and Screening" and "Qualitative Data Analysis Strategy."[26] Even in the sections of that report describing the participants' reactions, the report often factually discussed methods used and offered high-level observations. Some examples are included below:

> The questionnaire tested how different stated benefits impacted participants' views on the formation of the Census demographic frame. None of the benefits specifically mention a community impact.[27]

> English-speaking and Spanish-speaking participants in our study defined community in slightly different ways. Across both groups, participants thought of geographic location as a defining feature of their community.[28]

---

[25] Hsieh et al., Research Public Opinion of Administrative Records, *supra* note 17.
[26] *Id.*
[27] *Id.* at 3-1
[28] *Id.*

Throughout the questionnaire, multiple questions asked participants to weigh the risks and benefits of data collection conducted by companies and the government.[29]

The Report requested here almost certainly contains similar methodological descriptions and high-level observations that cannot reveal respondents' confidential information, but the Bureau has undertaken no effort to segregate such non-exempt information. The Bureau's position is so extreme that it asserts that even the Report's table of contents cannot be released.[30]

The above analysis of similar records shows segregation of non-exempt material within the report at issue here is, more than just feasible, it is the standard practice required by the agency under FOIA. The Bureau has, thus, not met its burden to withhold the Cognitive Testing report in full under 13 U.S.C. §§ 8, 9. *See Wilner*, 592 F.3d at 72 (FOIA Exemption 3's "applicability depends [on] . . . the inclusion of withheld material within the [withholding] statute's coverage."). Indeed, the Bureau implicitly suggests that the report *does* contain segregable non-confidential information, writing that "to the extent that the draft report contains factual information that is not protected by Title 13" it is exempt from disclosure because it is "pre-decisional and deliberative," under an exemption asserted for the first time in litigation. Defs.' Mem. at 15.

### B. The Census Bureau Has Not Met Its Burden for Withholding the Cognitive Testing Report in Full Under Exemption 5.

The Bureau now, in litigation, also asserts that the Cognitive Testing Report can be withheld in its entirety under FOIA Exemption 5 because it is purportedly protected in full by the deliberative process privilege, and because disclosure would cause foreseeable harm. *See* Poehler

---

[29] *Id.* at 3-2.

[30] Although Plaintiff lacks access to the report withheld in full, Plaintiff notes that the Census Bureau has regularly released cognitive testing reports with verbatim quotes from respondents. *See, e.g. id.* at 3-5 ("For example, P79 stated 'It should be someone's active choice to give that data.' This participant wanted to consent actively to providing data for future uses. Another participant (P18) said 'When you're filling out passport applications for example, is it going to be made clear that that information will be shared with other agencies, or will it just be shared?'").

Decl. ¶¶ 17-21, 25. Defendants' withholding of the report in full on this basis, without the release of even a shred of factual information contained therein, cannot be sustained. Defendants have failed to establish that the report is deliberative in nature, that disclosure of factual and scientific content in this context would foreseeably harm agency deliberations in the future, and that absolutely no information in the report is reasonably segregable non-exempt material.

### 1. The Cognitive Testing Report Is Not the Type of Document Protected by the Deliberative Process Privilege.

The Bureau has not met its burden to assert the deliberative process privilege protects the Report in full, nor could it given the Bureau's *actual* use of cognitive testing reports to inform public discussion rather than to solely inform internal decision-making. To invoke the deliberative process privilege, an agency must establish that withheld material is both predecisional and deliberative. A document is deliberative if it is "actually . . . related to the process by which policies are formulated." *N.Y. Times Co. v. Dep't of Educ.*, 658 F. Supp. 3d 171, 185 (S.D.N.Y. 2023) (citing *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks and citation omitted)). "Courts have looked to factors such as whether the document '(i) formed an essential link in a specified consultative process, (ii) reflect[s] the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency.'" *Id.* (quoting *Grand Cent. P'ship*, 166 F.3d at 482).

Although Defendants' brief states that the report was "intended to guide the Census Bureau in deciding whether to include SOGI questions on the ACS," the agency's declaration does not attest that this was the sole purpose of the *report*. *Compare* Defs.' Mem. at 15, *with* Poehler Decl. ¶ 17 ("*the underlying research* was intended to evaluate the suitability of inclusion of gender identity questions") (emphasis added). And the Bureau's practice of releasing cognitive testing

reports to disseminate research and foster discussion undermines any claim that the report's sole purpose was to inform internal agency decisions such that the report is deliberative in nature.

Over and over again, the Bureau has publicly released cognitive testing reports "to inform interested parties of research and to encourage discussion" and has done so with the representation that the "views expressed [in the reports] are those of the authors and not those of the U.S. Census Bureau."[31] Although the Bureau's process may have been informed by RTI's research, the agency's consistent practice has been to release these reports for external "research" value and "discussion," not to solely use them for internal deliberation.[32] Applying the *New York Times* factors that courts consider in assessing deliberativeness, the agency has consistently affirmed that these cognitive testing reports reflect the views of "the *authors* not those of the U.S. Census Bureau."[33] *See N.Y. Times*, 658 F. Supp. at 185 (failing prong (ii)). The agency's practice shows that these reports have, thus *not* been critical links in an internal consultative process, *id.* (failing prong (i)), but are instead scientific documents intended to convey the scientific views of the authors rather than of the Bureau, *id.* (failing prong (iii)). These factors weigh in favor of finding that this report is *not* privileged. *Id.* Even though the Bureau asserts the report is in "draft" form, given that the Bureau as a practice does not attribute such reports' views to the agency, and that it will never complete the report, its current designation as a "draft" does not convert the record to one created to inform deliberations or to, only after finalization, reflect the Bureau's views.

The Bureau does not address its longstanding practice of releasing cognitive testing reports explicitly for "discussion" and to reflect the views of the authors, including during the current

---

[31] *See, e.g.*, Hsieh et al., *supra* note 17; *see also* Berger et al., *supra* note 17; Stenger et al., *supra* note 17; Pace et al., *supra* note 17.
[32] *See supra* note 17.
[33] *See supra* note 17 (emphasis added).

administration.[34] It merely asserts that releasing any part of the cognitive testing report at all "would risk public confusion" because "priorities changed" and the Bureau had not made "final decisions or recommendations." Poehler Decl. ¶ 19. The Bureau does not explain how such "public confusion" could be at risk here when it does not ascribe views in such reports to the agency. The Bureau notes that there are comments on the "draft" report but has undertaken no effort to redact those comments and draft portions that would actually reveal internal agency deliberations.

### 2. At a Minimum the Bureau Must Segregate and Release the Factual Information Within the Cognitive Testing Report.

Even if the Cognitive Testing Report were subject to the deliberative process privilege in part, the extensive factual information contained within the report concerning what research was actually conducted would be subject to disclosure. The deliberative process "privilege generally does not extend to purely factual material," and "any non-privileged material that is 'reasonably segregable' from the deliberative portions of records must be produced." *N.Y. Times*, 658 F. Supp. 3d at 185 (quoting *NRDC v. EPA*, 954 F.3d 150, 157 (2d Cir. 2020)); *see also Borowski*, 711 F. Supp. 3d at 180-81, 188 (applying Second Circuit law and emphasizing segregability).

Defendants acknowledge that the report contains significant factual material, including information documenting the design and execution of structured cognitive interviews and summaries of the results of those interviews. *See* Poehler Decl. ¶ 12. But the Bureau has undertaken no effort to segregate and release that factual information. Instead, Defendants assert, without elaboration or meaningful context, that "the choice of what factual information to include" is itself predecisional and deliberative. Defs.' Mem. at 15.

---

[34] Berger et al., *supra* note 17 ("This report is released to inform interested parties of research and *to encourage discussion of work in progress. Any views* expressed on the methodological issues *are those of the authors* and not necessarily those of the U.S. Census Bureau.") (emphasis added).

Defendants cite *Mapother v. Department of Justice*, to support this blanket assertion of the privilege, but that case's partial deviation from the general rule that factual material should be segregated and disclosed is not applicable here. 3 F.3d 1533, 1539 (D.C. Cir. 1993). In *Mapother*, the court recognized that generally "factual material must be disclosed" but discussed an exception where disclosing "factual material" "would expose an agency's policy deliberations to unwarranted scrutiny." *Id.* at 1537–38 (quoting *Wolfe v. Dep't of Health & Hum. Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988)). The record at issue there was a report specifically compiled for the Attorney General by an investigative office to make a determination about whether or not to bar the president of Austria from entering the United States. *Id.* Even in the context of that investigative record informing a decision with foreign policy implications, the Court *still* found that the report's factual information was releasable in part. *Id.* at 1536. The Bureau has taken a more extreme position here with far less justification.

Further, *Mapother* relied on earlier case law finding the withholding of factual information appropriate when it was "prepared for the *sole* purpose of assisting" an agency's head's decision-making and distinguished it from cases where informing others was part of the purpose of a report's creation. *Id.* at 1539 (quoting *Playboy Enters., Inc. v. DOJ*, 677 F.2d 931, 936 (D.C. Cir. 1982) (emphasis added) (a case where the report was compiled in part to enable sharing information with Congress)). In the case of the Bureau, cognitive testing reports have long been used—and continue to be used—to inform the public about research and to further discussion outside the agency.[35] The report at issue here is a far cry from the internal-facing investigative report at issue in *Mapother*.

---

[35] *See, e.g.*, Stein et al., *supra* note 8; Gottschalk & Stinson, *supra* note 17; Cohen, *supra* note 17; Ramirez, *supra* note 17; Hsieh et al., *supra* note 17; Mulry et al., *supra* note 17.

### 3. Even if the Report Were Subject to the Deliberative Process Privilege, the Bureau Has Not Shown There is a Foreseeable Harm in Disclosure.

Even *if* the Bureau could show that the Report was privileged deliberative material due to its "draft" status, the Report may be withheld only if the agency shows that disclosure would foreseeably harm an interest protected by the privilege. 5 U.S.C. § 552(a)(8)(A); *Seife v. FDA,* 43 F.4th 231, 240-41 (2d Cir. 2022). This "provision *does* impose an independent and meaningful burden on agencies" in withholding information. *NRDC v. EPA*, No. 17-CV-5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019). "An agency may not 'perfunctorily state that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information' among or between government officials." *Id.* (quoting *Rosenberg v. DOD*, 342 F. Supp. 3d 62, 72, 79 (D.D.C. 2018)).

As discussed above, the document that the Bureau seeks to withhold under Exemption 5 here is one of a type—cognitive testing reports—that the agency routinely prepares precisely for dissemination of research and the facilitation of public discussion. But to support the claim that it need not disclose even a shred of information from the Report, the Bureau summarily asserts that its release would cause foreseeable harm because it:

> would have a chilling effect on Census Bureau employees and contractors, as it would negatively impact their willingness to share candid or controversial opinions and recommendations regarding future Census survey approaches and data collection.

Poehler Decl. ¶ 20. This perfunctory statement does not explain how employees and contractors would be chilled in their candor by the disclosure of a cognitive testing report like this, when they regularly prepare such documents *for* public consumption. And the assessment that it would chill "opinions and recommendations" does nothing to support the Census Bureau's withholding of the substantial factual information in the report. *Id*. Census Bureau employees and contractors, including the contractor that drafted this report, have worked on these reports in the past with the

17

understanding that they would often be disclosed for public consumption and discussion, not solely for the decision-making of agency leaders. It is unclear how the release of even factual information in this report could chill these employees' candor in the future when they likely would have expected their contributions to the report at issue to have been made public in the first place.

Defendants' brief glosses over the agency's failure to show foreseeable harm with citations to two cases, *Grand Central* and *Klamath*, that predate the 2016 enactment of the foreseeable harm standard, and a third, *NRDC v. EPA*, where the court explicitly declined to reach the foreseeable harm analysis after finding the deliberative process privilege did not apply, *see* 954 F.3d at 155 n.3. Defs.' Mem. at 16-17. The only case Defendants cite upholding an agency's sufficient finding of foreseeable harm of disclosure is *Seife v. FDA*, where the agency produced 45,000 pages of records submitted by a pharmaceutical company concerning the development of a drug for a neuromuscular disease, but "redacted some pages" under Exemption 4 because they contained confidential commercial information, *see* 43 F. 4th at 237. Defs.' Mem. at 16. But that case provides a stark contrast to the Bureau's blanket withholding on the basis of conclusory statements here. In *Seife*, the agency described "in reasonably specific detail" how disclosure of the redacted information could "be used to develop studies for other exon-skipping drugs, used in competitors' head-to-head trials, or be informative" concerning ongoing commercial research and thus harm the company's commercial interests. 43 F. 4th at 242. The FDA's careful segregation of exempt information in *Seife* and its reasoned explanation of the specific forms of harm that would result from disclosure are a far cry from the Bureau's conclusory assertions here that even a partial

18

release of a report prepared for public consumption would generally chill candor in deliberations.[36]

## II.    The Census Bureau Has Not Met Its Burden to Withhold the ACS SOGI Field Testing Data in Full.

Plaintiff also seeks two data files capturing (1) respondents' answers to the ACS SOGI Test's field testing questions on SOGI and other questions relevant to the analytical benchmarks for the ACS SOGI Test ("self-response file"); and (2) web paradata on respondents' interactions with the survey instrument ("web paradata file"). Poehler Decl. ¶¶ 9, 10. The Census Bureau withheld the files in full on the grounds that they are "wholly comprised of raw census data that are protected from disclosure," *id.* ¶ 16, and "nothing is segregable because the entire files are exempt," *id.* ¶ 26. The requested files, however, are not "raw census data," but "statistical material" that is releasable under Title 13 when confidentiality is maintained. The agency has failed to carry its burden to explain why *nothing* in this "statistical material" is reasonably segregable.

### A.    The Requested Data is "Statistical Material" That is Releasable under Title 13 When Confidentiality is Maintained.

Defendants argue incorrectly that *Baldrige v. Shapiro*, 455 U.S. 345 (1982), compels the conclusion that §§ 8(b) and 9(a) of Title 13 "bar disclosure of the requested information at issue here." Defs.' Mem. at 9. But *Baldrige* held only that "*raw* data reported by or on behalf of individuals need not be disclosed" under FOIA. 455 U.S. at 362 (emphasis added). Indeed, the Court used the word "raw" 15 times, and the raw information sought there—like names and addresses—was of great particularity to individuals. By contrast, *Baldrige* acknowledged that §§ 8(b) and 9(a) allow for disclosure of "statistical materials." *See id.* at 356 ("Section 8(b) allows

---

[36] Where, as here, an agency asserts that an entire record is exempt and non-segregable, courts in this District have recognized that *in camera* review may assist in assessing whether factual or descriptive material can be reasonably segregated and disclosed. *See, e.g., ACLU v. DOD*, 543 F.3d 59, 88 (2d Cir. 2008) (recognizing discretion for *in camera* review to evaluate exemption claims). Though *in camera* review can sometimes be burdensome for the Court, this dispute involves only a single record, such that *in camera* review may be helpful without undue burden.

the Secretary to provide statistical materials" and "[t]he focus of § 9(a) is also on the information that constitutes the statistical compilation."). Plaintiff does not request the purely raw data at issue in *Baldrige*; he requests deidentified, almost certainly numerically coded data that constitutes "statistical material." This distinction is confirmed by decades of actual agency practice post-*Baldrige*.

Plaintiff's request seeks deidentified, almost certainly numerically coded data that constitutes "statistical material" and is releasable under Title 13 when confidentiality is maintained. In construing §§ 8(b) and 9(a), the D.C. Circuit in *Seymour v. Barabba* defined "statistical materials" as "of a numerical nature" and explained that the Census Bureau has the "authority to disclose numerical statistical data which does not identify any person, corporation, or entity in any way." 559 F.2d 806, 809 (D.C. Cir. 1977). The data here complies: The SOGI field testing data was collected pursuant to the ACS, and it is the Census Bureau's standard practice to remove identifiers from ACS data and to code it into designated numerical values as it is collected. *See, e.g.*, U.S. Census Bureau, *2024 ACS Code Lists* (Excel spreadsheet), https://www2.census.gov/programs-surveys/acs/tech_docs/code_lists/2024_ACS_Code_Lists.xlsx (last visited Feb. 9, 2026); *see also* U.S. Census Bureau, *American Community Survey and Puerto Rico Community Survey Design and Methodology*, at 145 (Dec. 2024), https://perma.cc/S7KQ-CATY. The Census Bureau has never disputed Plaintiff's assertion that the requested data files are already deidentified. *See* Poehler Decl. ¶ 6 (reproducing, without disputing, Plaintiff's statement that the requested data files

contain deidentified data).[37] Plaintiff's expert declares that "[f]rom [his] perspective as a disclosure-avoidance expert, the existing ACS SOGI Test microdata files constitute 'statistical material' (Title 13, Section 8)." Leclerc Decl. ¶ 8.

Decades of actual agency practice post-*Baldrige* confirms this definition of "statistical materials." 13 U.S.C. § 8(b). Since the 1960s,[38] the Census Bureau has annually released the ACS PUMS, which in the Bureau's own words "contain[] individual responses to the full range of topics on the ACS (without individually identifiable information)."[39] For example, in its Guide on using PUMS files, the Bureau published the below example of ACS 5-year PUMS person-level microdata in the state of Pennsylvania:

| Table 1.1. **Example of Microdata** | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| RT | SERIALNO | SPORDER | ST | AGEP | JWTR | SEX |
| P | 2016000009344 | 02 | 42 | 49 | . | 2 |
| P | 2016000009344 | 03 | 42 | 15 | . | 2 |
| P | 2016000009578 | 02 | 42 | 27 | 01 | 1 |
| P | 2016000009578 | 03 | 42 | 28 | 01 | 1 |
| P | 2016000009578 | 04 | 42 | 29 | 01 | 1 |
| P | 2016000009578 | 05 | 42 | 25 | 01 | 1 |
| P | 2016000021254 | 02 | 42 | 25 | 10 | 2 |
| P | 2016000024874 | 02 | 42 | 72 | . | 2 |
| P | 2016000025941 | 02 | 42 | 22 | 02 | 2 |
| P | 2016000025941 | 03 | 42 | 14 | . | 1 |
| P | 2016000025941 | 04 | 42 | 71 | . | 2 |
| Source: U.S. Census Bureau, 2012–2016 American Community Survey Estimates, 5-Year Public Use Microdata Sample File. | | | | | | |

[40]

Despite Defendants' suggestion that *Baldrige* bars the Bureau from ever releasing individual-level data "reported by, or on behalf of" a respondent, *see, e.g.*, Defs.' Mem. at 9–10, each row in the

---

[37] *Compare also* Compl. ¶ 24 & Ex. 8 (Plaintiff's FOIA request describes the "self-response file" and "web paradata file" as containing individual-level ***deidentified*** data (emphasis added)), *with* Answer ¶ 24 (does not deny characterization of the data files as "deidentified"), *with generally* Poehler Decl. (only appearance of the term "deidentified" is in the reproduction of Plaintiff's FOIA request).

[38] *See* U.S. Census Bureau, *Steven Ruggles, Census Data Processing, Part 2,* U.S. Census Bureau (Aug. 2, 2012), https://perma.cc/4NSQ-9NZ3.

[39] *See* U.S. Census Bureau, *Understanding and Using the American Community Survey Public Use Microdata Sample Files*, *supra* note 14, at 3–4.

[40] *Id.*

above chart represents individual-level data collected from or on behalf of a person. But as plainly observable, the data is not "raw," *see generally Baldrige*, 455 U.S. 345; it has been coded such that it is "of a numerical nature," *Seymour*, 559 F.2d at 809, in accordance with the below key:

> In the highlighted row in Table 1.1:
> - The variable for Record Type (RT) is "P," indicating that this record comes from the PUMS person file.
> - The SERIALNO ("2016000025941") is a unique identifier for the housing unit.
> - SPORDER ("02") is a unique identifier of persons within a housing unit.
> - ST is "42," indicating the individual lives in Pennsylvania.
> - AGEP is "22," indicating the person was 22 years old at the time of the survey.
> - JWTR, or Means of Transportation to Work, is "02" indicating the person commutes to work by bus or trolley.
> - SEX is "2" indicating the person is female. [41]

Applying this key, the highlighted row of the above chart publishes the data of a 22-year-old female living in Pennsylvania who commutes to work by bus or trolley. As neither Congress nor any court has ever suggested that the Census Bureau's sixty-year practice of releasing ACS PUMS data violates §§ 8(b), 9(a), or *Baldrige*'s bar on releasing "raw census data reported by or on behalf of individuals,"[42] 455 U.S. at 361, the foregoing numerically coded data must correctly be considered "statistical material" under Title 13, even as it contains individual-level respondent data.

---

[41] *Id.*

[42] *See Baldrige*, 455 U.S. at 356–58 (detailing multiple amendments by Congress to the Census Act's confidentiality provisions between 1879 and 1976); *see also Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 170 (4th Cir. 1998) ("[U]nder certain circumstances, inaction by Congress may be interpreted as legislative ratification of or acquiescence to an agency's position."); *Bob Jones Univ. v. United States*, 461 U.S. 574, 601 (1983) ("In view of its prolonged and acute awareness of so important an issue, Congress' failure to act on the bills proposed on this subject provides added support for concluding that Congress acquiesced in the IRS rulings.").

Notably, the agency has never denied that it makes public *real* Census data reported by or collected on behalf of individuals in the ACS PUMS files (albeit "without individually identifiable information").[43] *Compare* Compl. ¶ 27 (asserting the ACS PUMS "routinely releases the individual-level data" "where millions' of respondents' individual data are made available to the public"), *with* Poehler Decl. ¶ 27 (offering no contradiction in the only paragraph discussing the PUMS). Rather, the Declaration states only that the Bureau "has never released public use microdata files from *testing* efforts." Poehler Decl. ¶ 27 (emphasis in original). By "testing efforts," the declarant is referencing that the SOGI data at issue here was collected as part of the Bureau's testing of new SOGI questions. But the fact that this data was collected pursuant to a "testing effort" negates neither the Bureau's practice of releasing real individual-level data via the ACS PUMS, nor the definition of "statistical material" necessitated by this decades-long practice pre-and post-*Baldrige*.

Moreover, although the agency declares that the data files Plaintiff seeks are "not a summary data product or tabulation," it never declares that they are not "statistical material." Poehler Decl. ¶ 16. Plaintiff agrees that the requested files are not "summary data product or tabulation;"[44] but neither, as demonstrated by the above chart, *supra*, are the publicly released ACS PUMS. Where Defendants do not contest that the requested data is already deidentified, *supra*, and where standard agency practice suggests it is almost certainly numerically coded, *supra*, the files comprise "statistical material" that stand in stark contrast with the untreated, raw data sought in *Baldrige*. *See* 455 U.S. at 351 (seeking a "master address register" from the Census Bureau listing addresses, householders' names, and vacancy status).

---

[43] U.S. Census Bureau, *Understanding and Using the American Community Survey Public Use Microdata Sample Files*, *supra* note 14, at 3.

[44] *See Seymour*, 559 F.2d at 809 (defining "tabulation" as "a computation to ascertain the total of a column of figures").

Defendants' justification for withholding in full the ACS SOGI field testing data hinges on it being "wholly comprised of *raw* census data" and, thus, entirely exempt. Poehler Decl. ¶¶ 16, 26 (emphasis added). Because, for the foregoing reasons, the requested data is "statistical material," the agency's explanation is incomplete. Though even "statistical material" must preserve confidentiality, *see* 13 U.S.C. §§ 8(b), 9(a), the Bureau has made no attempt to explain how this statistical material presents an identification risk, or why "nothing" in the requested files is reasonably segregable without risk of reidentification.[45] The agency has not carried its burden.

## B.  At Least Some Portions of the Data Files are Reasonably Segregable.

Because, as discussed above, the withheld data files are "statistical material" subject to potential release under Title 13, the Bureau must "provide a 'detailed justification'" for its inability to segregate non-exempt material. *See Phillips*, 2024 WL 230854, at *3 (noting in a case concerning Census records that "[i]t is standard practice for the Government to remove confidential data from documents produced pursuant to FOIA," and quoting FOIA's segregability requirement in 5 U.S.C. § 552(b)); *see also* Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Att'ys' Fees & Costs at 18, *Phillips v. U.S. Bureau of Census*, No. 22-CV-9304 (S.D.N.Y. Sept. 11, 2023), ECF No. 22 (assertion by Defendant Census Bureau that "the only question for the Court was whether the Government could demonstrate that it was logical or plausible that the withheld record contained *non-reasonably segregable material* covered by" Title 13 (emphasis added)) (hereinafter Defs.' *Phillips* Fee Opp'n). The Bureau is, therefore, obligated to take reasonable steps to segregate non-exempt information by releasing the data in a form that protects confidentiality. The use of redaction, deletion, and confidentiality techniques that the agency regularly employs

---

[45] Indeed, even when considering the "vacancy status" information at issue in *Baldrige*, the Court found "[i]t is not unlikely that while checking the Bureau vacancy figures the [plaintiff city seeking the data] would speak to individuals who had supplied [the] data to the Bureau." 455 U.S. at 361 n.17.

are a means of meeting this obligation to segregate and release non-exempt information. Defendants' objection that the application of such measures would impermissibly require the creation of new records ignores another court in the district's treatment of the issue, as well as this Circuit's direction that segregation may require modification of records to allow for the release of non-exempt information.

### 4. Basic Redaction of Information Would Allow for the Disclosure of At Least Some Information.

The agency offers, without detail, that the requested data does "not present a situation wherein the Census Bureau can sort a pre-existing database or otherwise readily reproduce the data in the requested format," while protecting confidentiality, and argues that any application of confidentiality techniques would require the creation of a "wholly new data file." Poehler Decl. ¶¶ 26, 28. But the Bureau does not explain why *nothing* in the files can be segregated using data suppression (which is essentially identical to standard redaction of documents under FOIA). The extreme nature of the Bureau's position that *nothing* in the requested files can be disclosed is most obvious when considered incrementally.

*First*, the Bureau has not explained, nor could it, why it has not even segregated and produced records in a format that shows the field names or column headers of the requested datasets reflecting each category of data that was collected. There is no argument to be made that these field names—devised by Census personnel—are "raw census data reported by or on behalf of individuals" precluded from disclosure under §§ 8(b), 9(a), or *Baldrige*. *See* 455 U.S. at 361. And releasing such field names in isolation could not identify any respondent. The agency could certainly produce a record that looks something like the below first column from the example PUMS microdata file discussed above:

| RT | SERIALNO | SPORDER | ST | AGEP | JWTR | SEX |
|----|----------|---------|----|------|------|-----|

Redaction or deletion is a standard technique employed by agencies responding to FOIA requests. *See, e.g.*, *Austin Sanctuary Network*, 2022 WL 4356732, at *23 ("[A]gencies must disclose 'any reasonably segregable portion of a record . . . after deletion of the portions which are exempt.'").[46]

*Second*, the Bureau also does not explain how, with suppression of numerous data fields, it could not release *any* data whatsoever while protecting the confidentiality of respondents. For example, the agency does not explain how a release *solely* of information regarding current gender identity could allow for identification of a respondent. Even going further, the agency does not explain how release of *only* columns containing data regarding respondents' sex assigned at birth, current gender identity, and whether the respondent lives in a rural or urban region—omitting *all* other geographic data, income information, and other variables—would allow for the possible identification of an individual respondent. The Bureau's conclusory assertions that it cannot segregate information at all with standard redaction techniques are not sufficient to meet its burden.

*Third*, the Bureau has not provided any explanation as to how an individual respondent's confidentiality might be impinged by disclosing a redacted version of various paradata variables, such as how releasing "navigation" data in isolation with other fields suppressed could logically or plausibly reveal an individual's identity. *See* Poehler Decl. ¶ 16.

### 5. Application of More Advanced Disclosure Avoidance Techniques to Release Substantial Data is Feasible and Required Under FOIA.

Beyond the standard application of redaction to release some information, analogous caselaw suggests the Bureau can and should apply reasonable disclosure avoidance techniques to

---

[46] Releasing the column headers within the requested data files would indicate what categories of information were collected from respondents but would not identify any respondent. Although the release of this information would be of less public value than the release of the data itself, it would be informative of what the Bureau compiled before purportedly ceasing work on its SOGI test data. Plaintiff is at a disadvantage in contesting the Bureau's failure to segregate releasable information because the Bureau has neither released these column headers with all data deleted nor identified all of these fields in its declaration. *See generally* Poehler Decl.

segregate and release a substantial amount of important data within the requested data files. Plaintiff asks that the Bureau apply disclosure avoidance techniques to existing individual-level microdata to release segregable statistical information at that level, as it has in the PUMS. Applying these techniques, including suppression or deletion of fields, in conjunction with the standard use of an algorithm to allow "limited, systematic adjustments" without creating an entirely new data set would allow the agency to release the existing data while protecting confidentiality. *See* Leclerc Decl. ¶ 17.

Defendants incorrectly suggest that Plaintiff is requesting a new compilation of "summary statistics," which would require the creation of a new record that does not exist. Defs.' Mem. at 10. This is inaccurate. Such an argument mirrors one the Census Bureau made in unsuccessfully contesting that a FOIA plaintiff had "substantially prevailed" for purposes of a fee award in *Phillips*, 2024 WL 230854, at *3. The Bureau there argued that it never released the Census files that were the subject of the plaintiff's records request because the application of a "new programming code" "to process the files" "create[d] a new record." Defs.' *Phillips* Fee Opp'n at 7, 13-16. In finding that the plaintiff had, nevertheless, "substantially prevailed," Judge Rakoff "credit[ed]" that the "produced 2020 file"[47] differed in certain respects from the requested one, but concluded it was not "of any moment that the produced 2020 file removed confidential data that was included in the requested 2020 file. It is standard practice for the Government to remove confidential data from documents produced pursuant to FOIA." *Phillips*, 2024 WL 230854, at *3 (citing *ACLU*, 58 F.4th at 653 ("FOIA's segregability requirement . . . instructs that 'any reasonably segregable portion of a record shall be provided to any person requesting such record

---

[47] At issue in *Phillips* was also a so-called "2010 file" that the Census Bureau had deleted prior to receiving the relevant FOIA request, but chose to recreate. *See* 2024 WL 230854, at *1, *5.

after deletion of the portions which are exempt.'" (quoting 5 U.S.C. § 552(b))). Here too, the court should treat the application of disclosure avoidance techniques to existing Census data as "standard" FOIA segregability practice rather than the creation of a new record.

Although the *Phillips* court had no occasion to order the Census Bureau to apply disclosure avoidance techniques (given the Bureau's actions to release the records), the Second Circuit has held that agencies can be required to make adjustments to data in existing files in order to segregate and release meaningful information that would otherwise be exempt from disclosure. *See ACLU*, 58 F.4th at 656. The Circuit held that the agency there was required to replace exempt A-file (immigrant identification) numbers with other, new unique identifiers so that the agency could release the substance of the requested information in non-exempt form. *Id*. Here, the Bureau can similarly apply modifications to the existing data files through its disclosure avoidance techniques—such as through an algorithm that adjusts certain values with automaticity—that will protect confidentiality and allow the release of the already extant individual-level data. Leclerc Decl. ¶ 17. In rejecting the agency's argument that requiring modification would impermissibly require the agency to create new records, the court in *ACLU* found that requiring such modification comported with both the 1996 E-FOIA amendment's instruction to produce records in "any form or format . . . readily reproducible" and with FOIA's requirement for reasonable efforts to segregate non-exempt information. *ACLU*, 58 F.4th at 657-60. The *ACLU* court allowed that the modification of records it required did not even "delineate the outer boundaries of FOIA's 'form or format' requirement," indicating that more extensive modifications may be required in other contexts. *Id*. at 658.[48]

---

[48] The Second Circuit noted in *ACLU* that when the D.C. Circuit announced a more stringent prohibition of requiring agencies to alter records to produce non-exempt content, Congress had not yet enacted the E-FOIA. *See* 58 F.4th at 660.

Here, the Bureau has not explained why it cannot similarly apply reasonable disclosure avoidance techniques that redact substantial information and adjust values in the remaining columns to protect respondents' confidentiality. In *Baser v. Veterans Affairs*, the court found that the agency still had not met its burden of releasing all segregable information *even after* it had applied a "methodology to protect patient information under HIPAA" in requested microdata by redacting some information and changing the values of other fields through a technique akin to what the Bureau calls "coarsening" and had released adjusted files to the requester. No. 13-CV-12591, 2014 WL 4897290, at *2 (E.D. Mich. Sept. 30, 2014) (case seeking data related to VA healthcare wait times); *see* Second Supp. Decl. of Susan Hickey, *Baser*, No. 13-CV-12591, ECF No. 33-2 (explaining that agency "generalized" values for age, service disability percentage, and diagnosis code). In this case, by contrast, the Bureau flatly asserts that it cannot apply similar confidentiality measures because doing so would impermissibly require the creation of a "wholly" new record. Poehler Decl. ¶ 26.

Requiring adjustment of the existing data files to protect confidentiality, and thus allowing release of segregable non-exempt information here, is akin to procedures courts—and the U.S. Chief FOIA officers council—have found appropriate to modulate voices and videos in recordings to allow for the release of meaningful information by altering the existing record to protect confidentiality. *See Stahl v. DOJ,* No. 19-CV-4142 (BMC), 2021 WL 1163154, at *6 (E.D.N.Y. Mar. 26, 2021) (finding DOJ could "blur the faces of the medical staff" in videos to release records without identifying individuals); Technology Committee of the Chief FOIA Officers Council Video Redaction Working Group, *Technology Committee - Best Practices for Video Redaction Report*, FOIA (July 29, 2021), https://perma.cc/2KGY-UXX7 (finding it appropriate to "blur" videos and "modulate voices"); *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 587 (D.C. Cir.

2020) ("The government further does not explain why it cannot . . . blur[] out faces . . . [to] eliminate unwarranted invasions of privacy"). Modifying the pixels in a video to convey the meaning of a video while protecting individual confidentiality is akin to applying disclosure avoidance techniques to existing microdata here to allow for the release of a meaningful statistical data set that is modified in form to protect respondents' confidentiality.

As Plaintiff's expert explains, the Bureau could modestly adjust existing code to apply an algorithm to the requested data that would protect respondent confidentiality with a reasonable amount of effort and enable release. Leclerc Decl. ¶ 21. This is particularly true if the agency suppressed (essentially deleted) most of the approximately 250 data fields generally disclosed in the ACS PUMS microdata releases, as it would only need to apply the disclosure avoidance algorithm to 20 or so fields that would allow the release of meaningful data of relevance to the SOGI data test. *Id.* ¶ 19.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court require the Bureau to segregate and release non-exempt information from these records of national importance.

Dated: February 9, 2026

Respectfully submitted,

*/s/ Daniel A. McGrath*
Daniel A. McGrath (S.D.N.Y. Bar No. 5541198)
Amy C. Vickery (N.Y. Bar No. 5942271)[†]
Anisha Hindocha (D.C. Bar No 1725159)*
Robin Thurston (D.C. Bar No. 7268942)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 812-7824
dmcgrath@democracyforward.org
avickery@democracyforward.org
ahindocha@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiff*

[†] *S.D.N.Y. pro hac vice forthcoming*
* *Admitted pro hac vice*