UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN B. FREEMAN, PH.D., *Plaintiff*, v. U.S. CENSUS BUREAU, et al., *Defendants*. | Civil Action No. 25-cv-7834-LJL |

I declare under penalty of perjury, 28 U.S.C. § 1746, under the laws of the United States of America that the following is true and correct to the best of my knowledge and belief.

1. My name is Philip D. Leclerc. As is pertinent to the present case, my background is that I hold a Ph.D. in Mathematical Modeling and Analysis awarded by Virginia Commonwealth University, and, from 2016 to May 2025, I worked as a disclosure-avoidance expert at the United States Census Bureau (USCB).

2. My primary focus during my time at USCB was the development of modern algorithms, which satisfied a privacy requirement known as Differential Privacy, to replace earlier algorithms for protecting respondent confidentiality in the 2020 Decennial Census.

3. I began my tenure at USCB as a regular member of the team working on the 2020 Decennial Census program's transition to Differential Privacy algorithms; by the end of my time at USCB, after a number of promotions, I served as the leader of a team of disclosure-avoidance experts, whose focus continued to be the Decennial Census, but which was also regularly consulted by leadership about confidentiality risks in other USCB survey products. These conversations sometimes included discussion of the American Community Survey (ACS).

4. I also interacted with, and at times submitted requests for data releases to, USCB's Disclosure Review Board (DRB), the unit that governs approval of most data releases at USCB to ensure compliance with confidentiality requirements. In addition, I participated in a number of discussions at USCB's Data Stewardship Executive Policy (DSEP) Committee. USCB's DSEP Committee is its highest confidentiality-compliance decision-making board, which is not generally involved in day-to-day confidentiality-compliance discussions, but has a central role in more difficult, important, or novel cases.

5. My expertise is in the identification of confidentiality vulnerabilities and in the development of algorithms to protect against them, most notably Differential Privacy. As a byproduct of developing this expertise, I also gained significant familiarity with USCB confidentiality procedures and the decision-making bodies related to these procedures. In addition, I gained a general familiarity with USCB's various demographic surveys, such as the ACS, as they relate to questions about protecting the confidentiality of respondents who complete them.

6. My understanding of the present case is that the ACS program conducted data collection pursuant to a content test, known as the ACS SOGI Test, intended to evaluate the suitability

of sexual orientation and gender identity questions (SOGI) for inclusion in future iterations of the ACS. Per Elizabeth Poehler's declaration for the USCB, before work on the collected field-test data was completed, USCB employees were subsequently barred from further work on the collected gender-identity data, as a consequence of Executive Order 14168; however, work on the collected sexual orientation data was allowed to proceed. Given this situation, my primary goal is to comment on the ease with which suitable disclosure avoidance could be applied to the collected ACS SOGI Test microdata (both self-response data and paradata), such that it would be releasable without violating Title 13's confidentiality protections, under conventional disclosure-avoidance standards. I further explain how disclosure-avoidance techniques can be considered a process of segregating protected confidential information, thereby allowing the USCB to release non-exempt data that protects against the indirect identification of respondents.

7. The USCB releases data at the individual respondent level (i.e., microdata) regularly, after the application of disclosure-avoidance measures to protect confidentiality. For example, since 1960 the USCB has released Public Use Microdata Sample (PUMS) files from the ACS on an annual basis as "statistical material" under Title 13, Section 8, where millions of ACS respondents' individual-level data are released to the public following disclosure-avoidance techniques.

8. From my perspective as a disclosure-avoidance expert, the existing ACS SOGI Test microdata files constitute "statistical material" (Title 13, Section 8) that is releasable after disclosure avoidance measures are applied to control re-identification risk of any particular respondent. For statistical microdata files commonly released under Title 13, Section 8, disclosure-avoidance techniques are the mechanism through which the USCB redacts

information protected by Title 13, Section 9, i.e., data that could plausibly lead to the re-identification of any particular respondent.

### USCB Can Apply Existing Disclosure-Avoidance Techniques to the Microdata Files

9. The central issue that the USCB must solve when releasing microdata is to ensure that, once obvious identifiers are removed, it would be extremely unlikely for an outside party to be able to re-identify any particular respondent. The primary risk in releasing microdata without further adjustment arises primarily because individual-level data can become effectively identifiable when several ordinary variables are combined. For example, if an outside party already knows a person's age, sex, and salary, and those same variables appear unaltered in the microdata, it may be possible to infer a single respondent that matches that combination of values. If so, the outside party can reasonably conclude that such data corresponds to that person. This would undermine the confidentiality protections required by Title 13. Thus, when multiple potential identifiers are present together in microdata, they can function collectively as an unintended fingerprint for a specific individual, even if no obvious identifiers are included.

10. Disclosure avoidance, i.e., preventing such complex re-identification in data releases, is a highly regular and routine process at the USCB overseen by the DRB. Following the application of disclosure-avoidance processing, the USCB releases public-use microdata on an annual basis for numerous USCB-administered demographic surveys, not only for the ACS but also for the National Health Interview Survey (NHIS), the National Crime Victimization Survey (NCVS), and the Household Trends and Outlook Pulse Survey (HTOPS), among others. Released microdata for these latter three demographic surveys have also included individual-level SOGI data that the USCB collected.

11. The intended purpose of the USCB's public-use microdata files is to allow researchers and policymakers to conduct flexible analyses of population patterns and relationships while ensuring that no inference can be made about any identifiable respondent.[1] Thus, the substantive information of a USCB microdata file is the major statistical population patterns that exist across many rows of individual respondents' data, often tens of thousands, hundreds of thousands, or millions of rows of respondents' data. The minor adjustments to individual respondents' data during disclosure-avoidance processing therefore can feasibly preserve this substantive information, because each individual respondent makes a negligible contribution to the file's major statistical patterns.

12. The USCB's release of microdata has not exclusively applied to official survey data but has also occurred for methodological tests similar to the ACS SOGI Test when there has been specific public interest. A recent, notable example is public-use microdata from the 2020 Census Barriers, Attitudes, and Motivators Study (CBAMS) Survey (as described in section 3.6 of the CBAMS documentation),[2] which the USCB previously released and continues to make available on the USCB's Freedom of Information Act (FOIA) website under "Frequently Requested Records" (this release also included individual-level SOGI data).[3] From the standpoint of disclosure-avoidance processing, I do not recognize there to be meaningful differences between applying these techniques to official survey data (e.g., ACS PUMS files) versus methodological tests such as the ACS SOGI Test (e.g., 2020 CBAMS microdata file), above and beyond the ordinary assessment of which data variables are involved and the standard technical processing to undertake to ensure re-

---

[1] https://www.census.gov/content/dam/Census/library/publications/2021/acs/acs_pums_handbook_2021.pdf.
[2] https://www2.census.gov/programs-surveys/decennial/2020/program-management/final-analysis-reports/2020-report-cbams-study-survey.pdf.
[3] https://www.census.gov/about/policies/foia/foia_library/frequently_requested_records.html

identification risk is acceptably low.

13. The USCB has many tools for disclosure avoidance in its toolbox when it releases public-use microdata, including an umbrella of long-existing techniques known as Statistical Disclosure Limitation, as well as more recent Differential Privacy algorithms. The USCB has used Statistical Disclosure Limitation techniques for decades, which generally involve a combination of suppressing (i.e., removing) certain values, rounding data, coarsening data into more aggregate categories, and top-coding. For instance, geographic identifiers or age values might be coarsened to specify only larger geographic areas or age ranges (rather than granular geographic locations or single-year-of-age values). Age might be top-coded, meaning that extremely high ages (that are rare and could lead to identification of a respondent) are cut off using a default number (i.e., 85) or randomly chosen value. The USCB regularly applies these techniques to protect confidentiality when releasing public-use microdata for the ACS, NHIS, NCVS, HTOPS, among other demographic surveys.[4]

14. When the USCB uses Differential Privacy algorithms for public-use microdata involving demographic data, in several cases it has used what is known as a "multinomial randomized response" process. In this process, limited "noise" is introduced into the dataset by shifting individual data values by a small amount while preserving the large-scale statistical patterns that researchers and policymakers seek (by analyzing populations of respondents across many rows of data). Recent examples of the USCB using these Differential Privacy algorithms for public-use microdata is the CBAMS methodological survey test discussed

---

[4] https://www2.census.gov/programs-surveys/acs/methodology/design_and_methodology/2024/acs_design_methodology_report_2024.pdf; https://ftp.cdc.gov/pub/Health_Statistics/NCHS/Dataset_Documentation/NHIS/2024/srvydesc-508.pdf; https://bjs.ojp.gov/document/ncvstd16.pdf; https://www2.census.gov/programs-surveys/demo/technical-documentation/hhp/HTOPS_2502_Source_and_Accuracy.pdf;https://www.census.gov/programs-surveys/household-pulse-survey/about.html.

earlier, as well as public-use microdata for a demographic survey that the USCB released to the Internal Revenue Service (IRS).[5]

15. When the USCB uses any of these disclosure-avoidance techniques, including either Statistical Disclosure Limitation or Differential Privacy techniques, the agency generally aims to preserve the large-scale statistical population patterns that comprise the substance of a microdata file—the information that researchers and policymakers seek in these files—before versus after the techniques are applied.

**Protecting Confidentiality While Preserving a Microdata File's Substantive Information**

16. The disclosure-avoidance techniques the USCB uses are akin to the process of redacting identifying information in images. Consider an example of when satellite images across a county are sought under FOIA for analyses into housing density across the county. Applying Differential Privacy algorithms is similar to randomly blurring some pixels in the image in order to obscure small, identifiable details, while preserving its large-scale, non-identifying features. In a satellite image of a specific residential area, blurred pixels can destroy identifying information like the names on any given mailbox, while preserving the ability to count the number of buildings in the image. Statistical Disclosure Limitation techniques such as suppression are akin to blacking out mailboxes; if house size may indirectly lead certain individuals to be identified, coarsening would be similar to substituting pixels corresponding to houses with 1-3 rooms with a redaction descriptor (e.g., stock image or text) indicating a house with exactly 2 rooms; and top-coding is akin to substituting pixels corresponding to a very large house with 13 rooms (which given the rarity may be identifiable) with a redaction descriptor of a house with exactly 10 rooms. In

---

[5] https://www2.census.gov/about/partners/cac/sac/meetings/2024-03/presentation-statistical-product-first-approach-update.pdf.

short, the goal of disclosure avoidance is to produce a "tweaked" version of the original data that has been adjusted in small ways such that major patterns being sought are faithfully preserved, but small, sensitive details become unreliable. Thus, while individual respondents' data values may be altered in a microdata file, just as individual pixels may be altered in a satellite image, the file's substance—the major statistical patterns across many individual respondents—is preserved, just as variation in the density of houses across the county is preserved.

17. The USCB can apply disclosure-avoidance techniques to microdata without any discretionary rewriting of records. Subject to a small set of high-level choices (governing, for example, how much overall disclosure-avoidance noise to introduce), USCB staff can run the data through established, pre-existing scripts and pipelines that the agency already uses for this exact purpose in a mechanical and rule-driven process. Returning to the example of redacting identifying or sensitive information in satellite images, once the high-level choice is made (e.g., blur all mailboxes across every satellite image in the county), the image-editing process proceeds in a predictable manner. USCB disclosure avoidance works in a similar way, in the sense that it invokes a predictable, automated process that makes limited, systematic adjustments to protect confidentiality while leaving the underlying statistical patterns (comprising the substantive information of a microdata file) intact. It does not require the creation of an entirely new data set, or the manual adjustment of the values for each respondent, but rather, in past, publicly documented applications,[6]

---

[6]https://imai.fas.harvard.edu/research/files/DASeval.pdf&sa=D&source=docs&ust=1770391289422296&usg=AOvVaw1l3WKq-GwN2lPVLjAXOkNF;
https://assets.nhgis.org/2010sf1.pdf&sa=D&source=docs&ust=1770391289422513&usg=AOvVaw1lzG9ufModYT T5Glqeu0pZ; https://www.census.gov/content/dam/Census/library/working-papers/2009/adrm/rrs2009-10.pdf&sa=D&source=docs&ust=1770391289422608&usg=AOvVaw1nQtukv6UysYje2TloF3Zf.

has generally involved making minor, algorithm-driven adjustments to protect confidentiality that feasibly can preserve the substantive statistical patterns in the data.

18. Because disclosure avoidance can feasibly preserve the underlying statistical population patterns, it likewise can retain these patterns regardless of the specific technique used. In the case of redacting satellite images, agencies may rely on different image-editing softwares that produce slightly different pixel-level changes when blurring mailboxes image-by-image, yet the end result is functionally the same across any of the various software choices. Similarly, in the context of the ACS SOGI Test microdata, regardless of the specific technique selected, disclosure avoidance could feasibly preserve aggregate estimates needed to answer research questions of public interest (e.g., "Are respondents in rural locations more likely to refuse or skip the sexual orientation question than respondents in urban locations?"). Accordingly, while the USCB may have discretion over which disclosure-avoidance technique is applied (just as agencies have discretion over which image-editing software or technique to use), regardless of the specific technique that is used disclosure avoidance could feasibly preserve the substantive information in the microdata file.

## Conclusions Regarding the Plaintiff's Request

19. Having reviewed the variables (columns of data) the plaintiff seeks—limited to those necessary to conduct the USCB's official 2024 analysis plan for the ACS SOGI Test—it is my professional opinion that applying disclosure-avoidance procedures to these microdata in a manner that satisfies Title 13's confidentiality requirement should be feasible (at the same acceptably low level of re-identification risk the USCB already deems sufficient for other releases). This is especially true because all detailed geographic

variables beyond a coarse Urban/Rural indicator (265,149,027 residents and 66,300,254 residents, respectively) can be redacted, just as numerous additional variables can be redacted that the plaintiff does not require. By contrast, ACS PUMS files contain geographic detail for areas as granular as 100,000 residents and contain[7] approximately 250 person-descriptive variables; the public-use version of the microdata files that the plaintiff seeks here, to my understanding, could provide valuable information with only approximately 20 person-descriptive variables. These differences in granularity and scope, together with the fact that the USCB has a number of disclosure-avoidance tools at its disposal, as reviewed here, and has previously released public-use microdata that includes SOGI data, speak to the highly feasible nature of the request. USCB staff should be able to apply existing disclosure-avoidance techniques in a predictable, mechanical manner that can adequately protect Title 13 confidentiality.

20. If the USCB were to fulfill the plaintiff's request, the application of disclosure avoidance could feasibly preserve the data files' statistical population patterns regardless of the specific techniques used. In publicly-documented, similar past applications of disclosure avoidance techniques by USCB, such as the CBAMS example discussed above, at the choices made for, e.g., magnitude of noise in those applications, it would generally be expected that a majority of data rows would be largely unaltered, with occasional minor transformations akin to blurring or cropping pixels in images to redact identifying information. Thus, while I do not have legal expertise to comment on whether disclosure-avoidance processing amounts to the "creation of a new record," I would certainly not describe the resulting dataset as entirely new. From the perspective of the substantive information in the record—the statistical population patterns that microdata files are

---

[7] https://www.census.gov/content/dam/Census/library/publications/2021/acs/acs_pums_handbook_2021.pdf.

designed to reveal—the aim of disclosure avoidance is generally to preserve the original information (as much as is possible, consistent with confidentiality requirements), not to create new information.

21. Code implementing all of the disclosure-avoidance techniques discussed already exists at the USCB. Applying these existing disclosure-avoidance scripts to the ACS SOGI Test microdata should be straightforward, involving just the adjustments of code. Making some allowance for code review after these minor changes, and for requisite DRB approval, I estimate that it would take no more than 2.5 weeks to modify and apply such an algorithm (including time waiting for groups to meet and review release requests, assuming a normal operating schedule for DRB and availability of staff to perform code reviews), such that the ACS SOGI Test microdata could be regarded as properly protected against Title 13 confidentiality violations.

_____
Philip Leclerc

_Osaka, Japan_
[Location]

_FEB. 7, 2026_
Dated