UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JONATHAN B. FREEMAN,

             Plaintiff,

     – *versus* –

UNITED STATES CENSUS BUREAU and
UNITED STATES DEPARTMENT OF
COMMERCE,

           Defendants.

Civil Action No. 25-7834 (LJL)

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

JAY CLAYTON
United States Attorney for the
Southern District of New York
Counsel for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2699
rachael.doud@usdoj.gov

Of Counsel:

RACHAEL DOUD
Assistant United States Attorney

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .....................................................................................................2

    I.  Title 13 ......................................................................................................2

    II.  The American Community Survey ................................................................3

    III. Plaintiff's FOIA Request ............................................................................3

        A.  Internal Date Files...............................................................................3

        B.  Draft RTI Report.................................................................................4

    IV. The Census Bureau's Disclosure Avoidance Review Process ...........................6

ARGUMENT ..........................................................................................................7

    I.  The Response Date Is Protected from Disclosure by FOIA Exemption 3 ..........7

        A.  The Response Data is Raw Census Data Barred from Disclosure by 13 U.S.C. § 9 .....7

        B.  No Portion of the Response Data is Reasonably Segregable........................................11

    II. The Draft RTI Report Is Protected from Disclosure by FOIA Exemptions 3 and 5 ........16

        A.  The Draft RTI Report Is Properly Withheld Pursuant to Exemption 3 Because 13 U.S.C. § 9 Bars Its Release .........................................................16

        B.  The Draft RTI Report Is Properly Withheld Pursuant to Exemption 5 .....................19

            i.    The Draft RTI Report Is Subject to the Deliberative Process Privilege ...............19

            ii.  No Portion of the Draft RTI Report Could Be Segregated and Released.............21

            iii. Disclosure of the Draft RTI Report Would Cause Foreseeable Harm..................21

CONCLUSION........................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Dep't of Justice*,

   681 F.3d 61 (2d Cir. 2012) ........................................................................... 12, 13, 15

*ACLU v. USCIS*,

   58 F. 4th 643 (2d Cir. 2023) ................................................................................. 14

*Baldridge v. Shapiro*,

   455 U.S. 345 (1982) ................................................................................................ 7

*Fair Lines America Found. Inc. v. U.S. Dep't of Commerce*,

   619 F. Supp. 3d 212 (D.D.C. 2022) ....................................................................... 2

*Flightsafety Servs. Corp. v. DOL*,

   326 F.3d 607 (5th Cir. 2003) ............................................................................... 15

*Fonda v. CIA*,

   434 F. Supp. 498 (D.D.C. 1977) .................................................................... 11, 19

*Highland Capital Mgmt. v. Schneider*,

   551 F. Supp. 2d 173 (S.D.N.Y. 2008) .................................................................. 10

*Irons v. Levi*,

   451 F. Supp. 751 (D. Mass. 1978) ................................................................. 11, 18

*Mapother v. Dep't of Justice*,

   3 F.3d 1533 (D.C. Cir. 1993) ............................................................................... 21

*N.Y. Times Co. v. Dep't of Educ.*,

   658 F. Supp. 3d 171 (S.D.N.Y. 2023) ....................................................... 19, 20, 21

*NRDC v. EPA,*

    954 F.3d 150 (2d Cir. 2020).................................................................................. 23

*Phillips v. United States Bureau of Census,*

    22-cv-9304 (JSR), 2024 WL 230854 (S.D.N.Y. Jan. 22, 2024).................................. 13, 14, 17

*Pierce & Stevens Chem. Corp. v. U.S. Consumer Prod. Safety Comm'n,*

    585 F.2d 1382 (2d Cir. 1978).................................................................................. 12

*Reporters Committee for Freedom of Press v. FBI,*

    Civil Case No. 15-1392 (RJL), 2022 WL 1908841 (D.D.C. June 3, 2022)............................. 23

*Seymour v. Barabba,*

    559 F. 2d 806 (D.C. Cir. 1977) .............................................................................. 8

*Students Against Genocide v. Dep't of State,*

    257 F.3d 828 (D.C. Cir. 2001) .............................................................................. 15

*Wadelton v. Dep't of State,*

    106 F. Supp. 3d 139 (D.C. Cir. 2015) ...................................................................... 18

## Statutes

5 U.S.C. § 552(b) ................................................................................................ 15

13 U.S.C. § 8 ................................................................................................ passim

13 U.S.C. § 9 ................................................................................................ passim

Defendants United States Census Bureau ("Census" or "Census Bureau") and United States Department of Commerce (collectively, "Defendants") respectfully submit this memorandum of law in opposition to Plaintiff's motion for summary judgment and in further support of their cross-motion for summary judgment.

## PRELIMINARY STATEMENT

Plaintiff's Freedom of Information Act ("FOIA") requests seeks access to raw Census data files and a far-from-final draft report regarding potential Census questions for the American Community Survey ("ACS").  All of these records fall squarely within FOIA Exemption 3, and thus must be withheld, because their disclosure is prohibited by another statutory authority:  13 U.S.C. §§ 9 and 8(b).

As explained further below, the data files that Plaintiff seeks to access consist of raw Census response data—the very heart of what Sections 8 and 9 protect.  Contrary to Plaintiff's claim, the data files are not "deidentified," but instead are replete with identifiable information about particular respondents.  Likewise, the draft report regarding potential ACS questions contains and reflects a substantial amount of information about particular respondents.  These records have not undergone the Census Bureau's rigorous disclosure avoidance review process, which is critical for ensuring the preservation of confidentiality.  In suggesting that any identifiable information contained in the records at issue can reasonably be redacted or segregated, Plaintiff misunderstands the contents of these records and fails to appreciate the nature of the process required to disclose any portion of these records in compliance with the strictures of Sections 8 and 9.

The draft report is further protected from disclosure pursuant to FOIA Exemption 5 because it is a pre-decisional, draft document subject to deliberative process protection.  The

draft report reflects numerous proposed edits that were never resolved and approximately ninety outstanding comments that were never addressed; it is precisely the kind of incomplete snapshot of the pre-decisional process that FOIA Exemption 5 is meant to protect. Its release would cause foreseeable harm, and its contents cannot reasonably be redacted or segregated to account for that harm.

Accordingly, the Court should deny Plaintiff's motion for summary judgment and grant Defendants' motion.

## BACKGROUND

### I.     Title 13

Title 13, Section 9 prohibits Defendants from using Census data "for any purpose other than the statistical purposes for which it is supplied," making "any publication whereby the data furnished by a particular establishment or individual . . . can be identified," or permitting "anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports." 13 U.S.C. § 9(a). Section 9's prohibition applies to the release of both raw Census data and to data that would "contribute to the ability of a third party to reconstruct" confidential Census information. *Fair Lines America Found. Inc. v. U.S. Dep't of Commerce*, 619 F. Supp. 3d 212, 221 (D.D.C. 2022). Consistent with those limitations, Section 8(b) permits the Secretary to "furnish copies of tabulations and other statistical materials which do not disclose the information reported by, or on behalf of, any particular respondent." 13 U.S.C. § 8(b).

### II.    The American Community Survey

The ACS is a survey conducted by the Census Bureau on an ongoing basis to collect detailed social, economic, housing, and demographic information from a sample of households

across the country.  Declaration of Elizabeth Poehler dated January 12, 2026 ("First Poehler

Declaration") ¶ 2; Declaration of Elizabeth Poehler dated March 6, 2026 ("Second Poehler

Declaration") ¶ 2.  In February 2024, the Census Bureau began conducting cognitive testing on

adding sexual orientation and gender identity (SOGI) questions to the ACS in collaboration with

RTI International, a Census Bureau contractor, and RTI began preparing a draft report

concerning the results of the cognitive testing.  Second Poehler Decl. ¶ 5.  On January 20, 2025,

the President issued Executive Order ("EO") 14168, Defending Women from Gender Ideology

Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan.

20, 2025), which defined "gender identity" for Executive Branch purposes as a "fully internal

and subjective sense of self . . . that does not provide a meaningful basis for identification."

Following the issuance of EO 14168, the Census Bureau suspended RTI's cognitive testing work

and stopped work on RTI's draft report, which had not been finalized.  Second Poehler Decl. ¶ 5.

This case concerns two FOIA requests made by Plaintiff Jonathan B. Freeman.  The first

request seeks copies of two "internal data files" related to the ACS SOGI testing:  the self-

response file containing "individual-level deidentified self-response data from ACS SOGI Test

respondents," and the web paradata file containing "individual-level deidentified web paradata

from ACS SOGI Test respondents."  Compl., Dkt. No. 1, ¶ 24.  The second request seeks a

"[c]opy of all non-data elements" within the draft RTI report.  *Id.* ¶ 19.

### III.    Plaintiff's FOIA Requests

#### A.  Internal Data Files

The two internal data files requested by Plaintiff consist of raw Census response data.

Second Poehler Decl. ¶ 22.  The self-response file contains data collected from respondents

during test collection, often called survey responses or microdata.  *Id.* ¶ 20. The web paradata

file contains the behaviors captured from respondents during the testing, and includes such data as the time the user went to the webpage, where the user clicked on the page and other keystroke data, the data entered on the webpage, any system messages that were displayed (such as error messages), and the time the user exited the webpage. *Id.* ¶ 21. Both files consist entirely of raw Census data, not aggregated data or tabulations, and the data has not had identifying data removed or been subject to Census's disclosure avoidance review processes. *Id.* ¶ 22; *see also* Declaration of Michael Hawes dated March 6, 2026 ("Hawes Decl.") ¶ 19.

Sections 9 and 8(b) of Title 13 effectively prohibit the Census Bureau from releasing response data that has not gone through the disclosure avoidance review process. The Census Bureau plans and releases Public Use Microdata Samples ("PUMS") files for the official ACS on an annual basis. Second Poehler Decl. ¶ 23. However, the PUMS files are not raw data files. *Id.* ¶ 24. Rather, the PUMS files are data samples created by applying several proprietary disclosure avoidance techniques to comply with Title 13. *Id.* The ACS has never released PUMS files or similar microdata files (response or paradata) for testing activities. *Id.* ¶ 26. Accordingly, consistent with prior ACS practices, the Census Bureau did not plan to create a PUMS file and never created a PUMS file for the 2024 ACS SOGI test data files. *Id.*

**B. Draft RTI Report**

When the Census Bureau began conducting cognitive testing on SOGI questions for the ACS in February 2024 in collaboration with RTI, it anticipated that RTI would deliver a final report with RTI's conclusions regarding the SOGI testing and its recommendations to the Census Bureau after the Census Bureau provided feedback to RTI and the Census Bureau and RTI worked through any issues. Second Poehler Decl. ¶ 14. Once it received the final report, the Census Bureau intended to use it and the recommendations included therein to make decisions

on whether and what kind of SOGI questions to include in future ACS testing.  *Id.* ¶ 15.  That process was never completed, however, because work on the draft RTI report was stopped in January 2025.  *Id.* ¶ 5.

The results sections of the report include summaries of respondents' answers to ACS questions, quotations from respondents about how they understood or interpreted question terms, how easy or hard they found the questions, and information about their personal experiences.  *Id.* ¶ 10.  Other sections of the report include additional summary data, including information on how the Census Bureau recruited respondents, and the demographics of respondents, including sexual orientation and gender identity.  *Id.*  These data are expressed in tables and intertwined with text and are not fully discernable to an ordinary reader.  *Id.*  If work on the draft report had not stopped as a result of the Executive Order, Census planned to finalize its contents in conjunction with RTI and conduct a disclosure avoidance review of the report, to assess the risk of an outside actor inferring confidential information from the contents and apply statistical techniques to mitigate that risk.  *Id.* ¶ 11.

The draft RTI report is an incomplete, working draft containing unresolved edits and comments.  *Id.* ¶ 12.  Specifically, the draft report contains approximately ninety comments from Census Bureau employees that were not addressed or resolved before work stopped on the document.  *Id.* ¶ 13.  In addition, nearly all of the more than 200 pages in the document contain edits in "track changes" from Census employees and RTI staff that have not been accepted or rejected.  *Id.*

When work on the report stopped, the iterative process of commenting on the draft and resolving those items had not yet been completed.  *Id.* ¶ 14.  As a result, it is highly possible that

the contents and substantive findings of the report would have changed from the current draft prior to publication based on input from and discussions with Census Bureau employees. *Id.*

## IV.    The Census Bureau's Disclosure Avoidance Review Process

To ensure compliance with 13 U.S.C. §§ 8(b) and 9, the Census Bureau does not release survey response data, or materials containing or referencing response data, without subjecting the materials to the disclosure avoidance review process. Second Poehler Decl. ¶ 23; Hawes Decl. ¶ 8. Every disclosure of Census Bureau data (or information products based on that data) carries some risk that an outside actor might be able to identify a particular data subject (for example, an individual, household or establishment) or could make inferences about a data subject that violate confidentiality. Disclosure avoidance review is the process of assessing that risk in a particular dataset or information product—accounting for all other information—and, when necessary, applying one or more statistical techniques to mitigate that risk. Hawes Decl. ¶ 4. This is a significant undertaking.

The Disclosure Review Board ("DRB") is the group within the Census Bureau that evaluates the disclosure risk of information products proposed for public release. *Id.* ¶ 6. This involves assessing the specific information product not just on its own, but also in the context of prior and future Census Bureau releases from the same source data. *Id.* ¶ 7. The DRB must also consider the potential linkage to external data sources that could be used in combination to identify information concerning particular respondents. *Id.*

To account for the disclosure risk, the DRB also considers what disclosure risk mitigation strategy and what disclosure avoidance methods are appropriate. Disclosure avoidance techniques generally fall into three broad families: (1) suppression, which involves removing or concealing information; (2) coarsening, which alters the level of precision of the information;

and (3) noise infusion, which involves altering the content of the material. *Id.* ¶¶ 12-15. There is no one-size-fits-all, best technique for all contexts; the choice between techniques always depends on the specific circumstances and information being evaluated. *Id.* ¶¶ 9, 17. Accordingly, the determination of disclosure risk mitigation strategies requires significant time, expertise, and care from the Census Bureau. For new, complex, or particularly sensitive information products, this iterative review, risk assessment, and mitigation process can take months or even years before a final DRB approval may be made, and some proposed information products are never cleared for release due to the disclosure risk. *Id.* ¶ 9.

## ARGUMENT

I.    **The Response Data Is Protected from Disclosure by FOIA Exemption 3**

A.  **The Response Data Is Raw Census Data Barred from Disclosure by 13 U.S.C. § 9**

The self-response and web paradata files Plaintiff requests consist entirely of raw Census response data including respondents' identifying information. Second Poehler Decl. ¶ 22. Such material is at the heart of what 13 U.S.C. § 9 bars from disclosure. *See Baldridge v. Shapiro*, 455 U.S. 345 (1982) (Section 9, in conjunction with Section 8(b), "prohibit disclosure of data provided by, or on behalf of, any respondent" (internal quotation marks omitted)).

In an effort to avoid this obvious statutory bar, Plaintiff argues that the data is not "raw census data," but instead "'statistical material' that is releasable under Title 13 when confidentiality is maintained," because it is supposedly "deidentified." Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment, Dkt. No. 31 ("Plaintiff's Brief" or Pl.'s Br. ") at 19-20. This argument appears to be based on a fundamental misunderstanding of the nature of the data files. The self-response and web paradata files Plaintiff seeks are not, as Plaintiff claims, "deidentified." Second Poehler Decl. ¶ 25. Instead, as Defendants stated in their opening

papers, *they are wholly comprised of raw Census data.*  First Poehler Decl. ¶ 16.  The data files have not been processed, have not had identifying data removed, and have not undergone disclosure avoidance review.  Second Poehler Decl. ¶ 25.  They contain respondents' names as well as geographic details and numerous other potential identifiers, such as respondents' age, sex, and race.  *Id.*  There could not be a clearer example of material subject to 13 U.S.C. § 9.[1]

Plaintiff's arguments concerning the data files all flow from his apparent misunderstanding of the nature of the data and thus fail.  Plaintiff claims that *Seymour v. Barabba*, 559 F. 2d 806, 809 (D.C. Cir. 1977), supports a finding that the census data at issue here is "statistical material."  Pl.'s Br. at 20.  Plaintiff's reliance on *Seymour* is misplaced.  In that case, the court considered the question of whether Section 9 barred disclosure of the names and addresses of private companies utilized by the Census Bureau in fulfilling its duties under the federal census laws and concluded that it did, because those names and addresses were assembled for Census Bureau purposes.  *Seymour*, 559 F. 2d at 807, 809-10.  The court further explained that Section 8(b) did not "help plaintiff's cause" because the court interpreted its "reference . . . as to what the Secretary may furnish 'private persons and agencies' as being tabulations and statistical materials of a numerical nature, not names and addresses of specific individuals or firms reporting data to the Census Bureau."  *Id.* at 809.  Thus, if anything, *Seymour* makes clear that the raw data at issue here—which include names and geographic details and cannot be described as "tabulations and statistical materials of a numerical nature"— is not what Section 8(b) authorizes the Secretary to release.

---

[1] It is unclear why Plaintiff is under the impression that the data is "deidentified."  It appears Plaintiff may be confused by the fact that certain information, like respondents' sex, may be recorded in numerical form, such as using 1 for male and 2 for female.  Second Poehler Decl. ¶ 22.  The data nonetheless contains quintessential identifying information such as respondents' geography, name, age, sex, and race.  *Id.* ¶ 25.

Next, Plaintiff suggests that the Court should adopt the assertion of Plaintiff's "expert," Philip Leclerc ("Leclerc"), who purportedly opines that "[f]rom [his] perspective as a disclosure-avoidance expert, the existing ACS SOGI Test microdata files constitute 'statistical material' (Title 13, Section 8)."  Pl.'s Br. at 21 (citing Declaration of Philip Leclerc dated February 8, 2026 ("Leclerc Decl.") ¶ 8).  Plaintiff's description of his own expert's opinion is misleading, however.  Leclerc states that his "primary goal is to comment on the ease with which suitable disclosure avoidance could be applied to the collected ACS SOGI Test microdata (both self-response data and paradata), such that it would be releasable without violating Title 13's confidentiality protections, under conventional disclosure-avoidance standards."  Leclerc Decl. ¶ 6.  He further opines that from "[his] perspective as a disclosure-avoidance expert, the existing ACS SOGI Test microdata files constitute 'statistical material' (Title 13, Section 8) *that is releasable after disclosure avoidance measures are applied to control re-identification risk of any particular respondent*."  *Id.* ¶ 8 (emphasis added).  Plaintiff's brief omits the second part, in which Leclerc agrees that the raw Census data Plaintiff requests could not lawfully be provided as it is and acknowledges that the data would have to undergo disclosure avoidance review processes.

Leclerc also acknowledges that the disclosure avoidance techniques the Census Bureau applies before releasing any response data entail far more than simply removing respondents' names.  He notes that, "[f]or example, if an outside party already knows a person's age, sex, and salary, and those same variables appear unaltered in the microdata, it may be possible to infer a single respondent that matches that combination of values" and "[i]f so, the outside party can reasonably conclude that such data corresponds to that person" which "would undermine the confidentiality protections required by Title 13."  *Id.* ¶ 9.  Leclerc explains that the disclosure

avoidance techniques the Census Bureau uses entail "a combination of suppressing (i.e., removing) certain values, rounding data, coarsening data into more aggregate categories, and top-coding." *Id.* ¶ 13. He also notes that "[f]or instance, geographic identifiers or age values might be coarsened to specify only larger geographic areas or age ranges (rather than granular geographic locations or single-year-of-age values)," while "[a]ge might be topcoded, meaning that extremely high ages (that are rare and could lead to identification of a respondent) are cut off using a default number (i.e., 85) or randomly chosen value." *Id.* Thus, as Plaintiff's expert acknowledges, the raw Census response data Plaintiff requested could not be disclosed without the application of disclosure avoidance techniques that go far beyond simply redacting a column of data like names. This undermines Plaintiff's contention that the response files are, somehow, "deidentified statistical material" that could be released. In any event, Plaintiff's expert cannot opine on the ultimate legal issues in the case, like whether "the existing ACS SOGI Test microdata files constitute 'statistical material'" within the meaning of 13 U.S.C. § 8. *Id.* ¶¶ 7-8; *see, e.g.*, *Highland Capital Mgmt. v. Schneider*, 551 F. Supp. 2d 173, 179 (S.D.N.Y. 2008) ("While the expert can make factual conclusions that embrace an ultimate issue to be decided by the fact-finder, the expert cannot give testimony stating ultimate legal conclusions based upon those facts, nor can that testimony track the language of the statute or the law that the defendants are accused of violating.").

Next, Plaintiff contends that the Census Bureau regularly releases ACS PUMS data, which Plaintiff insists is similar to the raw Census data at issue here. Pl.'s Br. at 21. But PUMS are specially-planned data products for certain surveys, and they are released as processed data samples (rather than raw data files) after undergoing significant disclosure avoidance techniques.

Second Poehler Declaration ¶ 24.  The PUMS data are simply not comparable to the SOGI response data for these reasons.

### B.  No Portion of the Response Data Is Reasonably Segregable

As explained in Defendants' opening papers, the ACS SOGI field testing data is wholly comprised of raw Census data and, thus, entirely exempt from disclosure under Exemption 3. Poehler Decl. ¶¶ 16, 26; Second Poehler Decl. ¶ 22.  Plaintiff's Brief does nothing to alter that conclusion.

Plaintiff's argument starts with the premise that the data is "statistical material" subject to potential release under Section 8.  For the reasons discussed above, it is not.  Plaintiff goes on to argue that the Census Bureau could, at least, "segregate[] and produce[] records in a format that shows the field names or column headers of the requested datasets reflecting each category of data that was collected," because the field names themselves are not "'raw census data reported by or on behalf of individuals.'"  Pl.'s Br. at 25 (quoting 13 U.S.C. § 9).  Removing all of the data goes far beyond the "[r]edaction or deletion" Plaintiff suggests is a standard technique employed by agencies in responding to FOIA requests.  Pl.'s Br. at 26.  Moreover, Plaintiff requested the response data itself—not the field names.  Plaintiff cannot reasonably argue that Defendants can segregate the response files by removing all of the data that Plaintiff actually requested.  *See, e.g.*, *Irons v. Levi*, 451 F. Supp. 751, 753 (D. Mass. 1978), *rev'd on other grounds sub nom. Irons v. Bell*, 596 F.2d 468 (1st Cir. 1979) (rejecting plaintiff's request in litigation for "matter not reasonably described in plaintiff's original request," noting, "[h]e may not expand his request at this point");  *Fonda v. CIA*, 434 F. Supp. 498, 501 (D.D.C. 1977) (holding that plaintiff was not entitled to additional search where defendants' interpretation of

her original FOIA request was reasonable and explaining that "[i]f plaintiff wishes a further search, she can file another, more specific, FOIA request").

Plaintiff next contends that the Census Bureau could suppress "numerous data fields" but release some data, for example "*solely* . . . information regarding current gender identity."  Br. at 26.  This again ignores the fact that the testing data Plaintiff seeks is comprised entirely of raw Census data reflecting "information reported by, or on behalf of," particular respondents.  13 U.S.C. § 8(b).  As such, it cannot be segregated because, even if Census provided only some of the responses, that would still constitute information reported by, or on behalf of, particular respondents.  The Census Bureau could not simply produce certain data fields without subjecting them to its disclosure avoidance review process, because even data that does not obviously contain identifying information could be used, alone or in conjunction with other data sources, to identify respondents.  *See* Hawes Decl. ¶¶ 21-22.

Finally, Plaintiff argues that the Census Bureau could simply apply its disclosure avoidance process to the requested response files so they could be disclosed.  Pl.'s Br. at 29.  It is well established, however, that agencies are not required to "alter" or "modify" existing records to comply with FOIA, as the Government would then effectively be "creating" documents, which is "something FOIA does not obligate agencies to do."  *ACLU v. Dep't of Justice*, 681 F.3d 61, 71 (2d Cir. 2012); *see Pierce & Stevens Chem. Corp. v. U.S. Consumer Prod. Safety Comm'n*, 585 F.2d 1382, 1388 (2d Cir. 1978) ("[U]nder the FOIA, an agency does not rewrite a document or create informational material.  It discloses existing documents, which it has already prepared.").

Contrary to Plaintiff's argument, the case law does not support his position that FOIA requires the Census Bureau to undertake its disclosure avoidance process to generate response

information from the SOGI testing that could be disclosed.  Plaintiff first cites *Phillips v. United States Bureau of Census*, 22-cv-9304 (JSR), 2024 WL 230854 (S.D.N.Y. Jan. 22, 2024), and suggests that the court's holdings in that case undercut the Census Bureau's position here. Plaintiff's reliance on *Phillips* is misplaced.  In that case, the court merely addressed whether the plaintiff substantially prevailed in the case for purposes of obtaining fees under FOIA where the Census Bureau did not give him the specific file he requested but publicly disclosed a different but "comparable" file. *Id.* at *3.  In holding that the plaintiff substantially prevailed for fee award purposes, the court did not suggest that the Census Bureau had to modify the requested file to generate a "comparable" file that could be released.  In fact, the court said the opposite.

The court noted that the Census Bureau planned to release the files it ultimately released long before the plaintiff filed suit, but it had to "overcome" certain "challenges" before it could release them.  *Id.* at *4.  These included decisions about "how to protect respondent's confidential information, how to make the files it ultimately released user friendly, and how to communicate the difference between the data in the noisy measurement files and the publicly reported data in the Census to ensure the data would be used properly."  *Id.*  The court made clear that the Census Bureau was not required to undertake this process to respond to plaintiff's FOIA request, but did so of its own accord and for reasons unrelated to the request.  *Id.* Specifically, one of the files the plaintiff requested was a 2010 file that had been deleted.  With respect to this file, the court explained that, "as the Government correctly points out, its decision to recreate a comparable file to the requested 2010 file does not reflect an obligation imposed on the Census Bureau under FOIA,"  *id.* at *5 (citing *ACLU v. Dep't of Justice*, 681 F.3d 61, 71 (2d Cir. 2012) ("FOIA does not obligate agencies to" "creat[e] documents.")), and "[i]nstead, the

Census Bureau's decision to recreate the file was a recognition of the academic importance of such a file." *Id.*

The second file plaintiff requested was a 2020 file that the Census Bureau possessed but withheld pursuant to 13 U.S.C. § 9.  The court held that "it was reasonable for the Census Bureau to deny plaintiff's request to release the 2020 file because it fell within the parameters of FOIA Exemption 3." *Phillips*, 2024 WL 230854, at *5.  The court made this finding based in part on the Census Bureau's declaration, which explained that "the commingled confidential data (which was ultimately removed from the 2020 file that was released) and the noisy measurements themselves [which plaintiff sought] could not be disclosed under these statutory provisions." *Id.* at *6.  The court explained that "Plaintiff does not appear to take issue with the commingled confidential data being exempt from disclosure (and if he did, it would be meritless).  Instead, plaintiff appears to believe that the noisy measurements themselves would not lead to the risk of disclosing respondent's information." *Id.*  The court rejected plaintiff's argument, explaining that "what plaintiff overlooks is that the Census Bureau was not able to confirm that the noisy measurements would not risk disclosure of respondent's information until after December 2022, when plaintiff's FOIA request was denied," because it had not completed the "lengthy process" of creating a file that could be disclosed without violating the statute. *Id.* at *4, 6.  The *Phillips* court thus directly rejected the argument Plaintiff makes here—that the Census Bureau should be required to undertake such a process to respond to a FOIA request.

Next, Plaintiff contends that requiring the Census Bureau to apply disclosure avoidance techniques to generate files that could be produced to Plaintiff is akin to requiring U.S. Immigration and Customs Enforcement to substitute non-citizens' exempt Alien Identification Numbers for anonymized identifiers, as the Second Circuit approved in *ACLU v. USCIS*, 58 F.

4th 643, 663 (2d Cir. 2023).  It is not.  As explained in Defendants' opening papers, the Second

Poehler Declaration, and above, the disclosure avoidance process entails far more than simply

removing respondents' names or substituting them for anonymous identifiers.  Requiring the

Census Bureau to undertake disclosure avoidance review to generate products that could be

disclosed is far more like—and yet still more involved than—procedures courts have held would

inappropriately require the agency to create new records.  *See, e.g.*, *ACLU v. Dep't of Justice*,

681 F.3d 61, 71 (2d Cir. 2012) (holding that district court had exceeded its authority under FOIA

by proposing a disclosure "compromise," whereby classified information in responsive records

would be replaced by "a purportedly neutral phrase composed by the court"); *Flightsafety Servs.*

*Corp. v. DOL*, 326 F.3d 607, 613 (5th Cir. 2003) (holding that requiring agency to "insert new

information in place of the redacted information requires the creation of new agency records, a

task that the FOIA does not require the government to perform"); *Students Against Genocide v.*

*Dep't of State*, 257 F.3d 828, 837 (D.C. Cir. 2001) (rejecting request that agency "produce new

photographs at different resolution" to mask confidential information, stating that "although

agencies are required to provide 'any reasonably segregable,' non-exempt portion of an existing

record, 5 U.S.C. § 552(b), they are not required to create new documents").  Notably, in *ACLU v.*

*USCIS*, the Second Circuit distinguished these other cases on the grounds that the processing

required would have "altered the substantive content of the exempt record" and "required the

exercise of judgment and analysis in effecting the proposed substitution," *id.* at 661—measures

that would indisputably be required here if the Census Bureau subjected the SOGI response files

to its disclosure avoidance process.  By contrast, "the substitution of meaningless Unique IDs

could be effected by an automated replacement program without any agency (or court) analysis,

research, or judgment." *Id.* Here, the application of disclosure avoidance techniques to the existing records would require the Census Bureau to apply its expertise to create a new record.

Accordingly, no portion of the requested data files is reasonably segregable.

## II.    The Draft RTI Report Is Protected from Disclosure by FOIA Exemptions 3 and 5

### A.   The Draft RTI Report Is Properly Withheld Pursuant to Exemption 3 Because 13 U.S.C. § 9 Bars Its Release

The Census Bureau also cannot release the draft RTI report because it contains Census response data intermingled throughout and because, like the response data itself, it has not undergone the Census Bureau's rigorous disclosure avoidance review process. *See* Second Poehler Decl. ¶¶ 10-11; Hawes Decl. ¶ 20.

Plaintiff does not appear to dispute that 13 U.S.C. § 9 applies to the draft RTI report, or that it bars release of the report in its current form. Instead, Plaintiff argues that the Census Bureau could release "the narrative portions of the [report]" so that Plaintiff could "understand the methodology and observations RTI gained in testing questions about SOGI." Pl.'s Br. at 9. As with Plaintiff's argument concerning his data request, this argument appears to be based on a fundamental misunderstanding of Section 9 and the Census Bureau's disclosure avoidance review process.

As explained in the Second Poehler Declaration, the draft report includes summaries of respondents' answers to ACS questions, quotations from respondents about how they understood or interpreted question terms and how easy or hard they found the questions to answer, information about their personal experiences, and summary data such as recruiting information and respondent demographics. Second Poehler Decl. ¶ 10. As the declaration explains, "[t]hese data are expressed in tables and intertwined with text and are not fully discernable to an ordinary reader. A Census Bureau employee experienced with disclosure requirements for cognitive

testing reports would need to review the entire report to either confirm proper disclosure methods were used or to determine what disclosure avoidance processes will need to be utilized before the report can be released." *Id.*

Further, the disclosure avoidance review process entails far more than "redact[ing] . . . quotations and data," as Plaintiff suggests. Pl.'s Br. at 10. Instead, when conducting the process, the Census Bureau's Disclosure Review Board evaluates the disclosure risk of a proposed information product not just on its own, but in the context of prior and anticipated future releases from the same source data and related and third-party data sources. Hawes Decl. ¶ 7. The DRB considers information about the material's geographic detail, sampling methodology, granularity, potential for linkage to external data sources, relation to other Census Bureau statistical products, information on any special populations at additional risk of reidentification, and the proposed disclosure avoidance mechanism(s) to be used, and applies a variety of disclosure avoidance methods, including suppression, coarsening, and noise infusion, that change the material. *Id.* ¶¶ 9-15. Portions of a report containing data that implicates 13 U.S.C. § 9 cannot simply be excised and produced without going through disclosure avoidance review. *See* Poehler Decl. ¶ 10.

Plaintiff also attempts once again to rely on *Phillips* to argue that the Census Bureau could simply excise confidential data and produce the remainder of the report. Pl.'s Br. at 11. But as explained above, the court in *Phillips* recognized that the Census Bureau could not release materials containing Census response data without subjecting those materials to the "lengthy" disclosure avoidance review process. *Phillips*, 2024 WL 230854, at *6. The court did not suggest, as Plaintiff does here, that the Census Bureau could simply redact certain discrete information.

Plaintiff also points to a 2023 report from RTI as evidence that the Census Bureau could supposedly segregate materials containing or referencing individual response data and produce the remainder of the report.  Pl.'s Br. at 11 (citing Y. Patrick Hsieh et al., Research on Public Opinion of Administrative Records: Cognitive Testing Report, Dec. 2003, available at https://www2.census.gov/library/working-papers/2023/adrm/cbsm/rsm2023-12.pdf).  As an initial matter, Plaintiff is mistaken that the cited report is "an example of a similar record."  Pl.'s Br. at 11.  In fact, the 2023 report is from the Census Bureau's Research & Methodology Directorate.  ACS and ACS testing is separate and distinct from the Research & Methodology Directorate.    At any rate, like all of the materials based on response information that the Census Bureau discloses to the public, the 2023 RTI report underwent a detailed disclosure avoidance review process.  *See* Hawes Decl. ¶ 6; *see also* 2023 Report at 3 (stamp on cover page indicating: "The Census Bureau has reviewed this data product for unauthorized disclosure of confidential information and has approved the disclosure avoidance practices applied").  And again, that process entails far more than simply redacting discrete information.

Plaintiff also argues that Defendants could at least release small portions of the report like section headings.  Pl.'s Br. at 9, 12.  But "FOIA requires only separation of what is reasonably segregable, permitting the agency to avoid committing significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content."  *Wadelton v. Dep't of State*, 106 F. Supp. 3d 139, 155 (D.C. Cir. 2015).  Further, like Plaintiff's suggestion that the Census Bureau provide the field names of the raw data he seeks without the raw data itself, providing Plaintiff with the table of contents or headings of the draft report without any of its actual contents would effectively respond to a different request that Plaintiff did not make.  *See, e g.*, *Irons*, 451 F. Supp. at 753;

*Fonda*, 434 F. Supp. at 501.  This argument also ignores the fact that the entire report would have to go through the disclosure avoidance review process to be released in part or in any form. *See* Hawes Decl. ¶ 8; Poehler Decl. ¶ 10.

### B.  The Draft RTI Report Is Properly Withheld Pursuant to Exemption 5

#### i.   *The Draft RTI Report Is Subject to the Deliberative Process Privilege*

As explained in Defendants' opening papers, even if any portion of the draft RTI report could be segregated for purposes of avoiding Section 9's statutory bar, the entire report is properly withheld pursuant to the deliberative process privilege under FOIA Exemption 5.

Plaintiff first argues that the draft RTI report is "[n]ot the [t]ype of [d]ocument" protected by the deliberative process privilege because the Census Bureau uses final versions of such reports "to inform public discussion."  Pl.'s Br. at 13.  As explained in the Second Poehler Declaration, "[a]lthough the Census Bureau often releases testing reports publicly to support government transparency, the purpose of the RTI report was to inform the Census Bureau's decisions regarding the type of questions to include in future ACS testing.  In other words, the RTI report was not created to inform the public, although that can be a byproduct of public release."  Second Poehler Decl. ¶ 16.  The Declaration further notes that "[t]his is evident in the fact that the Census Bureau typically does not solicit public feedback on research and evaluation reports and never intended to do so for the ACS SOGI testing."  *Id.*  To the extent Plaintiff suggests that the draft RTI report could only be subject to deliberative process protection if guiding agency decisionmaking was "the sole purpose of the report," Pl.'s Br. at 13, that is not the standard.  *See, e.g.*, *N.Y. Times Co. v. Dep't of Educ.*, 658 F. Supp. 3d 171, 185 (S.D.N.Y. 2023) (A document is deliberative if it is "actually . . . related to the process by which policies are formulated.").  The RTI report was intended to guide the Census Bureau's decisionmaking on

whether and what kind of SOGI questions to include in future ACS testing, and, when finalized, would also reflect the Census Bureau's decisions, in conjunction with RTI, about how to present findings and what recommendations to make. Second Poehler Decl. ¶ 15. Accordingly, the report "formed an essential link in a specified consultative process." *N.Y. Times Co.*, 658 F. Supp. 3d at 185 (describing one factor courts look at in determining whether a document is protected by the deliberative process privilege).

Further, Plaintiff asserts that cognitive testing reports of the type he seeks include a disclaimer stating that "[t]his report is released to inform interested parties of research and to encourage discussion" and "[t]he views expressed are those of the authors and not those of the U.S. Census Bureau." Pl.'s Br. at 6, 14. That is inaccurate. That disclaimer is most often used for papers released by the Census Bureau's Research & Methodology Directorate, of which ACS Office is not part. Second Poehler Decl. ¶ 7. Prior ACS cognitive testing reports do not contain this disclaimer. *Id.* As explained in the Second Poehler Declaration, the drafting of the RTI report at issue was an iterative process involving comments and input from Census Bureau employees. *Id.* ¶ 14. Further, had work on the report not ceased and that process had been completed, "the findings in the report would very likely have changed between the current draft and a potential final version based on input from and discussions with Census Bureau employees." *Id.* Thus, it is not the case, as Plaintiff claims, that the RTI report solely reflects the "personal opinions of the writer rather than the policy of the agency." Pl.'s Br. at 13 (quoting *N.Y. Times Co.*, 658 F. Supp. 3d at 185 (describing second factor courts look at in determining whether a document is protected by the deliberative process privilege)).

Finally, the third factor described in *New York Times Co. v. Department of Education* also reflects that the draft RTI report is deliberative. Specifically, because RTI was still

responding to comments and edits from Census Bureau employees, the draft report would, if released, "inaccurately reflect or prematurely disclose the views of the agency." *N.Y. Times Co.*, 658 F. Supp. 3d at 185; *see* Second Poehler Decl. ¶¶ 17-18.

   *ii. No Portion of the Draft RTI Report Could Be Segregated and Released*

   Plaintiff next claims that the Census Bureau should segregate and release the "factual information contained within the report." Pl.'s Br. at 15. As Defendants explained in their opening papers, however, deciding which factual information to include in the report is also pre-decisional and deliberative. Poehler Decl. ¶ 25; *see Mapother v. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) ("Given the need for deliberation to inform discretion and for confidentiality to protect deliberation, we have felt bound to shelter factual summaries that were written to assist the making of a discretionary decision"). As explained in the Second Poehler Declaration, when preparing a draft report such as the draft RTI report RTI "review[s] the universe of information collected and possible issues arising during testing and selects the facts and issues they deem most relevant for informing the Census Bureau's decisions." Second Poehler Decl. ¶ 18. In the case of the draft RTI report, "when work stopped the selection of factual information to include with the recommendations, as well as the formulation of the recommendations themselves, were still ongoing and subject to internal discussion before the report was finalized." *Id.* Given that the iterative process of formulating the descriptions and recommendations in the draft RTI report was not completed, portions of the report, including supposed "factual information," cannot be segregated.

   *iii. Disclosure of the Draft RTI Report Would Cause Foreseeable Harm*

   Defendants have shown that releasing the draft RTI report in its current, unfinished state would cause foreseeable harm. First, as explained in both Poehler Declarations, disclosure of the

unfinished report would risk public confusion, as the public likely would not understand the nature of the in-process draft and how it fits into the Census Bureau's process for determining ACS test questions.  First Poehler Decl. ¶¶ 19-20; Second Poehler Decl. ¶ 19.  For example, some of the comments and edits in the report note possible factual errors or the need for clarification that have not been addressed or corrected.  Disclosing either these comments and edits or the underlying material that may need to be corrected would therefore risk public confusion.  *Id.*  Additionally, some of the comments might not be accepted for inclusion in a final report.  *Id.*  Releasing an unfinished version of the report means releasing potentially inaccurate information that the public may assume was already verified.  *Id.*

Disclosure of the draft RTI report would also risk harm to future Census Bureau testing and deliberations.  *Id.* ¶ 21.  Testing, including research to identify problems and determine options that do not generate sound results, is crucial to the Census Bureau's mission.  *Id.*  Subjecting the testing process and findings to public scrutiny before testing is complete or before test findings are fully analyzed and final recommendations are formulated risks slowing or halting the process for future tests.  *Id.*

Plaintiff argues that Defendants have failed to show that disclosure of the draft RTI report would cause foreseeable harm because the Census Bureau routinely publicly disseminates cognitive testing reports.  Pl.'s Br. at 17.  This argument ignores the fact that the Census Bureau publicly disseminates finalized cognitive testing reports after the completion of the iterative process where Census Bureau employees comment and provide factual corrections and the contractor responds to those comments and corrections.  Here, by contrast, Plaintiff seeks disclosure of an unfinished draft report on which work was stopped mid-stream.  The Census Bureau employees and contractor employees who worked on the report expected that a fully

vetted and finalized version of the report would be disclosed. They did not expect an unfinished and unfinalized draft of the report to be disclosed. Such disclosure would chill their candor in the future. *See NRDC v. EPA*, 954 F.3d 150, 158 (2d Cir. 2020) ("The key question we keep in mind when assessing the application of the deliberative process privilege to an agency record is whether disclosure would tend to diminish candor within an agency." (internal quotation marks omitted)); *Reporters Committee for Freedom of Press v. FBI*, Civil Case No. 15-1392 (RJL), 2022 WL 1908841, at *3 (D.D.C. June 3, 2022) (government established that disclosure of draft Office of Inspector General report would cause foreseeable harm where "disclosure of the draft resulting from [OIG's review of a DOJ component] would impede the agency's deliberations during that same process in the future" because OIG had not yet had a chance to "review the draft report for factual accuracy, for sensitivity, and to raise questions or concerns about the proposed recommendations before the final report is issued").

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment should be granted and Plaintiff's motion for summary judgment should be denied.

Dated: March 6, 2026
      New York, New York

                     Respectfully submitted,

                     JAY CLAYTON
                     United States Attorney
                     Southern District of New York

By:    */s/ Rachael Doud*
                     RACHAEL DOUD
                     Assistant United States Attorney
                     86 Chambers Street, Third Floor
                     New York, New York 10007
                     Telephone: (212) 637-2699
                     E-mail: rachael.doud@usdoj.gov

**Certificate of Compliance**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 7,103 words.