UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN B. FREEMAN,<br><br>Plaintiff,<br><br>v.<br><br>U.S. CENSUS BUREAU, et al.,<br><br>Defendants. | Civil Action No. 25-7834 (LJL) |

## SECOND DECLARATION OF ELIZABETH POEHLER

Pursuant to 28 U.S.C. Section 1746, I, Elizabeth Poehler, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I serve as the Assistant Division Chief for Survey Methods in the American Community Survey Office ("ACSO"), United States Census Bureau (the "Census Bureau" or "Census"). I have served in this role since August 1, 2021. In this role, I am responsible for technical and programmatic oversight of research and testing for the American Community Survey ("ACS").

2. The ACS is an ongoing survey conducted by Census that collects detailed social, economic, housing, and demographic information from a sample of households across the 50 states, the District of Columbia, and Puerto Rico. Data is collected via self-response modes (internet and paper) as well as interviewer-administered modes (telephone and in person). The ACS conducts regular research, testing, and evaluations aimed at improving the survey. The research informs potential changes to the survey including changes to data collection methods and question wording.

1

3. I make the statements herein on the basis of personal knowledge, as well as on information provided to me in my official capacity.

4. This second declaration supplements and incorporates by reference my January 12, 2026, Declaration in support of Defendants' Motion for Summary Judgment.

**RTI Cognitive Testing Draft Report**

5. In or around February 2024, the Census Bureau began conducting cognitive testing on adding sexual orientation and gender identity ("SOGI") questions for the ACS in collaboration with RTI International, a Census Bureau contractor. RTI began preparing a draft report concerning the results of the cognitive testing (the "RTI ACS SOGI Cognitive Testing Report"). The primary purpose of the report was to inform the Census Bureau's decisions regarding the wording of SOGI questions for possible future ACS testing. Following the issuance on January 20, 2025, of Executive Order ("EO") 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, the Census Bureau suspended RTI's cognitive testing work and stopped work on RTI's draft report, which had not been finalized.

6. I have personally reviewed the draft RTI ACS SOGI Cognitive Testing Report and am familiar with its contents. The RTI report is marked as a "Draft Report" on the title page. It also states on the title page that the draft report was prepared for the U.S. Census Bureau by RTI International. Previous ACS cognitive testing reports have included information on methodology, findings, and recommendations, and appendices that include recruiting and interview materials. The draft RTI ACS SOGI Cognitive Testing Report is over 200 pages and includes similar sections.

7. Plaintiff suggests the draft RTI ACS SOGI Cognitive Testing Report contains an author disclaimer, such as: "*Disclaimer*: This report is released to inform interested parties of research and to encourage discussion of work in progress. Any views expressed on the

methodological issues are those of the authors and not those of the U.S. Census Bureau."[1] The draft RTI ACS SOGI Cognitive Testing Report does *not* contain this type of disclaimer. This disclaimer is most often used for papers released by the Census Bureau's Research & Methodology Directorate, of which the ACSO is not a part. Prior ACS cognitive testing reports do not contain this disclaimer.[2]

8. The draft report also does *not* contain a statement indicating that it has been cleared for public release. To be cleared for release, a report must include a statement such as: "The Census Bureau has reviewed this data product for unauthorized disclosure of confidential information and has approved the disclosure avoidance practices applied." The fact that this language does not appear on the requested draft RTI report is evidence that the report has not been cleared for public disclosure.

*Title 13 and Exemption 3 of the FOIA*

9. FOIA Exemption 3 allows agencies to withhold information prohibited from disclosure by another federal statute. The Census Bureau and its employees are bound by Title 13, Sections 8 and 9, which prohibit disclosure of identifiable respondent information, including raw Census Bureau data. These protections extend to all data revealed by or on behalf of survey respondents, not just their names or addresses. For example, during the SOGI cognitive testing, respondents answered a subset of the ACS questions and explained how they came up with their answers, how they might paraphrase the questions, and what specific terms meant to them. All of

---

[1] *See* Cognitive Pretesting of the National Telecommunications and Information Administration 2023 Internet Use Survey (December 2024), available at https://www2.census.gov/library/working-papers/2024/adrm/cbsm/rsm2024-10.pdf.

[2] *See* https://www.census.gov/library/working-papers/2022/acs/2022_Wilson_02.html and https://www.census.gov/library/working-papers/2022/acs/2022_Wilson_01.html, and https://www.census.gov/library/working-papers/2016/acs/2016_Westat_05.html.

the data collected is confidential. Wrongful disclosure of protected information can result in criminal or financial penalties for Census Bureau employees.

10. The results sections of the draft RTI report include summaries of respondents' answers to ACS questions, quotations from respondents about how they understood or interpreted question terms, how easy or hard they found the questions to answer, and information about their own personal lived experiences. Other sections of the report include additional summary data, including information on how the Census Bureau recruited respondents, and the demographics of respondents, including their sexual orientation and gender identity. These data are expressed in tables and intertwined with text and are not fully discernable to an ordinary reader. A Census Bureau employee experienced with disclosure requirements for cognitive testing reports would need to review the entire report to either confirm that proper disclosure methods were used or determine what disclosure avoidance processes would need to be utilized before the report could be released.

11. If work on the draft report had not stopped as a result of the Executive Order, Census planned to finalize its contents in conjunction with RTI and subject the report to disclosure avoidance review to assess the risk of an outside actor inferring confidential information from the contents of the report and apply statistical techniques to mitigate that risk. All information products (such as a research report like the RTI ACS SOGI Cognitive Testing Report) must be reviewed to ensure the confidentiality of protected information and administratively restricted information, per the Census Bureau's Statistical Quality Standards.[3]

---

[3] *See* Section S1 of https://www2.census.gov/about/policies/quality/quality-standards.pdf.

*Exemption 5 of the FOIA: Deliberative Process Privilege*

12. The draft RTI report is pre-decisional. It is an incomplete, working draft containing unresolved edits and comments. No final, releasable version of the report exists.

13. The draft report contains approximately 90 comments from Census Bureau employees that were not addressed or resolved before work stopped on the document. In addition, nearly all of the over 200 pages in the document contain edits in "track changes," from Census Bureau employees and RTI staff, that have not been accepted or rejected. The editorial changes and comments include edits for clarity, as well as identification of potential factual errors. This back and forth is a typical part of the testing process.

14. When RTI originally began this project, the plan was for RTI to deliver a draft report with its conclusions regarding the SOGI testing and recommendations to the Census Bureau. RTI was to deliver a final report after the Census Bureau provided feedback to RTI and Census and RTI had worked through any issues. When work on the report stopped, the iterative process of commenting on the draft and resolving those issues had not been completed. As a result, the findings in the report would very likely have changed between the current draft and a potential final version, based on input from and discussions with Census Bureau employees.

15. The Census Bureau intended to use the final report and the recommendations included therein—once received—to make decisions on whether and what kind of SOGI questions to include in future ACS testing. The report would also reflect the Census Bureau's input, in conjunction with RTI, about how to present the findings and what recommendations to make in the report itself. However, before the report was complete, and thus before any decisions could be made about the ultimate findings and recommendations of the report, the Census Bureau ceased work in compliance with EO 14168.

16. Although the Census Bureau often releases testing reports publicly to support government transparency, the purpose of the RTI report was to inform the Census Bureau's decisions regarding the type of questions to include in future ACS testing. In other words, the RTI report was not created to inform the public, although that can be a byproduct of public release. This is evident in the fact that the Census Bureau typically does not solicit public feedback on research and evaluation reports and never intended to do so for the ACS SOGI testing.

17. Disclosure of the unfinished report would risk public confusion, as the public is not likely to understand the nature of the in-process draft and how it fits into the Census Bureau's process for determining ACS test questions. For example, some of the comments and edits in the report note possible factual errors or the need for clarification that have not been addressed or corrected. Additionally, some of the comments could ultimately not be accepted for inclusion in a final report. Releasing an unfinished version of the report means releasing potentially inaccurate information that the public may assume was already verified.

18. The draft report was still going through the iterative process between RTI and the Census Bureau when work on it was stopped. In preparing the draft report, contractors review the universe of information collected and possible issues arising during testing and select the facts and issues they deem most relevant for informing the Census Bureau's decisions. With respect to the draft RTI report, when work stopped the selection of factual information to include with the recommendations, as well as the formulation of the recommendations themselves, were still ongoing and subject to internal discussion before the report was finalized.

19. Disclosure of the draft report also risks harm to future Census Bureau testing and deliberations. Testing, which includes research to identify problems and determine options that do not generate sound results, is crucial to the Census Bureau's mission. If the testing process and

findings are subject to public scrutiny before testing is complete or before test findings are fully analyzed and final recommendations formulated, it risks slowing or halting the process for future tests.  Quality checks commonly identify errors during the iterative process of report reviews.  Releasing factually incorrect information to the public can cause confusion and raise questions about the legitimacy of the work, including the work of contractors or Census Bureau staff.  This type of scrutiny could lead to contractors not bidding on future Census Bureau projects.

### Self-Response and Paradata Files

20. Plaintiff requested two internal data files for the ACS SOGI test: the self-response file and the web paradata file, both of which are raw data and not statistical products.  The self-response file contains the data collected from respondents during test collection, often called survey responses.  The file the plaintiff requested can be visualized like an Excel data file, with one row for every person whose data was collected in the interview and columns for every question asked and answer provided.

21. The web paradata file contains the behaviors captured from respondents during their interaction with the test collection instrument.  The web paradata file is unstructured data and therefore is more complex to use; typically, a select group of analysts at the Census Bureau have experience working with paradata files.  The data file is in XML format and requires a parser to be able to process.  The file includes data such as the time the user went to the webpage, keystroke data such as where the user clicked on the page, the data entered on the webpage, any system messages that were displayed (such as error messages), and the time the user exited the webpage.  In the ACS, each question is displayed on a webpage by itself.  When users finish answering a question they navigate to the next page to see the next question.  Each page accessed for each person in the household will have this paradata, including if the user goes back to a previous

question, changes an answer, etc. An example of a section of paradata (with completely fake data) may look something like:

```
<event time="1443025340" type="login">
<environment useragent="Mozilla/5.0 (Windows NT 6.1) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/45.0.2454.99 Safari/537.36" />
</event>
<event page="main_menu" time="1443025341" type="entry" />
<event page="main_menu" time="1443025351" type="field_change">
<field name="undefined" value="" />
</event>
<event page="main_menu" time="1443025385" type="exit" />
<event page="main_menu" time="1443025385" type="hyperlink">
<link url="https://respond.census.gov/survey/main_menu" />
</event>
```

22. As I stated in my previous declaration, the self-response and web paradata files are wholly comprised of raw Census Bureau data, protected from disclosure under 13 U.S.C. § 9. These files are not aggregated data or a tabulation. Plaintiff erroneously claims that because the data files contain responses in numerical form, that amounts to deidentification or renders it "statistical material." This is incorrect. Plaintiff refers to the manner in which the individual data is recorded, and not the substance of the data. This assertion reflects a lack of knowledge regarding the standard survey process. The Census Bureau often records survey responses in numerical format rather than word form. For example, as respondents answer survey questions, they see a survey question on their screen such as, "Are you male or female?" with buttons to select their response. The output data file would likely translate this selection into a numeric representation of the selection, such as 1 for male and 2 for female. Alternatively, a question might prompt respondents to write-in their response. For example, for the question "Where were you born?" a respondent born in the United States is prompted to write-in or select from a list of states. The output data file would include what the respondent wrote, including typos and spelling errors. For ease of processing these write-ins are often "coded" into numeric representations, such as 01 for

Alabama.[4]  Therefore, the self-response and web paradata files are wholly comprised of raw Census Bureau data.

23.   Under Title 13, the Census Bureau is not permitted to release microdata and paradata in good faith without conducting a disclosure avoidance review.  As I stated previously, the Census Bureau plans and releases 1-year and 5-year Public Use Microdata Samples ("PUMS") files for the official ACS on an annual basis.  PUMS files allow data users to calculate their own estimates and margins of error that may not be available in pre-tabulated products on data.census.gov, the Census Bureau's primary data dissemination platform.

24.   The ACS PUMS are unique, planned data products that are not created for every Census Bureau survey.  PUMS files are not raw data files.  The PUMS files are created after a series of data preparation and processing steps are completed and after applying several proprietary disclosure avoidance techniques to comply with Title 13, including identifying a sub-sample of records for release.[5]  PUMS files, having gone through these steps, are planned and released to the public as data products.

25.   The data files that Plaintiff requested have *not* undergone these types of data preparation steps, have *not* had identifying data removed, and have *not* been assessed for disclosure risk.  The files contain identifiers such as the respondent's state, respondent name, telephone number, age, sex, and race, which can be used to identify individual respondents.  The data cannot be deidentified merely by removing a column or two.  The Census Bureau has not applied any

---

[4] *See* https://www.census.gov/library/reference/code-lists/ansi.2020.html#list-tab-230474085 for Census Bureau standardized geographic codes.

[5] *See* Chapter 10 of the ACS Design and Methodology report for a discussion of data preparation and processing steps that occur: https://www2.census.gov/programs-surveys/acs/methodology/design_and_methodology/2024/acs_design_methodology_ch10_2024.pdf.

algorithms, redactions, or deidentification techniques to the requested data files. Although Plaintiff requested deidentified files, the files have *not* been deidentified and do not exist in deidentified form.

26.     The Census Bureau has never released PUMS files or similar microdata files (response or paradata) for ACS testing activities. Consistent with this prior ACS practice, the Census Bureau did not plan to create a PUMS file, which would be a new data product, and never created a PUMS file for the 2024 ACS SOGI Test data files.

27.     The declaration of Plaintiff's expert, Philip Leclerc, incorrectly refers to the 2020 Census Barriers, Attitudes, and Motivators Study ("CBAMS") as a "methodological test" in an attempt to draw a comparison to the ACS SOGI Test. The 2020 CBAMS was not a content test like ACS SOGI, which tested potential questions to include in a future survey. CBAMS was a self-contained national survey, not a test of survey design or question wording for the Census. Crucially, any released CBAMS results were subjected to a risk assessment and disclosure avoidance review.

28.     With respect to the requested self-response and paradata files, the entire files are exempt from disclosure under Title 13 and Exemption 3 of the FOIA. The files consist entirely of raw Census Bureau data protected from disclosure under Title 13. The Census Bureau is prohibited from publicly releasing even a portion of these data files, even if certain data fields are removed. The Census Bureau would need to create a new product that does not currently exist to comply with the Plaintiff's request.

_____

Elizabeth Poehler
Assistant Division Chief, Survey Methods
U.S. Census Bureau

Executed this 6th day of March 2026.