# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN B. FREEMAN,<br><br>       Plaintiff,<br><br>   v.<br><br>U.S. CENSUS BUREAU, et al.,<br><br>      Defendants. | Civil Action No. 25-7834 (LJL) |

## <u>DECLARATION OF MICHAEL HAWES</u>

Pursuant to 28 U.S.C. Section 1746, I, Michael Brewster Hawes, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I serve as the Senior Survey Statistician for Scientific Communication at the U.S. Census Bureau, a position I have held since December 2022. I have worked at the Census Bureau for a total of ten years. Prior to assuming my current position, from June 2008 until November 2011, I worked as a statistician and policy analyst in the Policy Coordination Office, and from May 2019 until December 2022, I worked as the Senior Advisor for Data Access and Privacy.

2. As the Senior Survey Statistician for Scientific Communication, I am responsible for research and development relating to scientific communication about Census Bureau initiatives and on issues relating to the development, access, management, quality, and confidentiality of Census Bureau data and statistical products. I also serve as a senior technical advisor to the Census Bureau's Chief Scientist and Associate Director for Research and Methodology on issues relating to data confidentiality, disclosure avoidance, and data access, among other topics. During the 2020 Census production cycle (2019-2023), I was an active member of the interdisciplinary team that designed and implemented the disclosure avoidance system for the 2020 Census, and I served as

1

the primary interface on disclosure avoidance issues between the Census Bureau's senior leadership and the agency's broader stakeholders and data users. Since 2023, I have co-chaired the Census Bureau's Disclosure Avoidance Futures Working Group, in which capacity I help oversee and manage disclosure avoidance research and development for the 2030 Census and other statistical products. I am frequently called upon to advise senior leaders within the Census Bureau and across government on enterprise-level decisions and governance relating to disclosure avoidance and data access.

3.      As reflected in my attached CV, my other professional qualifications pertinent to this declaration include the following. I have held a professional certification from the International Association of Privacy Professionals as a Certified Information Privacy Professional/Government since 2011. From November 2011 until December 2016, I served as Statistical Privacy Advisor for the U.S. Department of Education, during which time I established and chaired the Department's first agency-wide Disclosure Review Board. Since 2017, I have been an appointed member of the interagency Federal Committee on Statistical Methodology ("FCSM"), specializing in the areas of data access and disclosure avoidance. From 2019 until 2024, I chaired the FCSM subcommittee on Updating Statistical Methods for Safeguarding Protected Data. I currently serve as the Vice-Chair of the federal interagency Disclosure Review Officer Council. I am an elected Fellow of the American Statistical Association and currently chair the association's Committee on Privacy and Confidentiality.

**Disclosure Avoidance**

4.        Disclosure avoidance, known more formally as statistical disclosure limitation, is the process of assessing the risk of confidentiality-violating inference in an information product[1] and, when necessary, applying one or more statistical techniques to mitigate that risk.  In the context of official statistics, such as the information products created  by the Census Bureau, this entails assessing and mitigating the risk that a particular data subject (e.g., an individual, household, or establishment) could be singled out in a public information product and/or that confidentiality-violating inferences could be made about them. This is achieved by introducing uncertainty into the published statistics sufficient to reduce an outside actor's ability to correctly identify a particular data subject and/or correctly infer response information about them.

5.        When considering an information product for release, the Census Bureau must ensure that it is complying with 13 U.S.C §§ 8(b) and 9, and that the disclosure risk associated with the release of the product has been sufficiently reduced. The first step in determining that this has been achieved is determining where the product may be vulnerable to a privacy attack (or where the product may enable a privacy attack on another information product). This is not a process for which there is a universal, formulaic recipe. Determining the disclosure risk of the information product requires a deep understanding of, among other considerations, its content, scope, granularity, precision, and context (including all other related available data products); there is no magic one-size-fits-all formula, as the process is highly individualized and can be quite

---

[1]        The Census Bureau defines an information product as "any statistical product produced either by Census Bureau staff or using Census Bureau data." This is an overarching term that includes products, usually intended for external distribution, in a variety of forms, including data sets, tabulations, research reports, working papers, news releases, data visualizations, and more. U.S. Census Bureau, *Statistical Quality Standards* (rev. Apr. 19, 2023), pp. 124 and 185, *available at* https://www2.census.gov/about/policies/quality/quality-standards.pdf.

extensive. The larger the product, the more detailed and granular it is, and the overall precision and accuracy of the information all generally increase disclosure risk.[2] This is why microdata products, which contain detailed individual-level information, often carry greater disclosure risk than highly aggregated tabulations or statistics. Once the risk profile of the product has been assessed and understood, ensuring that the product has been sufficiently protected against disclosure will often require reducing the quantity, granularity, or accuracy/precision of the information in the product. Sometimes, ensuring the confidentiality protections of Title 13 may require curtailing the public release of the information altogether.

### The Disclosure Review Board

6.      Enterprise-level governance of all data stewardship issues at the Census Bureau, including ensuring compliance with the confidentiality and non-disclosure provisions of 13 U.S.C. §§ 8(b) and 9, is the responsibility of the Census Bureau's Data Stewardship Executive Policy (DSEP) committee.  To support DSEP in its work, the committee established the Census Bureau's Disclosure Review Board (DRB), "to ensure that every information product released by the Census Bureau adheres to the confidentiality requirements of Title 13 and other applicable statutes.  This includes proposing policies and setting methodologies underlying confidentiality protection, reviewing Census Bureau information products for potential disclosure concerns before they are publicly released, identifying research opportunities, and coordinating the confidentiality-related activities needed to inform decision-making on data collection, data linking, and data dissemination."[3]   DSEP policy requires that every information product or statistic that Census

---

[2]      *See* Michael B. Hawes, *et al.*, *Toward a Principled Framework for Disclosure Avoidance*, HARVARD DATA SCIENCE REVIEW (Special Issue 6) (Aug. 20, 2025), *available at* https://hdsr.mitpress.mit.edu/pub/bux70n5u/release/3.

[3]      DS025: Organization of the Disclosure Review Board, at 1, *available at* https://www2.census.gov/foia/ds_policies/ds025.pdf.

creates from confidential data must be cleared through the DRB's disclosure avoidance process and be issued a DRB clearance number prior to public release.[4]

7.      The DRB's risk assessment function is multi-faceted. It must evaluate the disclosure risk of a proposed information product not just on its own, but also in the context of prior and anticipated future releases from the same source data and in the context of related and third-party data sources that could be leveraged in combination in a privacy attack. The need to consider the broader context and landscape of an information product when assessing disclosure risk reflects what is known as the "Mosaic Effect," which occurs "when the information in an individual dataset, in isolation, may not pose a risk of identifying an individual…but when combined with other available information, could pose such risk . . . ."[5] Agencies are required to consider the implications of the Mosaic Effect as part of their disclosure risk assessments.[6] It is also important to acknowledge that disclosure risk is often not uniform across the population represented in a data set. Some data subjects, especially those with unique or uncommon combinations of characteristics that make them easier to differentiate from their neighbors, are often at greater risk for reidentification.[7]  In order to ensure sufficient protection for these data subjects, the DRB's risk assessment needs to understand these varying vulnerabilities and the

---

[4]      *Id.* at 2.

[5]      OMB Memorandum M-13-13, "Open Data Policy-Managing Information as an Asset" (May 9, 2013, at 4-5, *available at* https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/memoranda/2013/m-13-13.pdf.

[6]      *Id.*

[7]      Abowd, *et. al.*, "A Simulated Reconstruction and Reidentification Attack on the 2010 U.S. Census" at 3.10, Harvard Data Science Review, 7(3) (Sept. 18, 2025), *available at* https://doi.org/10.1162/99608f92.4a1ebf70.

factors that influence them—factors that are often unique to a particular data set and its broader context.[8]

8.      All products derived from information protected under 13 U.S.C. §§ 8(b) and 9 must be reviewed and cleared for release in accordance with DRB policies and procedures. Routine and recurring information products may be eligible for expedited clearance, when disclosure risk assessments and standards for these products have already been established. However, complex or novel information products, such as the American Community Survey ("ACS") Sexual Orientation and Gender Identity ("SOGI") test paradata and self-response files, and the draft RTI report based upon those files, require comprehensive review and consideration by the DRB. These complex or novel information products include microdata products and products that have not undergone a comprehensive disclosure risk assessment, as well as reports and evaluations based on such information. In these cases, the requesting program area would need to complete a comprehensive review request package for each information product under consideration.

9.      A DRB review package for a microdata product, for example, would include detailed information about the file's geographic detail, sampling methodology, coding, categorical granularity, potential for linkage to external data sources, relation to other Census Bureau statistical products, information on any special populations at additional risk of reidentification, and the proposed disclosure avoidance mechanism(s) to be used. The DRB will then review the submitted materials (working with the program area if additional information is required) to assess the baseline disclosure risk of the product under consideration and to determine if the proposed disclosure risk mitigation strategy is sufficient or needs to be modified.  For new, complex, or particularly sensitive information products, this iterative review, risk assessment, and mitigation

---

[8]      *See* Hawes, *et al.*, *supra* note 2, at 5.3.

process can take months or even years before a final DRB approval may be made, with the possibility of proposed information products being non-cleared for release.

10.     In order to strive, in good faith, to comply with the confidentiality requirements of 13 U.S.C. §§ 8(b) and 9, the Census Bureau must carefully evaluate the disclosure risk associated with each information product and properly mitigate any such risks prior to publication, or determine that the risks cannot be mitigated and therefore that the information cannot be publicly released.   If the Census Bureau does not properly protect this information, survey respondents are likely to face tangible and substantial harm, such as identity theft, financial harm, loss of benefits, legal harm or adverse administrative or law enforcement actions, emotional harm or distress, reputational harm, or harm to relationships.

11.     Making sure that such risks are properly mitigated before publication is also essential to maintaining the public's trust.   Historically, the Census Bureau has enjoyed higher survey participation rates than private sector organizations, which reflects public trust that the Census Bureau will properly safeguard the information provided. If a disclosure of personal information were to occur because of improperly or insufficiently applied disclosure avoidance for one of our information products, individuals, households, and enterprises nationwide may be less willing to participate in Census Bureau surveys in the future.   To that end, failure to properly protect against disclosure could undermine the future quality and value of Census Bureau statistics.

**Disclosure Avoidance Methods**

12.     There are a wide variety of disclosure avoidance methods, but at their most basic, they can be divided into three broad families: Suppression, Coarsening, and Noise Infusion.

13.     Suppression-based approaches seek to reduce the risk of disclosure by removing information from the product to be released (e.g., removing entire tables, cells, or columns) or

from the underlying data used to generate the product (e.g., removing the records of data subjects at greater risk of reidentification). For example, one may remove statistics in a table about demographic characteristics if there are too few individuals from whom those statistics were calculated, such as birthplace information where 50 or fewer people reside in a certain geographic area. Suppression-based disclosure avoidance methods reduce disclosure risk by introducing uncertainty about the exact value of key statistics or records in an information product that could most readily lead to reidentification or confidentiality-violating inferences. One advantage of suppression-based methods is that they allow for reporting of highly precise statistics, but this precision comes at the expense of limiting statistical coverage, particularly for smaller subpopulations and geographies. Suppression differs from the traditional redaction of textual information in that the criteria for determining the necessary suppressions often depend on the specific disclosure risk context of the product and its intended uses once released, rather than being determinable in advance.

14.    Coarsening-based approaches seek to reduce disclosure risk by creating uncertainty about the exact value of the published statistics, thereby making it more difficult to single out particular data subjects or to infer their confidential response information with certainty. Commonly used coarsening techniques include rounding, collapsing reporting categories, reporting data in ranges, top or bottom-coding extreme values, and geographic aggregation. For example, reporting an individual's exact income, to the dollar and cent, in an "anonymized" data file could make it easy to link that individual's record to a third-party data source because few people would have that exact income value. Coarsening income values, for example by rounding them to the nearest $10,000 or reporting them in ranges (e.g., $100,000-$149,999) can make it more difficult to single out a particular individual from others that share the same coarsened value.

The magnitude and parameters one chooses for coarsening-based disclosure avoidance (e.g., rounding to the nearest 5 or 5,000) depends largely on the underlying disclosure risk of the data and the intended uses of the resulting product. Compared to suppression-based methods, coarsening techniques provide more complete data, but at the expense of granularity.

15.    Noise infusion is the third broad family of disclosure avoidance methods, which include a range of methods that introduce controlled amounts of uncertainty directly into the information or statistics being released. For example, before publishing business data, the Census Bureau could apply a random number multiplier to establishment data (e.g., payroll or employee counts). For instance, a firm's actual annual payroll of $100,000 might be reported as $101,000 or $98,500 in the published industry sector tabulations. Properly applied, noise infusion preserves the overall patterns in the data while reducing outside actors' confidence that they have singled out or correctly inferred something about a particular data subject. The Census Bureau has used various types of noise infusion (alone, or in conjunction with other disclosure avoidance methods) for many of its statistical products. Noise infusion-based disclosure avoidance methods often allow greater flexibility for targeting the amount of uncertainty being added to ensure the resulting statistics are sufficiently protected and accurate.

16.    While there may be some cases where particularly "light touch" disclosure avoidance methods may only make minor tweaks to a data file, that is certainly not the standard. Most disclosure avoidance methods alter the content (through noise infusion), coverage (through suppression), and/or precision (through coarsening) of the data file sufficiently that the resulting file would be considered new or substantially different.

17.    There is no single "best" disclosure avoidance method, nor is there an optimal "one-size-fits-all" way to implement one. A disclosure avoidance approach that works well in one

context may be poorly suited to another. Agencies often need to select and implement their disclosure avoidance solutions with a careful eye towards the anticipated value of the information product, how it will likely be used, and how it fits within the broader disclosure risk landscape.[9] The disclosure avoidance process is also not costless. The process of assessing disclosure risk, selecting an appropriate mitigation solution, and customizing that solution to the specific needs (disclosure risks and intended uses) of a particular information product often require substantial investment in staff time and expertise.

18.     Plaintiff's declarant Philip Leclerc actually supports this proposition, despite asserting that the Census Bureau "can run the data through established, pre-existing scripts and pipelines that the agency already uses for this exact purpose in a mechanical and rule-driven process." (Leclerc declaration, Para. 17).  Leclerc's prior paragraph describes various disclosure avoidance techniques, such as blurring and suppression, that are only appropriate in certain factual scenarios. For his paragraph 16 example of pixelating satellite images, he discusses the distinction between identifying details (like names on mailboxes and the exact number of rooms in the household, which could, for example, round 1-3 rooms to 2, or topcode 13 rooms as 10) and non-identifying details (the rest).  However, determining that those are the characteristics that are identifiable is unique to that file.  For example, determining that topcoding to 10+ rooms means that individual data is no longer identifiable, but 5+ rooms does not, requires judgment.  Indeed, the determination that the number of rooms is identifiable at all requires the exercise of judgment. Similarly, other information like the size of the driveway, or the number of bays in the garage (which would also be visible by satellite), could make data identifiable in some context. Protecting information through pixelation requires understanding what it is about the information makes it

---

[9]     *See* <u>Hawes, *et al.*</u>, *supra* note 2, at 6-12.

identifiable. Full color pixelation, for example, may not prevent inferences about skin color. Digitization of voices may not prevent inference about sex and would offer no protection at all against inference based on vocabulary and syntax, which could also be identifiable depending on what was being said and how.

**American Community Survey**

**Sexual Orientation and Gender Identity Testing Records**

19.     My understanding of the present case is that the Plaintiff requested the self-response microdata and paradata files for the ACS SOGI Test.  These files contain the outputs or raw data from the SOGI Testing and are therefore considered confidential; they have not been subjected to any disclosure avoidance techniques.  This raw data consists of information collected from respondents during the test collection and behaviors captured from respondents during their interaction with the test instrument.

20.     I understand that Plaintiff also requested a draft ACS SOGI Cognitive Testing Report prepared by RTI. This report also contains response data that has not been evaluated through the disclosure avoidance process. The DRB is responsible for reviewing and approving the release of research and evaluation reports and other qualitative information products, such as the RTI Report, that are derived from confidential surveys and other source information. Statistics and quantitative information included in those reports are assessed in the same way as other statistical information products. The qualitative portions of those products have a separate disclosure review checklist and procedure that examines factors such as participant recruitment, selection, and demographics, and detailed information on how the study handled potentially identifiable information such as direct quotes, proper nouns, descriptive demographic information, references to news reports, photos, and voice recordings.

21.     As noted above, the microdata and paradata files have not undergone any disclosure avoidance reviews. Even if they had, we would not refer to them as "deidentified" as there is no such thing as truly "deidentified" data. Just about any response information can be "identifiable" in the right context. For example, one would not typically think of movie ratings as particularly identifiable, but in a successful 2006 reidentification study, researchers were able to reidentify "anonymized" Netflix users' watching histories, by linking the users' ratings and dates for a handful of movies  to auxiliary information that included names and other identifying information.[10] Consequently, absent a disclosure risk assessment, it is impossible to establish a list of data elements that are or are not potentially identifiable.

22.     To convert the SOGI Content Test microdata and paradata into a releasable product, Census Bureau employees would have to conduct a risk assessment by evaluating the disclosure risk and potential for respondent harm, and applying disclosure avoidance methods to the data.

**Responding to Plaintiff's Request Requires the Creation of a New File**

23.     To provide materials in response to Plaintiff's request, the Census Bureau would have to create a public use file based on the underlying data. A public use file would be a new file and not analogous to pixelating an existing file, as Plaintiff's declarant Leclerc asserts (Leclerc declaration, Para. 20). While disclosure avoidance practitioners often use the pixelation analogy to explain the *impact* of disclosure avoidance on the resulting data, the *application* of disclosure avoidance is a much more deliberate and bespoke process than the use of standard off-the-shelf tools to pixelate an image or modulate a voice. Even if columns of data were removed from the SOGI Content Test data, various steps, such as evaluation and assessment of the disclosure risk,

---

[10]     Arvind Narayanan & Vitaly Shmatikov, *Robust De-anonymization of Large Datasets (How to Break Anonymity of the Netflix Prize Dataset)*, University of Texas (preprint, Oct. 18, 2006, rev. Nov. 26, 2024), available at https://arxiv.org/abs/cs/0610105

and programming and testing of the disclosure avoidance method(s), would still need to be performed before the DRB could clear the product for release. The resulting product would be a new file or data set, not merely an edited version of the original raw data.

24.     Further, simply applying existing tools used on other data, as Plaintiff's declarant suggests (Leclerc declaration, Para. 19), does not ensure that the disclosure risk has been sufficiently mitigated, including the risk of identifying an individual.  Disclosure avoidance is not a generic method and the result of applying a technique or algorithm to one set of data can be very different than the result for another data set.

25.     The Census Bureau cannot "modestly" adjust existing code to apply an algorithm to the ACS SOGI Content Test microdata files. Existing code would need to be modified to reflect the new files' data schemas and formats, implementation parameters would need to be adjusted and evaluated, and the code would have to be tested. The adapting, programming, and testing of these code changes would require significant use of staff resources which would require taking staff away from mission-critical projects, including preparation for the 2030 Decennial Census. Even if this work could occur, and the Census Bureau could develop and successfully apply an algorithm to the raw data at issue here that both sufficiently mitigates disclosure risk and still retains analytical utility, again, the result would be the creation of new data product, not a "version" of the original data that merely reformats or redacts the existing raw data.

<u>Conclusion</u>

26.     In their current form, the ACS SOGI test paradata and self-response files consist of confidential data protected under 13 U.S.C. §§8(b) and 9 and cannot be publicly disclosed.  The

process required to render the data releasable would involve the work described above to create a new data product.

27.     Further, the draft RTI Cognitive Testing Report that Plaintiff requested is based on and contains confidential response data under 13 U.S.C. §§8(b) and 9 that has not gone through the disclosure avoidance process.

28.     Producing the requested records would require the Census Bureau to conduct a comprehensive disclosure risk assessment, and to identify, implement, and test a suitable disclosure avoidance solution. Doing so would require the Census Bureau to divert resources away from mission-critical priorities, including preparations for the 2030 Census.

MICHAEL HAWES

Digitally signed by MICHAEL HAWES
Date: 2026.03.06 17:32:18 -05'00'

_____
Michael B. Hawes
Senior Survey Statistician
U.S. Census Bureau

Executed this 6th day of March 2026.

*Last updated in January 2026*

# Michael Brewster Hawes

📍 Washington, DC   ✉    🔗 michaelhawes.github.io   in mbhawes   🐙 michaelhawes

## About ───────────────────────────────────

Experienced senior leader, statistician, and privacy professional with expertise in federal privacy and confidentiality laws and statistical disclosure limitation (de-identification).

## Experience ───────────────────────────────

**U.S. Census Bureau**, Senior Survey Statistician for Scientific Communication (ST-1530-00)    *Suitland, MD*
*2022 — present*
- Responsible for research and development relating to scientific communication about agency initiatives and on issues relating to the development, access, management, quality, and confidentiality of Census Bureau data and statistical products.
- Advises agency senior leadership on improving technical communication to scientific journals, government officials, agency partners, media, data users, and other stakeholders, spanning the fields of statistics, computer science, survey methodology, demography, political science, sociology, health, economics, and other sciences.

**U.S. Census Bureau**, Senior Advisor for Data Access and Privacy (GS-1530-15)    *Suitland, MD*
*1999 — 2022*
- Advised agency senior leadership on technical and strategic challenges relating to statistical disclosure limitation, data governance, and data access.
- Conducted outreach and strategic communication with internal and external data users about the impact of statistical disclosure limitation modernization on the availability and usability of Census data.
- Drafted educational materials for diverse technical and non-technical audiences on differential privacy and the 2020 Census Disclosure Avoidance System, including the motivations for modernizing statistical disclosure limitation for the 2020 Census, the design and implementation of the system's TopDown Algorithm, and empirical disclosure risk assessments of data treated with different methods and levels of statistical disclosure limitation.
- Conducted 200+ briefings for federal advisory committees; Congressional members and staff; federal, state, and local officials; American Indian and Alaska Native tribal leaders; professional associations; and stakeholder interest groups.

**U.S. Department of Education**, Director of Student Privacy Policy (GS-0343-15)    *Washington, DC*
*2016 – 2019*
- Served as the senior regulator, policy advisor, and administrator for the Family Educational Rights and Privacy Act (FERPA) and the Protection of Pupil Rights Amendment (PPRA).
- Implemented organizational and procedural changes to reduce the longstanding enforcement backlog by over 50%.
- Managed the Department's provision of technical assistance to state and local governments on issues relating to student privacy.
- Developed and published over 70 major regulatory and technical assistance resources, and resolved over 16,000 technical assistance inquiries from federal, state, and local officials and stakeholders.
- Oversaw the delivery of 80+ (per year) legal and technical briefings, site visits, regional meetings, and presentations for federal agencies, state and local government officials, professional associations, private industry, and stakeholder groups.
- Managed the Department of Education's Disclosure Review Board, responsible for reviewing and approving the application of statistical disclosure limitation methodologies on Department of Education data releases and helped coordinate the Depart-

ment's broader data governance efforts through the Data Strategy Team.

**U.S. Department of Education**, Statistical Privacy Advisor (GS-1530-14)

*Washington, DC*
*2011 – 2016*

- Advised the Chief Privacy Officer and senior leadership on issues relating to data governance, privacy, and statistical disclosure limitation.
- Established and chaired the Department of Education's Disclosure Review Board (ED-DRB), responsible for reviewing and approving the application of statistical disclosure limitation methodologies on Department of Education data releases. The ED-DRB was the first governance board of its type by a non-statistical federal agency and has been widely recognized across government as a best-practice model of effective data governance.
- Managed the Department of Education's Privacy Technical Assistance Center.
- Conducted regular technical assistance briefings, site visits, regional meetings, and presentations for federal agencies, state and local government officials, professional associations, private industry, and stakeholder groups.

**Commission on Evidence-Based Policymaking**, Privacy Consultant (Part-time detail)

*Washington, DC*
*2016 – 2017*

- Advised the Commissioners and Commission staff on federal privacy laws relating to the safeguarding, use, and disclosure of data.
- Assisted in the drafting and review of the Commission's final report, *The Promise of Evidence-based Policymaking* ⧉.

**U.S. Census Bureau**, Statistician/Policy Analyst (GS-1530-12/GS-0301-13)

*Suitland, MD*
*2008 – 2011*

- Served as lead policy analyst for the Policy Coordination Office, providing expert review, opinion, and documentation on policy matters.

**Georgetown University**, Visiting Faculty
Department of Government and Edmund A. Walsh School of Foreign Service

*Washington, DC*
*2005 – 2007*

- Taught undergraduate and graduate courses with 5-150 students on international relations, U.S. foreign policy, and formal research methods.

## Education

**Harvard University,** John F. Kennedy School of Government
Strategic Management of Regulatory and Enforcement Agencies

*Cambridge, MA*
*2015*

**Partnership for Public Service**
Excellence in Government Senior Fellows Program

*Washington, DC*
*2012 – 2013*

**University of California, San Diego**
Postgraduate Studies, Political Science

*San Diego, CA*
*1999 – 2005*

**University of Chicago**
M.A., International Relations

*Chicago, IL*
*1999*

**Duke University**
B.A., *summa cum laude,* Political Science and History

*Durham, NC*
*1998*

**L'Institut d'Etudes Politiques de Paris**
*Diplôme, Programme International des Sciences Politiques et Sociales*

*Paris, France*
*1997*

## Professional Activities and Service

**American Statistical Association**

*ASA Privacy and Confidentiality Committee*
- Chair (2026 – present)
- Vice-Chair (2025)
- Appointed Member (2024 – 2026 term)

*ASA Professional Issues and Visibility Council*
- Appointed Member (2026 – present)

*ASA Privacy and Confidentiality Interest Group*
- Program Chair (2023 – 2025)

*ASA Committee on Professional Ethics*
- Friend of the Committee (2021-2025)
- Chair (2020)
- Vice-Chair (2018-2019)
- Appointed Member (2015-2017 and 2018-2020 terms)

*ASA Government Statistics Section*
- Program Chair (2017)
- Program Chair-Elect (2016)

**Privacy and Public Policy Conference**
- Program Committee (2023-2024)

**Public Interest Privacy Center**
- Chair, Board of Directors (2022 – present)

**Federal Committee on Statistical Methodology (FCSM)**
- Appointed Member (2017 – present)

*Federal Disclosure Review Officer Council*
- FCSM Sponsor and Vice-Chair, *ex officio* (2024 – present)

*FCSM Subcommittee on Updating Statistical Methods for Safeguarding Protected Data*
- Chair (2019 – 2024)

*FCSM Confidentiality and Data Access Committee*
- Chair (2017 – 2024)
- Vice-Chair (2013 – 2017)

*FCSM Subcommittee on Membership*
- Member (2021 – present)

*FCSM Data Protection Toolkit* 🔗
- Project Lead, Editor, and Principal Author (2019-present)

**Interagency Council on Statistical Policy**
- Working Groups on Implementing the Evidence Act (2021 – 2024)

**National Science and Technology Council**
- Subcommittee on Research Security (2023 – 2024)
- Fast-Track Action Committee on Advancing Privacy-Preserving Data Sharing and Analytics (2022 – 2023)

**Office of Science and Technology Policy**
- Interagency Policy Committee on Privacy (2023 – 2024)
- Sub-IPC on Privacy Enhancing Technologies (2023 – 2024)

**Federal Data Strategy**
- Data Ethics Framework ↗, Development Team (2020)

**Committee on National Statistics, National Academies of Science, Engineering, and Medicine**
- Workshop on Challenges and New Approaches for Protecting Privacy in Federal Statistical Programs ↗, Planning Committee (2019)

**Federal Commission on School Safety**
- Final Report on the Federal Commission on School Safety ↗, Contributing Author (2018)

**Federal Trade Commission and U.S. Department of Education**
- Joint Workshop on Student Privacy and Education Technology ↗, Organizer (2017)

**Federal Commission on Evidence-based Policymaking**
- *The Promise of Evidence-based Policymaking* ↗, Privacy Consultant and Contributing Author (2016 – 2017)

**International Association of Privacy Professionals**
- Certification Advisory Board, Member (2011 – 2013)

**Office of Management and Budget, Office of the Chief Statistician of the U.S.**
- Working Group on Informed Consent (2009 – 2011)

## Articles, Chapters, and Technical Publications ───────────────

**A Simulated Reconstruction and Reidentification Attack on the 2010 U.S. Census** ↗. Abowd, J.M., Adams, T., Ashmead, R., Darais, D., Dey, S., Garfinkel, S.L., Goldschlag, N., Hawes, M.B., Kifer, D., Leclerc, P., Lew, E., Moore, S., Rodríguez, R., Tadros, R.N., and Vilhuber, L., *Harvard Data Science Review* (2025).

**Toward a Principled Framework for Disclosure Avoidance** ↗. Hawes, M.B., Brassell, E., Caruso, A., Cumings-Menon, R., Devine, J., Dorius, C., Evans, D., Haase, K., Hedrick, M., Holan, S., Hollingsworth, C., Jensen, E., Kifer, D., Krause, A., Leclerc, P., Livsey, J., Rodriguez, R., Rogers, L., Spence, M., Velkoff, V., Walsh, M., Whitehorne, J., and Keller, S., *Harvard Data Science Review* (2025).

**21ˢᵗ century statistical disclosure limitation: motivations and challenges** ↗. Abowd, J.M., and Hawes, M.B., in Drechsler, J., Kifer, D., Reiter, J., and Slavković, A. (Eds.). *Handbook of Sharing Confidential Data: Differential Privacy, Secure Multiparty Computation, and Synthetic Data*, CRC Press (2024).

**Reply to Muralidhar et al., Kenny et al., and Hotz et al.: The benefits of engagement with external research teams** ↗, Jarmin, R.S., Abowd J.M., Ashmead, R., Cumings-Menon, R., Goldschlag, N., Hawes, M.B., Keller, S., Kifer, D., Leclerc, P., Reiter, J.P., Rodriguez, R.A., Schmutte, I., Velkoff, V.A., Zhuravlev, P., *Proceedings of the National Academies of Sciences*, 121(11), (2024).

**An in-depth examination of requirements for disclosure risk assessment** ↗, Jarmin, R.S., Abowd J.M., Ashmead, R., Cumings-Menon, R., Goldschlag, N., Hawes, M.B., Keller, S., Kifer, D., Leclerc, P., Reiter, J.P., Rodriguez, R.A., Schmutte, I., Velkoff, V.A., Zhuravlev, P., *Proceedings of the National Academies of Sciences*. 120(43) (2023).

**Confidentiality protection in the 2020 US Census of Population and Housing** ↗, Abowd, J.M. and Hawes, M.B., *Annual Review of Statistics and Its Applications*. 10:119-144 (2023).

**Redistricting Data—A Primer and History** ↗, Molfino, E., Whitehorne, J., Hawes, M., and Keller, S., U.S. Census Bureau (2023).

**Implementing differential privacy: seven lessons from the 2020 United States Census** ↗, Hawes, M. B., *Harvard Data Science Review*, 2(2) (2020).

**The modernization of statistical disclosure limitation at the U.S. Census Bureau** ↗, Abowd, J.M., Benedetto, G.L., Garfinkel, S.L., Dahl, S.A., Dajani, A.N., Graham, M., Hawes, M.B., Karwa, V., Kifer, D., Kim, H., Leclerc, P., Machanavajjhala,

A., Reiter, J.P., Rodriguez, R., Schmutte, I.M., Sexton, W.N., Singer, P.E., and Vilhuber, L., *Working Paper CED-WP-2020-009*, U.S. Census Bureau (2020).

**Determination of the 2020 U.S. Citizen Voting Age Population (CVAP) Using Administrative Records and Statistical Methodology Technical Report** ⧉, Abowd, J.M., Bell, W.R., Brown, J.D., Hawes, M.B., Heggeness, M.L., Keller, A.D., Mule Jr., V.T., Schafer, J.L., Spence, M., Warren, L., and Yi, M., *Working Paper CES-20-33*, Center for Economic Studies, U.S. Census Bureau (2020).

**U.S. Government Privacy: Essential Policies and Practices for Privacy Professionals**, Kendall, D. (Ed.), International Association of Privacy Professionals (2013).

**Congressional politics of financing the International Monetary Fund** ⧉, Broz, J.L., and Hawes, M.B., *International Organization*, 367-399 (2006).

**The politics of choice among national production systems** ⧉, Gourevitch, P., and Hawes, M.B., *L'Année de la Régulation*, 6, 241-270 (2002).

## Selected Regulatory Publications *(Out of over 70 published from 2014 – 2019)*

**Improving the Effectiveness and Efficiency of FERPA Enforcement** ⧉
U.S. Department of Education, Office of the Chief Privacy Officer (December 2018).

- *Designated as "Significant Guidance" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, this publication established a new paradigm for investigation and enforcement of formal complaints under the Family Educational Rights and Privacy Act (FERPA), and implemented new mechanisms for mediation and technical assistance in order to expedite resolution of student and parent concerns.*

**Letter to Wachter (Disclosure of Surveillance Video of Multiple Students)** ⧉
U.S. Department of Education, Office of the Chief Privacy Officer (December 2017).

- *Because the physical likeness of an individual is typically considered personally identifiable information, there was longstanding uncertainty regarding when an educational institution could legally share photos or videos that showed multiple students (e.g., a video that shows the crowd at a school basketball game) vs. when the school had a legal obligation to protect that video against disclosure (e.g., a hallway surveillance video that shows a student having a medical emergency amid bystanders). This publication, and the related FAQs on Photos and Videos under FERPA* ⧉ *provided much needed legal clarification of these requirements, with implications for school safety, law enforcement, and privacy.*

**Integrated Data Systems and Student Privacy** ⧉
U.S. Department of Education, Privacy Technical Assistance Center (January 2017).

- *The Family Educational Rights and Privacy Act provides mechanisms for educational agencies and authorities to share data with other state and local agencies for program evaluation and research, but in spite of the overall value that these integrated data repositories can provide, the legal and policy complexities associated with establishing a statewide longitudinal data system or county/municipal integrated data system often impede their creation. This publication clarified the legal framework under which an integrated data system can be established, and provided best practices for establishing them in a manner that promotes appropriate and responsible use of student data while also ensuring that privacy is properly safeguarded.*

**Guidance on the Use of Financial Aid Information for Program Evaluation and Research** ⧉
U.S. Department of Education, Privacy Technical Assistance Center (January 2017).

- *The information contained in student financial aid records is invaluable for research and program evaluation regarding the impact of demographic and economic factors on students' post-secondary educational achievement and subsequent career success. These financial aid records are protected under multiple federal laws, each with differing provisions regarding data access and use. This publication was the first-ever to clarify how these multiple laws intersect in the context of using financial aid data for program evaluation and research.*

**Response to Louisiana (Disclosure Avoidance)** ⧉
U.S. Department of Education, Office of Management (April 2016).

- *This publication clarified that state departments of education are required to assess the risk of disclosure in the aggregate statistics they publish, and to perform statistical disclosure limitation whenever that risk of disclosure exceeds the "reasonable person" threshold established under the Family Educational Rights and Privacy Act.*

**Protecting Student Privacy While Using Online Educational Services: Requirements and Best Practices** ⧉

U.S. Department of Education, Privacy Technical Assistance Center (February 2014).

- *In 1974, when the Family Education Rights and Privacy Act was enacted, students' education records were typically paper records stored in the school's front office. Over the subsequent decades, cloud providers replaced filing cabinets, learning management systems replaced teacher gradebooks, and online apps and services replaced handouts and worksheets. This guidance provided the first ever clarification of how FERPA applies in the online educational services context, and identified best practices that schools and technology companies should follow to ensure student privacy.*

## Selected Presentations *(Out of over 200 conducted from 2019 – 2025)*

**Joint Statistical Meetings, American Statistical Association** (August 2025)
- Panel Session on the Role of Professional Ethical Practice Standards in Ensuring Scientific Integrity of AI, Presentation on *AI Ethics in Official Statistics: Insights from the ASA and U.S. Federal Frameworks* 🔗

**Administrative Data Research Conference (ADRCon), Georgetown University** (June 2025)
- Presentation on *Privacy, Confidentiality, and Statistical Purposes* 🔗

**Disclosure Avoidance Webinar Series, U.S. Census Bureau** (June 2025)
- Webinar on *The 2030 Census Disclosure Avoidance Research Program* 🔗

**Disclosure Avoidance Webinar Series, U.S. Census Bureau** (January 2025)
- Webinar on *A Principled Framework for Disclosure Avoidance* 🔗

**Federal Committee on Statistical Methodology Research and Policy Conference** (October 2024)
- Panel on Delivering Solutions for Evidence Building in a National Secure Data Service Demonstration, Presentation on *The Future of Interagency Coordination on Data Protection* 🔗

**Joint Statistical Meetings, American Statistical Association** (August 2024)
- Paper Session on Artificial Intelligence in Federal Statistics: Current Uses, Potential Applications, and Ongoing Issues, Presentation on *AI and Official Statistics: Responsibly Leveraging Large Language Models in Support of Open Data* 🔗
- Panel Session on Evaluating Statistical Disclosure Control Techniques based on the Risk and Utility of Privacy-Protected Data, Presentation on *Towards a Principled Disclosure Avoidance Framework: Identifying the Characteristics of an Ideal, Applied Disclosure Avoidance System* 🔗

**White House Office of Science and Technology Policy** (July 2024)
- Workshop on Open Government in Action: Emerging Practices in Participatory Algorithm Design, Presentation on *Stakeholder Participation and Engagement in the Design and Tuning of the 2020 Census Disclosure Avoidance System* 🔗

**Harvard University, Department of Statistics** (July 2024)
- Guest Lecture on *Data Protection and Official Statistics: Lessons Learned from the 2020 Census and a Proposed Framework for Discussing and Evaluating Disclosure Avoidance Systems* 🔗

**National Bureau of Economic Research** (May 2024)
- Conference on Data Privacy Protection and the Conduct of Applied Research, Presentation on *Towards a Principled Discussion of a Disclosure Avoidance Framework: Identifying the Characteristics of an Ideal, Applied Disclosure Avoidance System* 🔗

**Committee on National Statistics, National Academies of Science, Engineering, and Medicine** (May 2024)
- AI Day, Presentation on *Ethical Considerations of AI for the Federal Statistical System* 🔗

**National Science Foundation** (January 2024)
- Workshop on Advanced Automated Systems, Contestability, and the Law, Presentation on *Translating Artificial Intelligence and Machine Learning Technology to Experts in Other Fields*

**Federal Committee on Statistical Methodology Research and Policy Conference** (October 2023)
- Panel on *How Can U.S. Professional Guidelines Inform Federal Statistical Policy?* 🔗
- Panel on *What do we mean by 'For Statistical Purposes Only'?* 🔗
- Panel on *Ensuring Scientific Integrity in the Federal Statistical System*

**Joint Statistical Meetings, American Statistical Association** (August 2023)
- Panel on *Statistical Privacy in the 21st Century: Census and Consensus* 🔗
- Panel on *Getting the Utility out of Privatized Data*

**Committee on National Statistics, National Academies of Sciences, Engineering, and Medicine** (May 2023)
- Workshop on Approaches to Sharing Blended Data in a 21st Century Data Infrastructure, Presentation on *Communicating Privacy to the Public* ☑

**Population Association of America** (April 2023)
- Workshop on *Assessing Fitness-for-Use of Differential Privacy-Adjusted Census Data, Organizer* ☑

**Association for the Advancement of Artificial Intelligence** (February 2023)
- Workshop on Privacy-Preserving Artificial Intelligence Panel on *Differential Privacy in real-world deployments: Where are we and what are we missing?*

**Census Scientific Advisory Committee** (September 2022)
- Presentation on *Reconstruction and Re-identification of the Demographic and Housing Characteristics File (DHC)* ☑

**Joint Statistical Meetings, American Statistical Association** (August 2022)
- Panel on *Communicating Statistical Disclosure Avoidance Measures to Data Users*

**Committee on National Statistics, National Academies of Sciences, Engineering, and Medicine** (June 2022)
- 2020 Census Data Products: Workshop on the Demographic and Housing Characteristics Files, Presentation on *Setting the Parameters of the TopDown Algorithm*

**Federal Advisory Committee on Data for Evidence-Building** March 2022
- Presentation on *Infrastructure Needs and the Data Protection Toolkit*

**Census Scientific Advisory Committee** (March 2022)
- Presentation on *Reconstruction and Re-identification of the Demographic and Housing Characteristics File (DHC)* ☑

**U.S. Chief Data Officers' Council** (March 2022)
- Presentation on *Promoting Data Access and Data Protection*

**Senate Homeland Security and Government Affairs Committee** (December 2021)
- Briefing on *The 2020 Census Disclosure Avoidance System*

**Joint Statistical Meetings, American Statistical Association** (August 2021)
- Presentation on *The ASA Ethical Guidelines for Statistical Practice*

**National Governors Association** (May 2021)
- Presentation on *The 2020 Census Disclosure Avoidance System*

**American Public Health Association** (October 2020)
- Presentation on *Differential Privacy and the 2020 Census*

**American Statistical Association** (January 2020)
- Privacy Day Webinar, *Differential Privacy and the 2020 Decennial Census* ☑

**Harvard Data Science Review, Harvard University** (October 2019)
- Inaugural Symposium, Presentation on *Background on Differential Privacy at the U.S. Census Bureau and 1940 Census Application* ☑

**Joint Statistical Meetings, American Statistical Association** (July 2019)
- Invited Panel Presentation on *Official Statistics at the Crossroads: Data Quality and Access in an Era of Heightened Privacy Risk* ☑

## Memberships

**American Statistical Association**

**Association of Public Data Users**

**Federal Committee on Statistical Methodology**

**International Association for Official Statistics**

**International Association of Privacy Professionals**

**International Statistical Institute**

**Partnership for Public Service, Excellence in Government Senior Fellow**

**Project Management Institute**

**Senior Executives Association**

## Certifications

**International Association of Privacy Professionals**
*Certified Information Privacy Professional/Government (CIPP/G)*

**Project Management Institute**
*Project Management Professional (PMP)*

**Federal Communications Commission**
*Amateur Radio License (KB3MNV), Technician Class*

## Honors and Awards

**American Statistical Association**
- Fellow (elected in 2025)

**U.S. Department of Commerce**
- Gold Medal Award (2023)
- Gold Medal Award (2022)

**U.S. Census Bureau**
- Bronze Medal Award (2023)
- Special Act Award (2021)
- Special Act Award (2021)
- Bronze Medal Award (2020)
- Bronze Medal Award (2020)
- Bronze Medal Award (2011)
- Special Achievement Award (2011)
- Special Achievement Award (2010)
- Special Achievement Award (2009)

**U.S. Department of Education**
- Merit Step Increase (2015)

**University of California, San Diego**
- Received Distinction on Ph.D. Qualifying Exams (2002)