**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JONATHAN B. FREEMAN, PH.D.,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. CENSUS BUREAU, et al.,<br><br>*Defendants*. | Civil Action No. 25-cv-7834-LJL |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.   Defendants' Position That Not a Shred of the Cognitive Testing Report Can Be Released Cannot Be Supported........................................................................................2

II.  Defendants Implicitly Concede That After Application of Reasonable Confidentiality Measures, the Requested Statistical Data Can Be Disclosed. ......................5

III. Applying Disclosure Avoidance Techniques Here Is a Reasonable Segregation Measure. ...................................................................................................................7

In their latest filings, Defendants continue to press the extreme position that not a scintilla of the information in files created in a $10 million landmark data collection can be segregated and released under the Freedom of Information Act ("FOIA"). But Defendants fundamentally fail to engage with their obligation under FOIA to take reasonable steps to segregate and release non-exempt information. Even with the submission of two additional declarations, they fail to answer basic questions necessary to support their blanket withholding of responsive records in this case.

The extremity of Defendants' position is most apparent in their continued insistence that *even* the subject headings of the Cognitive Testing Report ("the Report") and the column headings of the requested sexual orientation and gender identity ("SOGI") data are exempt from disclosure. Defendants' refusal to release even this basic information—which allows them to keep discussion of the actual records requested here generalized—appears based on the belief that if records have not previously been sent for internal disclosure review, they are categorically fully exempt from disclosure without an obligation to segregate releasable information. Defendants cannot cite authority for that position, and implicitly concede previous requests have, at least partly, spurred the initiation of such reviews.

Defendants also fail to support their refusal to take steps to segregate non-exempt information in other ways. They entirely fail to address case law holding that factual information must generally be disclosed absent unique circumstances not present here. Their briefing offers a blanket assertion that individual-level data is categorically exempt that contradicts Defendants' own declarations. They offer no explanation for how the isolated release of data solely regarding characteristics shared by millions of people—like gender identity (indicating someone identifies as a "Man," "Woman," or "Non-binary")—could risk identification. And they fail to seriously address the discussion of Plaintiff's expert, a recent Bureau disclosure avoidance official, of the

modest steps required to release meaningful data while protecting confidentiality. To be clear, Plaintiff has always maintained that appropriate confidentiality measures are necessary to ensure information identifying individuals is not released. Defendants simply fail to meet their burden to justify their sweeping withholdings and their refusal to segregate *any* information.

### I. Defendants' Position That Not a Shred of the Cognitive Testing Report Can Be Released Cannot Be Supported.

Defendants continue to insist that not a single shred of information can be released from the RTI Cognitive Testing Report. But neither law nor logic can support this maximalist approach.

*First*, Defendants' maintenance of their position appears to be based on the belief that, if a Bureau record has not yet gone through its "disclosure avoidance review process," it is categorically exempt from disclosure under Title 13. Defendants' Opposition ("Opp'n") 1, 16, ECF No. 40 (citing Hawes Decl. ¶ 8; Second Poehler Decl. ¶ 10.). Not so. Defendants point to no statute or regulation excepting the Census Bureau from FOIA's command to "take reasonable steps necessary to segregate and release nonexempt information" on this basis. 5 U.S.C. § 552(a)(8)(A)(ii)(II). Nor could they. The Bureau is free to send the Report to its Disclosure Review Board ("DRB") for review, but the existence of an agency review process does not relieve the agency of its obligation to segregate non-exempt information. Defendants themselves implicitly acknowledge that previous FOIA requests partly spurred their initiation of disclosure review of other reports. First Poehler Decl. ¶ 31 (stating only that previous disclosure reviews were not "solely" prompted by Plaintiff's FOIA requests). And the Bureau has previously taken the position that records with Title 13 information are not categorically exempt—they are instead subject to reasonable segregation. *See* Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Att'ys' Fees & Costs at 18, *Phillips v. U.S. Bureau of Census*, No. 22-CV-9304 (S.D.N.Y. Sept. 11, 2023), ECF

No. 22 ("only question for the Court was whether . . . it was logical or plausible that the withheld record contained *non-reasonably segregable material* covered by" Title 13 (emphasis added)).

Redacting portions of the Report is plainly feasible, making the illogic of Defendants' categorical position clear. Indeed, highlighting the limited burden of redacting such a report, the Bureau itself cites to other similar cognitive testing reports it has released with no redaction at all required. *See* Second Poehler Decl. ¶ 7 n.2.[1] Instead, Defendants point to generalized statements about disclosure avoidance techniques, and the Second Poehler Declaration's statements that "sections" of the report contain "summaries" and other information from respondents and "summary data . . . expressed in tables and intertwined in text," Second Poehler Decl. ¶ 10. Opp'n at 17. Defendants still fail to say how many such "sections" implicate the categories of potentially protected information they describe. And they offer no logical explanation for how methodological and background portions of the Report could possibly be protected under Title 13. This failure even to assert exemptions by specific section is a far cry from the "line-by-line" review generally required of agencies. *See* Pl.'s Op. Br. at 10, ECF No. 31 ("Pl.'s Br.").

*Second*, illustrative of the extremity of their position, Defendants do not budge from their position that even the subject headings of the Report are exempt from disclosure and cannot be produced. Strangely Defendants assert that releasing a report redacted but for the subject headings would "respond to a different request that Plaintiff did not make." Opp'n at 18–19. But Plaintiff requested the Report, and releasing a redacted version of that document in no way involves

---

[1] The ACS reports Defendants cite do not even redact participant quotes. For example, one report states: "The fifth institutional participant (one representing a prison/jail setting) only answered 'Yes' to item (h) and specified 'Medical care provided by the prison.'" *Cognitive Testing for the 2022 ACS Content Test: Round 3 Briefing and Recommendations* at 2-7 (U.S. Census Bureau 2022), https://tinyurl.com/2tyjkcz4.

response to a new and different FOIA request.[2] Agencies regularly apply redactions to substantive sections while releasing subject headings of purportedly privileged documents. *See, e.g.* McGrath Decl. Exs. 1 & 2 (representative examples; in Exhibit 1, the agency released section headers of a document expressly marked "draft"). Releasing the Report in this form would provide information of value, and Defendants' refusal to do so harms Plaintiff's ability to show how portions of the Report likely contain information that is not plausibly deliberative or likely to contain exclusively protected Title 13 information (i.e., sections detailing methodology).

Showing the structure and topics addressed in the Report on a novel data collection does not require Defendants to unreasonably separate "disjointed words" as they argue. Opp'n at 18. The case Defendants rely on for this proposition, *Wadelton v. Department of State*, found the agency had failed to meet its segregation burden by not combing through even handwritten notes to identify releasable, non-exempt material, a far more burdensome undertaking than the routine redaction Plaintiff seeks. 106 F. Supp. 3d 139, 155 (D.D.C. 2015).[3] Further, Defendants' failure to meet their burden for this categorical withholding is made plain by Defendants' non-specific explanations of unidentified "sections" of the Report they assert are exempt. *See* Second Poehler Decl. ¶ 10.

*Third*, Defendants entirely fail to address the general rule that factual information must be segregated from deliberative material and released. *Mapother v. DOJ*, 3 F.3d 1533 (D.C. Cir. 1993), and related cases where courts have deviated from this general rule involved fundamentally

---

[2] Defendants' misunderstanding of the law here is underscored by the cases they rely on—those considering the adequacy of *searches* for records rather than those considering appropriate segregation measures. *Id.* (citing *Irons v. Levi*, 451 F. Supp. 751, 753 (D. Mass. 1978) ("Plaintiff argues that defendant's search was not fully responsive") and *Fonda v. CIA*, 434 F. Supp. 498, 501 (D.D.C. 1977) (involving Plaintiff's demand for an "open-ended search").
[3] Defendants mistakenly cite *Wadelton* as a D.C. Circuit decision.

4

different circumstances—and even the *Mapother* court required production of some factual information. *Compare* Pl.'s Br. at 16 *with* Opp'n at 21; *see also Mapother*, 3 F.3d at 1536–38. Defendants provide no logical explanation of how the factual information in the Report is *itself* deliberative material, and indeed their declarant recognizes that the Report's factual information is distinct from its "recommendations." Opp'n at 21.

*Fourth*, Defendants' prior plan to release the report reduces the foreseeable harm to the agency's deliberative process. The authors knew it was being drafted in part for public consumption. While Defendants attest that the previously released cognitive testing reports with disclaimers about the attribution of the reports' views came from different Bureau components, they do not contest that they *did* plan to release the Report here. And the reports Defendants cite as failing to show the disclaimer of representation of agency views were still reports released in full. Second Poehler Decl. ¶ 7–8.[4] Thus, even in asserting the Report here differs, Defendants point to their own repeated practice of wholly disclosing reports like the one here at issue—reinforcing the conclusion that Report authors are unlikely to be chilled from including factual and scientific information in such records in the future. *Id*. To the extent that portions of the report contain tracked changes or contested comments, those portions can be redacted while other portions are produced. That is exactly the type of "line-by-line" review and segregation approach agencies are required to undertake. *See* Pl's. Br. at 10. Defendants instead withhold every line of the Report.

In sum, Defendants cannot categorically withhold the Report on the basis that an internal review process exists, or on the basis that all of its factual information—including the very subject matter of its sections—are covered by the deliberative process privilege.

---

[4] Citing "https://www.census.gov/library/working-papers/2022/acs/2022_Wilson_02.html, and https://www.census.gov/library/working-papers/2022/acs/2022_Wilson_01.html, and https://www.census.gov/library/working-papers/2016/acs/2016_Westat_05.html."

## II. Defendants Implicitly Concede That After Application of Reasonable Confidentiality Measures, the Requested Statistical Data Can Be Disclosed.

Defendants' response makes clear that the data files Plaintiff requests are not *categorically* exempt from disclosure. And Plaintiff has consistently acknowledged that segregation measures must be undertaken before these files can be released. That confidentiality measures are required, likewise, does not *categorically* exempt the data from disclosure. That is standard FOIA practice.

Defendants' briefing would have this court believe that Plaintiff's request is an open-and-shut matter under *Baldrige v. Shapiro* because Plaintiff seeks data "reported by, or on behalf of" a respondent. *See, e.g.*, Opp'n at 12 (discussing 455 U.S. 345 (1982)). But, if that were the case, the Bureau's sixty-year practice of releasing ACS PUMS data sets would be illegal. Across their filings, Defendants have never disputed that the PUMS releases contain individual-level ACS data with information like that requested here. *See id.* at 10–11. Instead, Defendants' declarants recognize that with confidentiality measures individual-level data can be released: "Under Title 13, the Census Bureau is not permitted to release microdata and paradata in good faith *without conducting a disclosure avoidance review*." *See* Second Poehler Decl. ¶ 23 (emphasis added).

In *Baldrige*, by contrast, requesters specifically sought names and address information—data points that presented a *direct* identification risk. The Bureau could not produce those data points while protecting respondent confidentiality. Plaintiff here does not seek—and does not object to the Bureau withholding—names or other information with identification risk from the data files. Although Defendants note the requested files also contain respondents' geographic details, age, and sex, Opp'n at 8, they do not explain why such data is categorically barred from release here, but not in the PUMS releases.[5] Just as the PUMS data is releasable "statistical

---

[5] *See, e.g.*, Pl.'s Br. at 21 (reproducing ACS PUMS microdata table containing individual-level data on, inter alia, respondents' geographic details, age, and sex).

6

material" with protections applied, so too are the requested SOGI data sets.[6]

Just as *Baldrige* is not dispositive, it is also not dispositive that the disclosure avoidance process has not been completed for the requested data. *See, e.g.*, Opp'n at 1. That review may be part of the agency's reasonable segregation of non-exempt material. *See infra* Section III.

Finally, Defendants still fail to explain how numerous aspects of the requested paradata, such as "the time the user went to the webpage" or "system messages that were displayed" could in any way identify a respondent or reveal confidentially reported information. *See* Opp'n at 4.

### III.    Applying Disclosure Avoidance Techniques Here Is a Reasonable Segregation Measure.

Given the requested data is not categorically exempt from disclosure, the Bureau is required to undertake reasonable segregation measures to release meaningful information. Instead, the Bureau flatly maintains that it is not required to do anything to release the requested data.

*First*, Defendants, as in the case of the Report, cannot logically support their blanket withholding of even the field names and column headers within the requested files. Opp'n at 11. They again mistakenly argue their refusal to release the files with everything but the column headers redacted is somehow supported by case law concerning claims that agencies failed to conduct adequate searches. *Id.* (again citing *Irons* and *Fonda*). But this information is part of the very files Plaintiff requested. *See* Opp'n at 3 (acknowledging Plaintiff requested two "data *files*" (emphasis added)). Despite Defendants' own description of Plaintiff's request, they assert that

---

[6] Defendants quibble over when exactly "raw" data becomes "statistical material." *Compare* Pl.'s Br. at 20–21 ("raw" data becomes "statistical material" when identifiers are removed and it is numerically coded (responding to Defs.' Mot. at 10 (quoting *Seymour v. Barabba*, 559 F.2d 806, 809 (D.C. Cir. 1977) (Census can "disclose numerical statistical data which does not identify any person, corporation, or entity in any way")), *with* Opp'n at 10–11 & n.1 (Despite confirming relevant data is numerically coded, now appearing to argue "raw" data becomes "statistical material" only after application of disclosure avoidance techniques). Ultimately, the court need not resolve this point because Plaintiff also argued the Bureau "can and should apply reasonable disclosure avoidance techniques" to said "statistical material." *See* Pl.'s Br. at 26. The Parties, thus, end up in the same place that disclosure avoidance measures are required. (Though they disagree as to what those measures entail and whether the Bureau is obligated to do them).

Plaintiff "requested the response data itself—not the field names." Opp'n at 11. Not so—Defendants are refusing to release basic information in those files with no plausible claim that the information is exempt. And this information—column headers and data fields—is itself of value and would allow for a more concrete discussion of what Defendants could release. Redacting data while releasing the column headers and data fields is a standard technique employed by agencies in responding to FOIA requests. *See* McGrath Decl. at Exs. 3 & 4 (representative examples).

*Second*, Defendants still have not carried their burden to show that it cannot release information in even a single column without risk of reidentification. Using the ACS PUMS as an example,[7] Defendants do not explain how releasing just the "sex" column from a dataset could plausibly present a reidentification risk. *See* side figure. Or here how releasing just the "sex assigned at birth" and "current gender identity" columns would plausibly present a reidentification risk. Instead, the Hawes Declaration discusses identification risk found to flow from respondents' movie ratings when combined with Netflix watching history data. Hawes Decl. at ¶¶ 21–22.  But the innumerable different permutations of an individual's movie viewing preferences are much more personalized data points than solely a person's sex at birth or current identification with gender identities—indicators shared identically with millions or hundreds of millions of other people. Even in submitting two additional declarations, Defendants offer no logical explanation of why this data could not be released in isolation with other characteristics redacted.

*Third*, Defendants are required to undertake more substantial segregation measures here, including the application of disclosure avoidance techniques. Defendants suggest that the Second Circuit in *ACLU v. USCIS* only found that the defendant agency was required to change

---

[7] *See* Pl.'s Br. at 21 (reproducing ACS PUMS microdata table).

identification numbers in producing responsive data, but the Circuit made clear that it was *not* "delineat[ing] the outer boundaries" of data modifications that may be required under FOIA. 58 F.4th 643, 658 (2d Cir. 2023). And Defendants here have undertaken no effort at all to adjust any of the responsive data into releasable form. Defendants wholly fail to address the analogous case in *Baser v. Veterans Affairs*, where the court found that the agency still had not met its burden of releasing all segregable information even *after* it had applied disclosure avoidance methods to microdata by redacting some information and changing the values of other fields. 2014 WL 4897290, at *2 (E.D. Mich. 2014). Instead, Defendants rely on *ACLU v. DOJ*, 681 F.3d 61, 71 (2d Cir. 2012), to argue that any such application would impermissibly create a new record. But in *ACLU v. DOJ*, the court held that courts could not require inaccurate "neutral" phrases to be injected into existing records to change their substance. *Id*. Here, the disclosure avoidance methods would maintain an accurate picture of the overall statistical information in the requested files—the substantive information in these records—while obscuring particular identifying details. Leclerc Decl. ¶ 17. As even Defendants' declarant seems to acknowledge, the impact of applying these methods is akin to blurring of pixels in photos and videos, allowing for the viewing of the substance of the collected statistical information without identification of respondents. *See* Hawes Decl. ¶ 20; *see* Pl.'s Br. at 29. This can be achieved in a "mechanical" manner without "any discretionary rewriting of records." Leclerc. Decl. ¶ 17.

*Fourth*, Defendants do not offer specific information as they seek to summarily reject the assessment of Plaintiff's expert—a former Census Bureau official responsible for developing algorithms and disclosure avoidance through 2025—that the Bureau could reasonably use "pre-existing" scripts in a "mechanical" and "automated" process to conduct appropriate segregation in a matter of "2.5 weeks," a process that is not dramatically more involved than that required in

9

*ACLU v. USCIS*. Leclerc Decl. ¶¶ 17, 21, ECF No 32. Defendants' declarant asserts, without quantification, that required modifications of existing code would not be done "modestly" and would require, again unquantified, "significant staff resources." Hawes Decl. ¶ 25.[8]

*Fifth*, nowhere do Defendants declare the Bureau has determined it *cannot* ensure against reidentification risk in the data Plaintiff seeks, only that doing so would require resources. This distinction undermines Defendants' discussion of *Phillips v. U.S. Bureau of Census*. Contrary to Defendants' suggestion, the *Phillips* court did not find the Bureau had no obligation to apply any confidentiality measures. Rather, in assessing entitlement to attorney's fees, the court held only that when the Bureau rejected plaintiff's request for the 2020 file[9] it had a "colorable"—not a legally or factually "correct"—basis for doing so because the Bureau did not yet have the capability to safely release the files. 2024 WL 230854, at *4–5 (S.D.N.Y. Jan. 22, 2024) (listing challenges the Bureau had to overcome to release the files). Critically, after the Bureau developed the capability, the court rejected defendants' argument that applying a "new programming code" "to process the files" "create[d] a new record,"[10] finding instead that "[i]t is standard practice for the Government to remove confidential data from documents produced pursuant to FOIA." *Phillips*, 2024 WL 230854, at *3. Defendants here are refusing to comply with "standard" FOIA practice.

Plaintiff respectfully requests that the Court require the Bureau to segregate and release non-exempt information from these records of national importance.

---

[8] Plaintiffs note that Defendants' declarant is responsible for "scientific communication," Hawes Decl. ¶ 2, and does not purport to have direct experience developing or applying algorithms in the disclosure avoidance process or otherwise, unlike Plaintiff's expert declarant, Leclerc Decl. ¶¶ 1-5.

[9] Defendants' discussion of the 2010 file at issue in *Phillips* is misleading. As Defendants acknowledge that file was deleted *before* Phillips submitted his FOIA request for it. Where the Bureau was no longer "in control of" the 2010 file at the time of Phillips' request, it was not an "agency record" under FOIA. *See DOJ v. Tax Analysts*, 492 U.S. 136, 145 (1989). The agency was, thus, not required to produce it under a distinct line of FOIA authority.

[10] *See* Opp'n to Pl.'s Mot. for Att'ys' Fees at 7, 13-16, *Phillips*, No. 22-CV-9304, ECF No. 22.

Dated: March 18, 2026

Respectfully submitted,

*/s/ Daniel A. McGrath*_____
Daniel A. McGrath (S.D.N.Y. Bar No. 5541198)
Amy C. Vickery (N.Y. Bar No. 5942271)*
Anisha Hindocha (D.C. Bar No 1725159)*
Robin Thurston (D.C. Bar No. 7268942)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 812-7824
dmcgrath@democracyforward.org
avickery@democracyforward.org
ahindocha@democracyforward.org
rthurston@democracyforward.org


*Counsel for Plaintiff*

*Admitted pro hac vice*

## CERTIFICATE OF COMPLIANCE WITH PAGE LIMIT AND LOCAL RULE 7.1

Undersigned counsel certifies that this Reply Memorandum complies with the Individual Practices' limit of 10 pages of Judge Lewis J. Liman, as well as the 3,500 word limit of Local Rule 7.1 as it contains 3,377 words of text according to undersigned's Microsoft Word word count.

*/s/ Daniel A. McGrath*