USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 09/25/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JONATHAN B. FREEMAN,

Plaintiff,

-v-

U.S. CENSUS BUREAU, et al.,

Defendants.

25-cv-7834 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants the United States Census Bureau ("Census Bureau" or the "Bureau") and the United States Department of Commerce ("Department of Commerce" and with the Census Bureau, "Defendants") and Plaintiff Jonathan B. Freeman ("Dr. Freeman" or "Plaintiff") cross-move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Dkt. Nos. 27, 30.

For the following reasons, the motions are granted in part and denied in part.

**BACKGROUND**

## I. The ACS

Since 2005, the United States Census Bureau has conducted an ongoing survey, known as the American Community Survey, to collect detailed housing and socioeconomic data from approximately 3.5 million households across the 50 states, the District of Columbia, and Puerto Rico. *See* U.S. Census Bureau, *Am. Cmty. Survey (ACS)*, https://www.census.gov/programs-surveys/acs/; Agency Information Collection Activities, Submission to the Office of Management and Budget (OMB) for Review and Approval, Comment Request, American Community Survey Methods Panel: 2024 Sexual Orientation and Gender Identity Test, 88 Fed. Reg. 64404 (Sept. 19, 2023); Dkt. No. 1 ¶ 8; Dkt. No. 41 ¶ 2. "[T]he ACS collects data on over

40 topics on social, economic, housing, and demographic characteristics, including questions on income, race, citizenship status, and disabilities." Dkt. No. 29 ¶ 13. To improve survey responsiveness and accuracy, the ACS conducts regular research, testing, and evaluations that inform potential changes to the survey, including changes to data collection methods and question wording. *Id.* ¶ 2.

On September 19, 2023, the Census Bureau announced a proposal to begin testing questions about the sexual orientation and gender identity ("SOGI") of respondents on the ACS. *Id.* ¶ 9. The purpose of the testing was to assess the feasibility of adding SOGI questions to the ACS. *Id.* The Commerce Department announced the proposal in a request for comment published in the Federal Register:

> The Census Bureau plans to request Office of Management and Budget (OMB) approval to conduct a test of sexual orientation and gender identity questions on the ACS. The test is referred to as the 2024 ACS Sexual Orientation and Gender Identity (SOGI) Test. Federal agencies have expressed interest in and identified legal uses for this information, including civil rights and equal employment enforcement.

88 Fed. Reg. 64404, 64405.[1]

Specifically, the Census Bureau proposed to ask survey respondents to identify their sex assigned at birth, and for persons 15 years or older, to identify their current gender and their sexual orientation. Dkt. No. 29 ¶ 9. The announcement indicated that the Census Bureau would conduct a field test where questionnaires that included SOGI questions would be sent to respondents. *Id.* Half of the respondents would receive one version of the questions and half

[1] "Multiple federal agencies had requested standardized SOGI data to inform their programs and fulfill statutory obligations, including the Violence Against Women Act, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, the Fair Housing Act of 1968, the Equal Credit Opportunity Act, the Omnibus Crime Control and Safe Streets Act of 1968, the Civil Rights of Institutionalized Persons Act, and the Violent Crime and Law Enforcement Act of 1994." Dkt. No. 1 ¶ 10. Congress subsequently appropriated funds for the 2024 ACS SOGI Test in the FY 2023 Omnibus Appropriations bill. *Id.*

would receive a different version of the questions. *Id.* Of specific interest to the Census Bureau was how questions performed when completed by proxy respondents, *i.e.*, when responded to by one member of a household asked about everyone living in the household. 88 Fed. Reg. 64404, 64405.

Field testing kicked off in the summer of 2024 and involved administering SOGI questions to a large, nationally representative sample of approximately 480,000 housing units. American Community Survey Research and Evaluation Program, *ACS Research & Evaluation Analysis Plan (REAP) Sexual Orientation and Gender Identity Test* (Apr. 17, 2024), https://perma.cc/G4NM-7DRD. The field test collected two principal categories of information: (1) data reflecting respondents' answers to SOGI and other survey questions, and (2) web paradata capturing how respondents interacted with the test collection instrument, including the time the user accessed the webpage, keystroke or mouse-click data, navigation behavior, and the use of help features. Dkt. No. 29 ¶ 16.

The 2024 ACS SOGI Test also included a cognitive testing component, which involved structured, in-depth interviews conducted with a diverse sample of respondents to examine how respondents understood and interpreted proposed SOGI questions. Dkt. No. 1 ¶ 12. The Bureau engaged an outside contractor, RTI International ("RTI"), to conduct the cognitive testing in or around February 2024. Dkt. No. 29 ¶ 10; Dkt. No. 41 ¶ 5. RTI began conducting ACS SOGI testing in or around August 2024. Dkt. No. 1 ¶ 9; Dkt. No. 29 ¶ 10. The Census Bureau disclosed RTI's involvement with the testing. *See* Stephanie Galvin, U.S. Census Bureau, Testing and Implementing Sexual Orientation and Gender Identity (SOGI) Questions in the American Community Survey (ACS) at 17–19 (Presentation at the National Advisory Committee Fall Meeting, Nov. 7-8, 2024), https://perma.cc/B989-5WTW. The Census Bureau publicly

stated: "The Census Bureau will release at least one report discussing the aggregate results of the 2024 ACS SOGI Test, after applying disclosure avoidance techniques." U.S. Census Bureau, Supporting Statement A: American Community Survey Methods Panel: 2024 Sexual Orientation and Gender Identity Test, OMB Control No. 0607-0936 (2024), https://perma.cc/VW3R-7WGF. RTI prepared a draft report concerning the results of the cognitive testing (the "RTI Report" or the "Report"). Dkt. No. 29 ¶ 10; Dkt. No. 41 ¶ 5. The Report is dated January 2025 but has never been finalized and has not been released.

The front page of the Report indicates that it was prepared by RTI International for the U.S. Census Bureau. The Report is approximately 200 pages long. Dkt. No. 41 ¶ 6. It contains an Abstract, Executive Summary, Project Overview, Research Methods, findings for respondents who speak English and those who speak Spanish, and Recommendations. The Court has reviewed the draft report *ex parte* and *in camera*.

## II. The Executive Order

Donald Trump was inaugurated as President on January 20, 2025. That same day, he signed Executive Order 14168, entitled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (the "Executive Order"). Dkt. No. 41 ¶ 5. The Executive Order directed Executive Branch agencies to use the term "sex" and not "gender" in all applicable Federal policies and documents. Exec. Order No. 14168 § 3(c), 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025); Dkt. No. 29 ¶ 11. The President also directed, in part, as follows:

> Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

Exec. Order No. 14168 §3(e).[2]

As a result of the Executive Order, the Census Bureau suspended RTI's cognitive testing work and the Census Bureau's work on the gender identity question. Dkt. No. 29 ¶¶ 12, 14; Dkt. No. 41 ¶ 5. RTI and the Census Bureau also stopped work on the Report. *Id.* In addition, as a result of the Executive Order, the Report and the respondent information from the test instrument are not currently available to Census employees for additional research or additional editing. Dkt. No. 29 ¶ 12.

**III. The FOIA Requests**

Dr. Freeman is a professor who has conducted and published substantial academic research in the past using data obtained from government sources such as the Census Bureau. Dkt. No. 1 ¶ 4. On May 30, 2025, Dr. Freeman sent the first of two Freedom of Information Act ("FOIA") requests to the Census Bureau seeking all non-data elements within the RTI Report. Dkt. No. 29 ¶ 4. Dr. Freeman's May 30, 2025 request sought the following:

> A copy of all non-data elements within the American Community Survey (ACS) Sexual Orientation and Gender Identity (SOGI) Cognitive Testing Report, produced by RTI International in or around November 2024.

*Id.*; Dkt. No. 1-5. The request clarified:

> This request excludes any data tables, verbatim respondent quotes, or other data elements that may be protected from disclosure under Title 13.
>
> If the Disclosure Review Board has not yet evaluated the report's data elements for disclosure risk, I request the release of all non-data narrative content. Because the data and non-data elements of the report are reasonably segregable, I request that all non-exempt, non-data elements be segregated and released pursuant to 5 U.S.C. § 552(b).

*Id.*

[2] The Executive Order asserted that "'Gender ideology' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that it "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." *Id.* § 2(f).

The Census Bureau denied this request on June 18, 2025 on the basis of FOIA Exemption 3, claiming that the information responsive to the request contained information protected from disclosure under Title 13, United States Code, Section 9. Dkt. No. 29 ¶ 5; Dkt. No. 1-6.

On June 19, 2025, Dr. Freeman appealed the Census Bureau's decision on the basis that the Bureau's categorical denial failed to meet FOIA's requirement to segregate all non-exempt portions of the record. Dkt. No. 1 ¶ 22; Dkt. No. 1-7. Dr. Freeman did not receive a response. Dkt. No. 1 ¶ 23.

On July 21, 2025, Dr. Freeman sent a second FOIA request for information about the ACS SOGI Test to the Census Bureau. Dkt. No. 29 ¶ 6; Dkt. No. 1-8. The request sought the following:

> [C]opies of the following two internal data files related to the American Community Survey (ACS) Sexual Orientation and Gender Identity (SOGI) Test, which are currently in possession by Elizabeth Poehler (elizabeth.poehler@census.gov) and Donna Daily (donna.m.daily@census.gov);
>
> Self-Response File (CSV or JSON format)—This file contains individual-level deidentified self-response data from ACS SOGI Test respondents. Each row corresponds to a respondent, and each column corresponds to an individual survey item.
>
> Web Paradata File (CSV or JSON format)—This file contains individual-level deidentified web paradata from ACS SOGI Test respondents. Each row corresponds to a timestamp (concatenated across respondents), and each column represents web navigation-related information through the survey.

*Id.*

On August 1, 2025, the Census Bureau responded that the information was exempt from disclosure under FOIA Exemption 3 because it contained information protected from disclosure under Title 13, United States Code, Section 9. Dkt. No. 29 ¶ 7; Dkt. No. 1-9. Dr. Freeman appealed the Census Bureau's decision on August 4, 2025. Dkt. No. 1 ¶ 26; Dkt. No. 1-10.

## PROCEDURAL HISTORY

Dr. Freeman filed this lawsuit under the Freedom of Information Act ("FOIA") on September 22, 2025. Dkt. No. 1. He seeks an order that Defendants (i) conduct searches for any and all records responsive to his requests using search methods reasonably calculated to lead to the discovery of all responsive records; (ii) transmit any responsive ACS SOGI Test data, consistent with 13 U.S.C. §§ 8, 9, and other applicable statutes to the Census Bureau's Disclosure Review Board for disclosure review and processing; and (iii) produce by a date certain any and all non-exempt responsive records. Dkt. No. 1 at 11–12 (Prayer for Relief).

Defendants answered the complaint on January 12, 2026. Dkt. No. 26. That same day, Defendants filed a motion for summary judgment, a memorandum of law in support of the motion for summary judgment, and the declaration of Elizabeth Poehler in support of the motion for summary judgment. Dkt. Nos. 27–29. On February 9, 2026, Plaintiff filed a cross-motion for summary judgment supported by a memorandum of law in support of the motion and the declaration of Philip Leclerc. Dkt. Nos. 30–32. On March 6, 2026, Defendants filed a memorandum of law in opposition to the cross-motion for summary judgment and in further support of Defendants' motion for summary judgment. Dkt. No. 40. Defendants also filed the declarations of Elizabeth Poehler and Michael Hawes in opposition to Plaintiff's cross-motion for summary judgment. Dkt. Nos. 41–42. On March 18, 2026, Plaintiff filed a reply memorandum of law and the declaration of Daniel A. McGrath in further support of his cross-motion for summary judgment. Dkt. Nos. 43–44.

By order of August 13, 2026, the Court ordered Defendants to deliver two copies of the RTI Report to the Court for *ex parte* and *in camera* review. Dkt. No. 45. On August 27, 2026, Defendants delivered to the Court two copies of the original draft RTI Report as well as two copies of a version reviewed and approved by the Disclosure Review Board. Dkt. No. 50.

## LEGAL STANDARD

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).

In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to [the non-moving party]," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). If "the party opposing summary judgment propounds a reasonable conflicting

interpretation of a material disputed fact," summary judgment shall be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9–10 (2d Cir. 1983).

To obtain summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA. *See* 5 U.S.C. § 552(a)(4)(B); *E.P.A. v. Mink*, 410 U.S. 73, 79 (1973); *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994). A district court in a FOIA case may grant summary judgment in favor of an agency "on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quoting *Gallant v. N.L.R.B.*, 26 F.3d 168, 171 (D.C. Cir. 1994) (citation omitted) (emphasis added)). Agency affidavits or declarations are "accorded a presumption of good faith," *Carney*, 19 F.3d at 812, which "cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents,'" *SafeCard Servs., Inc. v. SEC*, 926 F.3d 1197, 1200 (D.C. Cir. 1991) (citation omitted). Accordingly, summary judgment is warranted "when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)); *see Am. Oversight v. U.S. Dep't of Just.*, 45 F.4th 579, 587 (2d Cir. 2022) (sworn declarations must be "factually uncontroverted and sufficiently detailed to have the exemption appear 'logical and plausible'" (quoting *Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs. ("Knight I")*, 30 F.4th 318, 327 (2d. Cir. 2022))).

The Court reviews an agency's decision to withhold records or portions thereof *de novo*. *See* 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989).[3]

## DISCUSSION

### I. The Freedom of Information Act

The Freedom of Information Act was "designed 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). It was enacted to "promote honest and open government and to assure the existence of an informed citizenry 'to hold the governors accountable to the governed.'" *Grand Cent. P'ship*, 166 F.3d at 478 (quoting *Ethyl Corp. v. E.P.A.*, 25 F.3d 1241, 1245 (4th Cir. 1994)). Thus, "FOIA 'strongly favor[s] public disclosure of information in the possession of federal agencies.'" *Am. Oversight*, 45 F.4th at 587 (quoting *Knight I*, 30 F.4th at 327). The Act accordingly "requires federal agencies to disclose records to the public on request unless a record is protected by one of nine statutory exemptions." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 58 F.4th 1255, 1261 (D.C. Cir. 2023) (citing 5 U.S.C. § 552(b)). While FOIA's exemptions are "as much a part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirement," *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (quoting *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018)), FOIA's exemptions must nevertheless be "narrowly construed," *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *FBI v. Abramson*, 456

[3] Courts in this Circuit frequently refer to opinions of the United States Court of Appeals for the D.C. Circuit due to its expertise on FOIA issues. *See Austin Sanctuary Network v. U.S. Immigr. and Customs Enf't*, 2022 WL 4356732, at *21 (S.D.N.Y. Sept. 19, 2022) (citing cases).

U.S. 615, 630 (1982)), and the burden is on the agency to justify any withholdings, 5 U.S.C. § 552(a)(4)(B).

FOIA Exemption 3 applies to records "specifically exempted from disclosure by statute," provided that the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3); *see Wilner*, 592 F.3d at 71. The court engages in a two-fold inquiry to determine whether Exemption 3 applies. It asks first whether there exists "a statutory exemption to disclosure within the meaning of Exemption 3," and second, whether the information being withheld falls within that exemption. *C.I.A. v. Sims*, 471 U.S. 159, 167 (1985); *Baldrige v. Shapiro*, 455 U.S. 345, 353 (1982); *Wilner*, 592 F.3d at 72.

Sections 8(b) and 9 of the Census Act "qualify as withholding statutes under Exemption 3." *Baldrige*, 455 U.S. at 355. Section 8(b) of the Census Act provides that subject to specified limitations, "the Secretary [of Commerce] may furnish copies of tabulations and other statistical materials which do not disclose the information reported by, or on behalf of, any particular respondent . . . ." 13 U.S.C. § 8(b). Section 9(a) provides, in relevant part:

> Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, or local government census liaison, may, except as provided in section 8 or 16 or chapter 10 of this title . . .
>
> (1) use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied; or
>
> (2) make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or
>
> (3) permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports.

*Id.* § 9(a).

The Supreme Court has held that the Census Act does not just protect the identity of individuals but extends to all "raw data reported by or on behalf of individuals." *Baldrige*, 455 U.S. at 355, 358.

FOIA Exemption 5 shields from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "Although Exemption 5's terms and the statutory definitions say nothing about communications with outsiders, some Courts of Appeals have held that a document prepared for a Government agency by an outside consultant qualifies as an 'intra-agency' memorandum." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 2–3 (2001). In considering the scope of Exemption 5, the Second Circuit "has recognized that agencies may require assistance from outside consultants in formulating policy, and has held that 'nothing turns on the point that . . . reports were prepared by outside consultants . . . rather than agency staff.'" *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 77 (2d Cir. 2002) (Sotomayor, J.) (quoting *Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70, 83 (2d Cir. 1979) (Friendly, J.)). Rather, "[w]hether a particular document is exempt under (b)(5) depends not only on the intrinsic character of the document itself, but also on the role it played in the administrative process." *Lead Indus.*, 610 F.2d at 80.

Exemption 5 "incorporates the privileges available to Government agencies in civil litigation," including "the deliberative process privilege, attorney-client privilege, and attorney work-product privilege." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021). The exemption protects from disclosure "agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules." *Tigue*, 312 F.3d at 76 (quoting *Grand Cent. P'ship*, 166 F.3d at 481).

The deliberative process privilege protects "documents 'reflecting advisory opinions, recommendations[,] and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quoting *Carl Zeiss Stiftung v. V.E.B. Cal Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)). To invoke the exemption, the agency must show that the record is: (1) "predecisional, that is, prepared in order to assist an agency decisionmaker in arriving at his decision"; and (2) "deliberative, that is, actually related to the process by which policies are formulated." *Knight I*, 30 F.4th at 334 (quoting *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 84 (2d Cir. 1991)). "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Sierra Club*, 592 U.S. at 268 (citation omitted).

"[T]he ultimate purpose of th[e deliberative process] privilege is to prevent injury to the quality of agency decisions." *Sears*, 421 U.S. at 151. The exemption is "designed to safeguard and promote agency decisionmaking processes in at least three ways: [I]t serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Grand Cent. P'ship*, 166 F.3d at 481 (internal quotation marks and citations omitted).

As amended in the FOIA Improvement Act of 2016 ("FIA"), FOIA provides that "[a]n agency shall withhold information under this section only if the agency reasonably foresees that

disclosure would harm an interest protected by an exemption described in subsection (b)." 5 U.S.C. § 552(a)(8)(A)(i). The foreseeable harm requirement "impose[s] an independent and meaningful burden on agencies." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (quoting *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019)). Because "[t]he focus of . . . FOIA is information, not documents, . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).[4]

Under 5 U.S.C. § 552(b), agencies must disclose "any reasonably segregable portion of a record . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "This provision requires agencies and courts to differentiate among the contents of a document rather than to treat it as an indivisible 'record' for FOIA purposes." *Am. C.L. Union v. Nat'l Sec. Agency*, 2017 WL 6387731, at *4 (S.D.N.Y. Aug. 17, 2017) (quoting *Am. C.L. Union v. U.S. Dep't of Just.*, 210 F. Supp. 3d 467, 485 (S.D.N.Y. 2016)), *aff'd*, 925 F.3d 576 (2d Cir. 2019). Non-exempt information is not reasonably segregable when it is "inextricably intertwined" with the exempt information in a record "such that disclosure would compromise the confidentiality of [exempt] information that is entitled to protection under Exemption 5." *Hopkins*, 929 F.2d at 85 (internal quotation marks and citation omitted). "To meet this standard, 'the agency must provide a "detailed justification" for its non-segregability' but need not 'provide so much detail that the exempt material would be effectively disclosed.'" *Austin Sanctuary Network v. U.S. Immigr. & Customs Enf't*, 2022 WL 4356732, at *23 (S.D.N.Y. Sept. 19, 2022) (quoting *Johnson v. Exec.*

[4] The foreseeable harm requirement does not apply to "information that is otherwise prohibited from disclosure by law" or to classified information. 5 U.S.C. § 552(a)(8)(B).

*Off. for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002)). "[C]ourts have held that disclosure is not required when, after segregation, all that is left is 'a few nuggets of non-intertwined' information." *Am. C.L. Union v. U.S. Dep't of Just.*, 252 F. Supp. 3d 217, 227 (S.D.N.Y. 2017) (quoting *Lead Indus.*, 610 F.2d at 88).

## II. The RTI SOGI Cognitive Testing Report

Defendants withheld production of the RTI Report on the basis of Exemption 3 alone. Dkt. No. 29 ¶ 5; Dkt. No. 1-6. In their motion for summary judgment, Defendants initially argued that withholding was appropriate based on Exemption 3 and Exemption 5.[5] The Census Bureau has since subjected the RTI Report to review by the Disclosure Review Board and no longer relies on Exemption 3 to withhold the RTI Report as reviewed. Dkt. No. 48. Defendants explain that the Census Bureau "may disclose materials that have been reviewed, adjusted as necessary, and approved by the Census Bureau's Disclosure Review Board, *id.* at 1, and agrees that the version of the RTI Report reviewed by the Disclosure Review Board "would not be subject to Exemption 3," *id.* at 2. Plaintiff has agreed to accept the reviewed version of the RTI Report. *Id.* Accordingly, at this point, the only remaining question is whether the RTI Report is exempt from disclosure by the deliberative process privilege.

[5] An agency's failure to assert an exemption in response to a FOIA request does not constitute waiver of its right to subsequently assert that exemption in litigation. *See N.Y. Times Co. v. U.S. Secret Serv.*, 2018 WL 722420, at *2 (S.D.N.Y. Feb. 5, 2018) (agency's "failure to claim [exemption] in its administrative process does not waive its right to claim the Exemption in a district court proceeding"); *Hodes v. U.S. Dep't of Housing & Urban Dev.*, 532 F. Supp. 2d 108, 114 n.2 (D.D.C. 2008) (holding that an agency could invoke an exemption that was not previously asserted in its letters with the FOIA/Privacy Act requester); *Sciba v. Bd. of Governor of Fed. Rsrv. Sys.*, 2005 WL 758260, at *1 n.3 (D.D.C. Apr. 1, 2005) ("an agency only waives FOIA Exemptions by failing to claim them in the original proceedings before the district court").

### A. Deliberative Process Privilege

Although the parties do not directly discuss it in their briefing, there appears to be no real dispute that the RTI Report is properly considered an intra-agency memorandum. *See Tigue*, 312 F.3d at 77–78. The Census Bureau routinely partners with external research contractors like RTI to help inform its decisionmaking. *See, e.g.*, Y. Patrick Hsieh et al., Research on Public Opinion of Administrative Records: Cognitive Testing Report (U.S. Census Bureau, Working Paper No. RSM 2023-12, Dec. 2023), https://perma.cc/WDZ5-CTAL (cognitive testing report regarding draft survey instrument prepared by RTI for Census Bureau in December 2023). The parties appear to agree that the RTI Report "played essentially the same part in [the Bureau's] process of deliberation as documents prepared by agency personnel might have done." *Klamath*, 532 U.S. at 10.

The parties also apparently agree that the RTI Report is predecisional. The draft pre-dates the Census Bureau adopting SOGI questions as part of the ACS and is intended to assist the Census Bureau in how to frame those questions should it decide to add them to the ACS. *See* Dkt. No. 31 at 13 (arguing that Defendants have failed to establish that the RTI Report is deliberative in nature or that the release of factual and scientific content would cause foreseeable harm without addressing predecisional element). "Even where a draft never becomes final, the draft version remains predecisional." *NAACP Legal Def. & Educ. Fund, Inc. v. U.S. Dep't of Just.*, 2020 WL 5237765, at *7 (S.D.N.Y. Sept. 2, 2020). The parties disagree, however, on whether the RTI Report is deliberative, whether its disclosure would cause foreseeable harm, and whether the factual portions of it can be segregated from any deliberative portions.

"[T]here is obviously no rule that documents prepared by government consultants are necessarily deliberative. Rather, a court must consider the consultant's function in preparing the documents at issue." *Allocco Recycling, Ltd. v. Doherty*, 220 F.R.D. 407, 412 (S.D.N.Y. 2004);

*see also CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1160–62 (D.C. Cir. 1987) (though deliberative material created by consultant may be privileged from disclosure, "[t]his is not to say that any material derived from an outside expert is inviolable; factual data, for example, are still susceptible to discovery"). In order to evaluate a claim for deliberative process, "an understanding of the function the documents serve within the agency is crucial." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 858 (D.C. Cir. 1980).

"An agency record is 'deliberative if it reflects the give-and-take of the consultative process.'" *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 954 F.3d 150, 156 (quoting *Brennan Ctr. for Just. at N.Y.U. Sch. of Law v. U.S. Dep't of Just.*, 697 F.3d 184, 202 (2d Cir. 2012)). To determine whether a record is deliberative, the court considers "whether the document (i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency." *Grand Cent. P'ship*, 166 F.3d at 482 (cleaned up). "The 'key question' [to] keep in mind when assessing the application of the deliberative process privilege to an agency record is 'whether disclosure would tend to diminish candor within an agency.'" *Nat. Res. Def. Council*, 954 F.3d at 158 (quoting *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (R.B. Ginsburg, J.)). "[T]he deliberative-process privilege may apply even when the agency never reaches a final decision." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 45 F.4th 963, 972 (D.C. Cir. 2022). "But to carry its burden in such a situation, the agency still must tie the withheld records to a decision-making process, even if that process did not ultimately result in a decision." *Id.*

The RTI Report played a role in the Bureau's decisionmaking process. According to the Bureau's declarant, "[t]he primary purpose of the report was to inform the Census Bureau's decisions regarding the wording of SOGI questions for possible future ACS testing." Dkt. No. 41 ¶ 5. "[T]he underlying research was intended to evaluate the suitability of inclusion of gender identity questions on the ACS." Dkt. No. 29 ¶ 18. Consistent with that purpose, a portion of the Report contains recommendations as to how SOGI questions might be framed so as to improve responsiveness and accuracy. "The Census Bureau intended to use the final report and the recommendations included therein—once received—to make decisions on whether and what kind of SOGI questions to include in future ACS testing." Dkt. No. 41 ¶ 15. Where "a consultant is retained to evaluate information and submit recommendations as to decisions thereon," courts have found the "advice or opinion transmitted to the agency [to be] subject to privileged withholding." *CNA Fin. Corp.*, 830 F.2d at 1162. The RTI Report reflects the views of RTI; disclosure of its recommendations with respect to proposed questions could therefore risk "premature disclosure of proposed policies before they have been finally formulated or adopted." *Grand Cent. P'ship*, 166 F.3d at 481 (quoting *Providence J. Co. v. U.S. Dep't of the Army*, 981 F.2d 552, 557 (1st Cir. 1992)).

The determination that the RTI Report is predecisional and deliberative, however, does not answer the question whether any or all of it can be withheld. For one "[t]he privilege does not . . . as a general matter, cover 'purely factual' material." *Grand Cent. P'ship*, 166 F.3d at 482. "[F]actual segments of a predecisional document are exempt from disclosure under Exemption 5 if: [i] the predecisional document is submitted to the agency to assist it in rendering an informed decision upon the record, and [ii] disclosing the factual segments would reveal the deliberative process itself by demonstrating which facts in the record were considered

significant." *N.Y. Times Co. v. U.S. Dep't of Just.*, 2022 WL 2304173, at *2 (S.D.N.Y. June 27, 2022) (quoting *N.Y. Times Co. v. U.S. Dep't of Just.*, 2017 WL 4712636, at *19 (S.D.N.Y. Sept. 29, 2017)), *aff'd*, 2024 WL 1109260 (2d Cir. Mar. 14, 2024) (summary order). "While the 'factual/deliberative divide is not always black and white[,] . . . the key question . . . [is] whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Am. Soc'y for Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 2021 WL 1163627, at *10 (S.D.N.Y. Mar. 25, 2021) (quoting *Color of Change v. U.S. Dep't of Homeland Sec.*, 325 F. Supp. 3d 447, 455 (S.D.N.Y. 2018)), *aff'd*, 60 F.4th 16 (2d Cir. 2023).

An agency may withhold factual information under the privilege where the agency "us[ed] its independent judgment to select facts, out of a larger pool of facts, that, in its view, [were] significant and should be considered in developing recommendations." *NAACP*, 2020 WL 5237765, at *8. The discussion of facts in that circumstance may "show the authors' judgment in 'cull[ing] the relevant documents, extract[ing] pertinent facts, [and] organiz[ing] them to suit a specific purpose.'" *Color of Change*, 325 F. Supp. 3d at 455 (quoting *Nat'l Sec. Archive v. C.I.A.*, 752 F.3d 460, 465 (D.C. Cir. 2014)); *accord N.Y. Times Co. v. Dep't of Educ.*, 658 F. Supp. 3d 171, 189 (S.D.N.Y. 2023) (holding that material was deliberative rather than factual because it "resulted from a selective process in which Department official chose particular information, including legislation and regulations, they deemed 'relevant to formulating a policy position on school safety issues'"). By contrast, "purely factual material that does not reveal—even indirectly—how any agency action or policy was formed" and "simply recite[s]" a set of facts is not protected as deliberative under FOIA. *Am. Soc'y for*

*Prevention of Cruelty to Animals*, 2021 WL 1163627, at *10–11; *see also Adelante Ala. Worker Ctr. v. U.S. Dep't of Homeland Sec.*, 376 F. Supp. 3d 345, 363 (S.D.N.Y. 2019) (discussion of specific detainee complaints is not deliberative); *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 2019 WL 4142725, at *12 (S.D.N.Y. Aug. 30, 2019) (statistical breakdown of cases is not deliberative), *rev'd in part, vacated in part*, 19 F.4th 177 (2d Cir. 2021).

Defendants have not sustained their burden of showing that factual content in the RTI Report is "inextricably intertwined" with deliberative material such that no portion of the report can be reasonably segregated. *Hopkins*, 929 F.2d at 85. Defendants' declarant Elizabeth Poehler, the Assistant Division Chief for Survey Methods in the ACS Office ("ASCO"), asserts that the Report is deliberative and portions of it cannot be segregated because "the selection of what factual information, findings, and analysis to include in the report is itself deliberative as it informs the Census Bureau's deliberations on final decisions and recommendations." Dkt. No. 29 ¶ 25. The declaration is entirely conclusory. Poehler does not identify any facts that would support the proposition that RTI exercised any judgment in determining what factual information or findings to include in the Report. Poehler's second declaration provides no further substance. It merely tracks the relevant standard, stating that "[i]n preparing the draft report, *contractors* review the universe of information collected and possible issues arising during testing and select the facts and issues they deem most relevant for informing the Census Bureau's decisions." Dkt. No. 41 ¶ 18 (emphasis added); *see Nat. Res. Def. Council*, 2019 WL 4142725, at *12 (rejecting EPA's conclusory assertions that the records at issue "reflect[] a give-and-take discussion on potential actions geared towards improving the New Chemicals program"). Poehler does not make any assertions regarding the process engaged in by these contractors. Tellingly, Poehler does not assert that there existed a universe of factual information broader than what was

included in the Report or that RTI exercised any judgment in determining what information to include in the Report and what information not to include.

The draft RTI Report, which the Court has reviewed *in camera*, is also inconsistent with Poehler's bare contentions. The RTI Report contains seven sections: Abstract, Executive Summary, Project Overview, Research Methods, English Findings, Spanish Findings, and Recommendations.[6] Except perhaps for material contained in the second and seventh sections, the content of the RTI Report is purely factual, describing the methodology and results of the ACS SOGI Cognitive Testing. The headings titled "Research Methods" and English and Spanish "Findings" speak to the factual nature of these sections. While the "Project Overview" section indicates that the SOGI questions were initially developed by the Census Bureau, Defendants offer no sworn declarations or record evidence that the Bureau performed any further work of its own with respect to testing or analysis of the data, all of which was collected by RTI. In that sense, much of the draft reports reads as "a recitation of facts prepared solely to 'inform' a decisionmaker" rather than "part of a collaborative effort" between RTI and the Bureau to assess question wording, response options, and Spanish language modifications for possible future testing of SOGI questions. *NAACP*, 2020 WL 5237765, at *8.

Defendants thus fail to establish that disclosing factual segments of the RTI Report would "reveal the deliberative process of summarization itself by demonstrating which facts in the massive . . . record were considered significant by the decisionmaker and those assisting her." *Lead Indus.*, 610 F.2d at 85. There is no evidence that RTI culled material from a larger record, much less a basis to believe that any culling that it did would reveal Census Bureau discussions.

[6] The RTI Report also includes three appendices containing the materials used to recruit respondents to participate in the test, interview materials, and changes made to the English and Spanish questions between testing rounds. Dkt. No. 41 ¶ 6.

Defendants have not submitted evidence from RTI or any other declarant to establish that RTI distilled testing data to isolate facts or issues worth including in the Report.[7] The materials here are thus dissimilar to records lawfully withheld in cases where the withholding agency proffered evidence that the authors synthesized large quantities of largely factual material and their selection of facts thought to be relevant reflected a policy-oriented judgment meriting protection from disclosure. *See, e.g.*, *Juul Labs, Inc. v. Food & Drug Admin.*, 731 F. Supp. 3d 46, 68–69 (D.D.C. 2024) (portions of memorandum were properly withheld where they "contain[ed] analyses in which agency scientists 'distill[ed] the raw data and information submitted by [Juul] in its PMTAs,' 'separat[ed] the significant facts from the insignificant facts,' 'weigh[ed] the significance of various types of information against each other, and dr[ew] conclusions therefrom'"); *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1538 (D.C. Cir. 1993) (deliberative process privilege applied to 204-page document where authors "cull[ed] the relevant documents, extract[ed] pertinent facts, organize[d] them to suit a specific purpose, and . . . identif[ied] the significant issues they encountered along the way"); *Montrose Chem. Corp. of Calif. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974) (summaries of more than 9,200-page record to help EPA Administrator determine whether pesticide was injurious to environment were properly withheld because the process of "separating the wheat from the chaff is surely . . . part of the deliberative process").

In her second declaration, Poehler speaks more directly to the Report itself. She asserts that "the plan was for RTI to deliver a draft report with its conclusions regarding the SOGI testing and recommendations to the Census Bureau," Dkt. No. 41 ¶ 14, that the final report

[7] Notably, Poehler does not attest to any personal knowledge. *See* Dkt. No. 29 ¶ 8 (stating only that Poehler has "personally reviewed" the documents relevant to Plaintiff's FOIA requests).

would "reflect the Census Bureau's input, in conjunction with RTI, about how to present the findings and what recommendations to make in the report itself," *id.* ¶ 15, and that "when work stopped the selection of factual information to include with the recommendations, as well as the formulation of the recommendations themselves, were still ongoing and subject to internal discussion before the report was finalized," *id.* ¶ 18. She asserts that because the iterative process of commenting on the draft had not concluded, "the findings in the report would very likely have changed between the current draft and a potential final version, based on input from and discussions with Census Bureau employees." *Id.* ¶ 14. Those assertions support that the Recommendations section and those portions of the Executive Summary that summarize the Recommendations are deliberative and not factual and were properly withheld. Disclosure of that material would expose the agency's decisionmaking. They do not, however, support that the Abstract, Project Overview, Research Methods, English Findings, Spanish Findings, and portions of the Executive Summary that summarize those sections were properly withheld.

The Report itself reflects the Bureau's input on "how to present the findings." *Id.* ¶ 15. That input does not support the contention that the input was such as to shield the Report in its entirety from production. Bureau employees left comments, for example, asking RTI to "careful[ly] check the language and SGM tables" in the Research Methods section to "ensure that the figures are correct and add appropriately," and flagged that RTI needed to "go through and make sure everything sums to the correct denominator" in the Findings sections. Elsewhere, Bureau employees requested that RTI "correct the headers throughout the report. For example, it says 'Appendix A' in the English findings and Spanish findings." They also asked that RTI streamline or "collapse[]" "what we perceive as redundant themes" or concepts in the Spanish Findings section. Other comments suggested rewording and edits for clarity. In a section on

responses to the sex assigned at birth questions, one Bureau employee wrote, "The ambiguous reference to 'assigned' makes these quotes hard to place" and noted that the description needed to provide more context or could be "cut . . . altogether." One comment noted that the Bureau had rearranged a section "to enhance the narrative and flow of the information," while another simply stated, "This is hard to understand so I'm just deleting it." Some suggestions were purely structural or stylistic, asking that RTI move sentences "under another header . . . to follow structure elsewhere" and "ensure that references to sections . . . are renumbered as needed."

What is missing is any contention that the Bureau's notes constitute a record of deliberations between the Bureau and RTI on the wording of the SOGI questions, their suitability for inclusion in the ACS, or any of the other substantive content of the Report or the cognitive testing that RTI performed. *Allocco*, 220 F.R.D. at 414; *cf. NAACP*, 2020 WL 5237765, at *7 ("The June 30 Draft reflects the then-ongoing collaboration between the Police Foundation and COPS on a document that contains preliminary assessments, initial findings, and proposed recommendations, along with notes and comments by the drafters."); *Am. C.L. Union v. Dep't of Def.*, 2017 WL 4326524, at *14 (S.D.N.Y. Sept. 27, 2017) (portions of email which "reflect interim discussions between James Mitchell, a CIA contractor, and George Tenet, the then-director of the CIA, regarding the use of enhanced interrogation methods" were exempt from disclosure under the deliberative process privilege because "[t]he questions asked by Director Tenet, and the recommendations provided by Mitchell, are clearly part of the 'give and take of the deliberative process'"). Defendants have not submitted any evidence that would demonstrate similar deliberation as to open substantive issues. *See Grand Cent. P'ship*, 166 F.3d at 478 (defendants must identify with "reasonable specificity of detail" their entitlement to deliberative process privilege).

**B. Foreseeable Harm**

Defendants also fail to establish that disclosure of any of the deliberative or factual content of the RTI Report, including its Recommendations, would cause foreseeable harm to the interests protected by Exemption 5. *See* 5 U.S.C. § 552(a)(8)(A)(i). In other words, foreseeable harm presents an alternative basis for release of the RTI Report's factual information and a basis for release of the material that is not factual.

In their initial declaration in support of the motion for summary judgment, Defendants argued that release of the RTI Report would result in public confusion because the SOGI questions were merely being tested for inclusion on the ACS and the Census Bureau changed its "priorities" before the report was completed. Dkt. No. 29 ¶ 19. Defendants also asserted that release of the RTI Report would have a chilling effect on Census Bureau employees and contractors because "it would negatively impact their willingness to share candid or controversial opinions and recommendations regarding future Census survey approaches and data collection," *id.* ¶ 20, and that release of the testing process and interim statistical analysis would "lead to reluctance from the Census Bureau and its employees to engage in the testing process necessary for the Census Bureau's mission," *id.* ¶ 21. In their reply to Plaintiff's cross-motion for summary judgment, Defendants elaborate that release of the RTI Report would cause confusion because "some of the comments and edits in the report note possible factual errors or the need for clarification that have not been addressed or corrected." Dkt. No. 41 ¶ 17. Defendants also add that premature release could cause harm to future Census Bureau testing and deliberations because review of a report "before testing is complete or before test findings are fully analyzed and final recommendations formulated . . . risks slowing or halting the process for future tests," and scrutiny of "factually incorrect information . . . could lead to contractors not bidding on future Census Bureau projects." *Id.* ¶ 19.

The foreseeable harm requirement imposes a "meaningful burden on agencies." *Reps. Comm.*, 3 F.4th at 369 (quoting *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106). "An agency may not 'perfunctorily state that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information' among or between government officials." *Nat. Res. Def. Council*, 2019 WL 3338266, at *1 (quoting *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018)). To satisfy the burden, agencies must do more than "rely on mere speculative or abstract fears, . . . fear of embarrassment," or "generalized assertions" of harm. *Reps. Comm.*, 3 F.4th at 369 (internal quotation marks omitted). "The foreseeable harm requirement must be met independently from the elements of the exemption; otherwise, the FIA adds nothing." *Seife v. U.S. Food and Drug Admin.*, 43 F.4th 231, 241 (2d Cir. 2022). Defendants must "presen[t] sufficient evidence, in reasonably specific detail, to establish foreseeable harm to" the interest protected by the exemption. *Id.* at 242.

"This requirement 'applies with special force to deliberative process withholdings under Exemption 5,' because 'Congress viewed [this use of Exemption 5] as posing particular risks of "overuse."'" *Shteynlyuger v. Ctrs. for Medicare & Medicaid Servs.*, 698 F. Supp. 3d 82, 125 (D.D.C. 2023) (quoting *100Reporters v. U.S. Dep't of State*, 602 F. Supp. 3d 41, 61 (D.D.C. 2022)); *accord Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106. "[T]he foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reps. Comm.*, 3 F.4th at 369–70. "[W]hat is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.* at 370; *accord Rosenberg*, 342 F. Supp. 3d at 78 ("To satisfy the 'foreseeable harm' standard, [Defendants] must explain how a particular Exemption 5

withholding would harm the agency's deliberative process."); *Shteynlyuger*, 698 F. Supp. 3d at 125 ("disclosure would cause 'injury to the quality of agency decisions'" (quoting *Sears*, 421 U.S. at 151)).

Courts have held Government agencies to the requirement that they present reasonably specific detail regarding the foreseeable harm that disclosure could cause. In *Juul Labs, Inc. v. FDA*, for example, the FDA offered agency declarations that disclosure of internal review documents related to its marketing denial orders ("MDOs") for Juul's e-cigarette products would cause public confusion regarding the basis for the MDOs by "givi[ng] the public the wrong impression that the FDA had reached a final decision on the issues contained in them." 731 F. Supp. 3d at 72. The declarations then articulated the "serious health harms" that could result from such public confusion. *Id.* at 71. Consumers could misinterpret FDA's "perspective on the risk and benefits of the subject products, which, in turn, could impact the likelihood of nonusers of tobacco products initiating use, and of existing users of tobacco products continuing their use." *Id.* The court found that "[t]his detailed explanation satisfies the foreseeable harm requirement," carrying "the required 'link between the specified harm and specific information contained in the material withheld,'" and satisfying "the statutory nexus requirement by connecting the foreseeable harm to the 'interest protected by [the FOIA] exemption' at issue." *Id.* at 72 (citations omitted).

In *Public Employees for Environmental Responsibility v. Department of Homeland Security*, the agency withheld predecisional, deliberative "drafts of DHS's Strategic National Risk Assessment," which "address systemic risks to national security (e.g., national disasters and terrorist attacks)." 575 F. Supp. 3d 34, 40 (D.D.C. 2021). The agency declaration explained that "disclosure of the SNRA would harm FEMA by 'prematurely revealing threats and hazards . . .

[which] would . . . cause confusion to the public and may result in members of the public taking action on potential threats and hazards where no action is warranted,' or in a manner not 'suggested by a recommendation contained in the documents.'" *Id.* at 51 (alteration in original). The court found this showing to be sufficient because the agency had "explained not just that release of the [draft in question] would cause public confusion, but specifically articulated how the nature of the information contained within the documents—threats, hazards, and recommendations—would cause such confusion." *Id.* at 52.

Here, Defendants have not satisfied their burden. Defendants' first set of assertions are that release of the draft RTI Report would "negatively impact" the willingness of Census Bureau contractors and employees "to share candid or controversial opinions and recommendations regarding future Census survey approaches and data collection," Dkt. No. 29 ¶ 20, and would "lead to reluctance from the Census Bureau and its employees to engage in the testing process necessary for the Census Bureau's mission," *id.* ¶ 21. These are precisely the type of "generic, across-the-board articulations of harm" that courts consistently have held insufficient to satisfy FOIA's foreseeable harm requirement. *Nat. Res. Def. Council*, 2019 WL 3338266, at *1; *see also Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 107 (finding insufficient a declaration that stated that "[r]eleasing these documents could result in confusion regarding reasons and rationales that may not ultimately be the grounds for any actions [the agency] may take"); *Reps. Comm.*, 3 F.4th at 370–71 (rejecting agency's statement that release of documents would "potentially confuse the public about the reasons for the [agency]'s actions in this matter" as a "boilerplate, unparticularized, and hypothesized assertion of harm" that merely "mouth[ed] the generic rationale for the deliberative process privilege itself"). The same assertions could be made in every case. A court cannot permit withholding of an agency document on the blanket or

boilerplate assertion that its release would have a chilling effect on agency deliberations without eviscerating the foreseeable harm requirement. *Nat. Res. Def. Council*, 2019 WL 3338266, at *1. "Standing alone, that articulation of foreseeable harm would be too 'perfunctory' and would seem to apply to most, if not all, deliberative exchanges of information, 'regardless of category or substance.'" *Shteynlyuger*, 698 F. Supp. 3d at 127 (quoting *Reps. Comm.*, 3 F.4th at 370). Defendants must show how release of the particular record or category of record would cause harm to agency deliberations. *Id.* at 124; *Rosenberg*, 342 F. Supp. 3d at 78.

Defendants fare no better with their additional assertions. They argue that release of the RTI Report would result in public confusion because the SOGI questions were merely being tested for inclusion on the ACS and the Census Bureau changed its "priorities" before the report was completed, Dkt. No. 29 ¶ 19, and because "some of the comments and edits in the report note possible factual errors or the need for clarification that have not been addressed or corrected," Dkt. No. 41 ¶ 17. Courts have been understandably skeptical about assertions that disclosure will cause public confusion. *See, e.g.*, *Juul Labs*, 731 F. Supp. 3d at 72. Such assertions can too easily be used to camouflage what may only be "'information marred by errors,' or information that could cause 'embarrassment.'" *Id.* (internal citations omitted). Defendants fail to explain here how release of the Report would cause such public confusion. The Report compiles information about how respondents understood and were able to answer certain SOGI questions. It is prominently labeled "Draft Report" and its cover page reflects that it was prepared by RTI for the Census Bureau in January 2025. There is no basis to believe that its release would "confuse the public by providing it with erroneous information which falsely appears to have the Bureau's *imprimatur*." *Petroleum Info. Corp.*, 976 F.2d at 1436; *see Ams. for Fair Treatment v. U.S. Postal Serv.*, 663 F. Supp. 3d 39, 60–61 (D.D.C. 2023) ("If stating

simply that a draft version 'differ[s] from the final version' of a policy or statement . . . were enough to show reasonably foreseeable harm, agencies would never need to provide a situation-specific reason for withholding a nonfinal draft." (citation omitted)). Any residual risk could be "allayed by conspicuously warning FOIA requesters" that the report is in draft form and does not reflect the views of the Bureau. *Petroleum Info. Corp.*, 976 F.2d at 1437; *see also Colo. Wild Pub. Lands v. U.S. Forest Serv.*, 691 F. Supp. 3d 149, 167 (D.D.C. 2023) ("conjecture" about possibility of public confusion from releasing draft appraisals containing inaccuracies was insufficient to show harm where "it would be a simple task for the Forest Service to clear up any confusion by . . . explain[ing] that these errors appeared in draft appraisals and that the errors were corrected and removed from the final appraisals that the agency used when assessing the land exchange").

Nor could release confuse the public as to the "reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Coastal States*, 617 F.2d at 866. The Report addresses technical issues regarding how SOGI questions should be worded should the Bureau choose to add them to the ACS. As discussed, however, the Census Bureau "suspended RTI's cognitive testing work and the Census Bureau's work on the gender identity question" following the issuance of Executive Order 14168, Dkt. No. 29 ¶¶ 11–12, meaning that SOGI questions have not yet been deployed. Defendants have not identified the agency action about which the public would be confused or articulated how, if the agency action was its nonaction with respect to SOGI questions, release of the report in draft form would mislead the public as to the reasons for that nonaction.

To be sure, the Government does not lose the protection of the deliberative process privilege simply because a proposal "dies on the vine" or meets a "dead-end." *Citizens for*

*Resp.*, 45 F.4th at 972 (quoting *Sierra Club*, 592 U.S. at 268). However, to carry their burden, Defendants still must adequately explain "why actual harm would foreseeably result from release of the *specific* type of material at issue here." *Reps. Comm.*, 3 F.4th at 371 (emphasis added). Defendants offer no specific explanation for why release of the Report's recommendations, for example, would confuse the public in such a way as to undermine the Bureau's internal processes, even in the absence of a final decision as to the wording of potential SOGI questions. Their declarant asserts vaguely that "the public is not likely to understand the nature of the in-process draft and how it fits into the Census Bureau's process for determining ACS test questions" and that "[r]eleasing an unfinished version of the report means releasing potentially inaccurate information that the public may assume was already verified." Dkt. No. 41 ¶ 17. But what they fail to articulate is "the particular sensitivity of the types of information at issue or the role that they play in the relevant agency decisional processes (and, therefore, whether and how their release would harm similar deliberations in the future)." *Reps. Comm.*, 3 F.4th at 372.

Defendants also do not explain how release of the comments in the draft RTI Report could impair agency decisionmaking. *See id.* at 369–70; Dkt. No. 41 ¶ 19. The Court has reviewed the RTI Report *in camera*. As noted, the Bureau's comments are limited to typographical errors, grammatical mistakes, and suggestions regarding clarity, none of which appear to go to substance. It is a mystery, not answered by Defendants, how release of such information could cause confusion or impair the quality of agency decisionmaking.

That leaves Defendants with the assertions that subjecting a draft report to public scrutiny before testing is complete or findings are fully analyzed and final recommendations formulated "risks slowing or halting the process for future tests," and that release of "factually incorrect information . . . could lead to contractors not bidding on future Census Bureau projects." Dkt.

No. 41 ¶ 19. Those concerns are either conclusory or singularly inapplicable in this case. As noted *supra*, the Bureau publicly announced its decision to release at least one report on the 2024 ACS SOGI Test for comment. To the extent that the Bureau's concern is that the release of any report before the SOGI questions are added to the ACS would invite public comment on the proposed questions and thereby cause delay, that concern is ill-founded. The very process that the Census Bureau put in place and announced to the public grants the public the opportunity to comment on the SOGI questions. And, in this case, because the Government has announced that it does not intend to include SOGI questions in the ACS, the concern that release would slow or halt the process for future SOGI testing is entirely illusory. As a result of the Executive Order and the Government's decision, it appears that SOGI questions will not be asked until well after the Report is disclosed, if they are asked at all.

As to the purported harm caused to bids on future Census Bureau projects, the concern is purely speculative. The Bureau argues, without evidence, that "Census Bureau employees and contractor employees who worked on the report expected that a fully vetted and finalized version of the report would be disclosed," but "[t]hey did not expect an unfinished and unfinalized draft of the report to be disclosed." Dkt. No. 40 at 22–23. But the Bureau does not assert that the Report, from the perspective of RTI, was anything other than finished and finalized. The Report itself speaks to its completeness. It describes RTI's focus areas for research, including the wording of Spanish-language questions, multi-mode measurement, and proxy response, how RTI recruited the target population, its cognitive interview procedures, and the data collection periods for the two rounds of interviews conducted. It states that RTI ultimately "conducted approximately 250 cognitive interviews" with English-speaking adults in the United States and monolingual Spanish-speaking adults in both the United States and Puerto Rico. Finally, and

perhaps most significantly, RTI reports the English and Spanish "findings" of its cognitive testing. There is no basis to believe from the face or content of the Report that these results were incomplete or that further analysis was required or contemplated.

Thus, Defendants have made no showing that RTI would not have expected that the Report as delivered to the Bureau would be made public. Indeed, Defendants promised the public that a version of the Report would be released for review. *See* U.S. Census Bureau, Supporting Statement A: American Community Survey Methods Panel: 2024 Sexual Orientation and Gender Identity Test, OMB Control No. 0607-0936 (2024), https://perma.cc/VW3R-7WGF ("The Census Bureau will release at least one report discussing the aggregate results of the 2024 ACS SOGI Test, after applying disclosure avoidance techniques."). Nothing in the record suggests that RTI had a veto over when or whether the Government would release the Report. To the contrary, the evidence before the Court indicates that if the Census Bureau had been satisfied with the Report, apart from the minor editorial and presentational comments it relayed, the Bureau could have released the Report. Defendants therefore offer no basis for concern that disclosure of this Report would deter even RTI from bidding for other Census Bureau projects in the future. It is not sufficient for Defendants to assert that the Bureau "[did] not have a practice of releasing" draft reports prepared by contractors. *See Vanda Pharms., Inc. v. Food & Drug Admin.*, 2023 WL 2645714, at *4 (D.D.C. Mar. 27, 2023). Aside from removing the label "draft," RTI would have had no expectation that anything that it drafted would remain confidential. "Disclosure cannot chill deliberations if those deliberating do not reasonably expect their deliberations to remain private." *Id.*[8]

[8] Plaintiff also questions Defendants' assertion of public confusion and chilling on the basis that the Census Bureau "consistently releases full cognitive testing reports drafted by contractors, including RTI, with the explicit intention of disseminating research and informing public

The Court pauses to note the distinctive weakness of Defendants' articulation of foreseeable harm in this case. Defendants argue that release of the Report, which was intended to inform the Census Bureau's decisionmaking, would chill the willingness of contractors and employees to share their views in the future. Agency deliberation may well suffer if "those who expect public dissemination of their remarks . . . temper candor with a concern for appearances." *United States v. Nixon*, 418 U.S. 683, 705 (1974). But, as discussed, the authors of the RTI Report were explicitly told that their work would be disclosed publicly, and thus would have had no expectation of privacy when they expressed the views reflected therein. Nor does the Report contain agency views. It is a report prepared by RTI for the Census Bureau, not a joint product reflecting a collaborative effort between consultant and agency, and the comments left by Census Bureau employees are limited to the typographical, editorial, and stylistic. For those reasons,

---

discussion, and with the understanding that the reports do not represent the agency's views." Dkt. No. 31 at 5–6; *see also id.* at 9 ("[T]he Report contains substantial factual information and is of a type that the Bureau regularly prepares for public awareness, not attribution of agency views or sole internal deliberation."). Plaintiff cites as an example an RTI report prepared for the Census Bureau and issued in December 2023 in which RTI conducted cognitive testing "to further assess a draft survey instrument intended to measure public opinion about the use of administrative records by the Census Bureau and about the creation of a demographic frame." Y. Patrick Hsieh et al., Research on Public Opinion of Administrative Records: Cognitive Testing Report (U.S. Census Bureau, Working Paper No. RSM 2023-12, Dec. 2023), https://perma.cc/WDZ5-CTAL. The report also carried a disclaimer that "[t]he views expressed are those of the authors and not those of the U.S. Census Bureau." *Id.* Defendants respond by distinguishing the Report from papers released by the Census Bureau's Research & Methodology Directorate, "of which the [ACS Office] is not a part," and noting that neither the current Report nor prior ACS cognitive testing reports contain such a disclaimer. Dkt. No. 41 ¶ 7. Their declarant also asserts that "the purpose of the RTI report was to inform the Census Bureau's decisions regarding the type of questions to include in future ACS testing," though informing the public "can be a byproduct of public release." *Id.* ¶ 16. But these explanations do not make up for the absence of affirmative evidence regarding whether RTI or Bureau employees had a reasonable expectation of confidentiality as to *this* report. As discussed, Defendants offer no contract between the Bureau and RTI governing the eventuality of disclosure, and no declaration by an RTI consultant or anyone else addressing the expectations of RTI in particular as to confidentiality or any supposed chilling effect that release would impose on their willingness to bid for future Census Bureau projects.

release of the RTI Report, as reviewed by the Disclosure Review Board, would not cause foreseeable harm to the interests protected by Exemption 5.[9]

**III. Self-Response and Web Paradata Files**

Plaintiff's second FOIA request was for the files containing deidentified self-response and web paradata from ACS SOGI Test respondents. Dkt. No. 1-8. Defendants denied the request under Exemption 3 and take the position that the self-response and web paradata files contain information protected from disclosure by Sections 8(b) and 9 of the Census Act. Dkt. No. 1-9; Dkt. No. 28 at 7–9. Plaintiff argues that the Census Bureau has not met its burden to withhold the requested data in their entirety because (i) the requested records constitute "statistical material" releasable under Title 13 when confidentiality is maintained, and (ii) at least some portions of the data files are reasonably segregable. Dkt. No. 31 at 19–30.

As a threshold matter, Defendants have established that the requested records contain raw census data that is prohibited from disclosure. The web paradata file contains the behaviors captured from respondents during their interaction with the test collection instrument, such as keystroke data or mouse-click history, including how the respondent answered the question, and if the respondent accessed help text or navigated to a previous question in the survey. Dkt. No. 29 ¶ 16; Dkt. No. 41 ¶ 21. The self-response file contains information or data collected from respondents during the test collection, often called survey responses. Dkt. No. 29 ¶ 16; Dkt. No.

[9] The Court has discretion to permit FOIA defendants to supplement their showing of foreseeable harm. *See, e.g.*, *Rosenberg*, 342 F. Supp. 3d at 79; *Nat. Res. Def. Council*, 2019 WL 4142725, at *3, *5; *Shteynlyuger*, 698 F. Supp. 3d at 127, 133. But Defendants have requested no such opportunity here, and the Court has independently identified no reason Defendants should be given such an opportunity. Plaintiff pointed out the weakness of Defendants' foreseeable harm showing in its opposition to Defendants' motion for summary judgment, and Defendants responded with a further declaration purporting to show foreseeable harm. There is no reason to believe that if Defendants were given yet another opportunity, they would be able to demonstrate any foreseeable harm from release of the Report.

41 ¶ 20. According to Defendants' declarant, Elizabeth Poehler, who in her role is responsible for technical and programmatic oversight of research and testing for the ACS, the self-response file can be visualized as one row for every person whose data was collected in the interview and columns for every question asked and answer provided. Dkt. No. 41 ¶¶ 1, 20. The files are not aggregated or tabulated and contain identifiers such as the respondent's state, respondent name, telephone number, age, sex, and race, which can be used to identify individual respondents. *Id.* ¶¶ 22, 25.[10] Both datasets thus contain "information reported by, or on behalf of individuals" that is "part of the raw census data . . . intended by Congress to be protected." *Baldrige*, 455 U.S. at 358.

In his opening memorandum, Plaintiff asserts that the requested data files have already been deidentified. Dkt. No. 31 at 20. Plaintiff's argument is based on the assertion that "the Census Bureau's standard practice is to remove identifiers from ACS data and to code it into designated numerical values as it is collected," and an asserted equivalence between the SOGI data files and ACS Public Use Microdata Sample ("PUMS") files which are publicly released annually and contain individual-level microdata. Dkt. No. 31 at 20–21.[11] But as Defendants explain, the equivalence Plaintiff draws between the files he requests and the ACS PUMS files is false. ACS PUMS files are unique, planned data products that are not created for every Census Bureau survey and do not constitute raw data files. Dkt. No. 41 ¶ 24. They are created after a

[10] Though the Bureau may record survey responses for certain questions like respondent sex "in numerical format rather than word form," such as by indicating 1 for male and 2 for female, the data files do contain respondent names and other responses in word form. Dkt. No. 41 ¶¶ 22, 25.

[11] Plaintiff also cites his expert declarant, Philip D. Leclerc, Dkt. No. 31 at 21, but his declaration undermines rather than supports Plaintiff's argument. Dr. Leclerc asserts that "the existing ACS SOGI Test microdata files constitute 'statistical material' . . . that is releasable after disclosure avoidance measures are applied to control re-identification risk of any particular respondent," Dkt. No. 32 ¶ 8, thereby at least implicitly admitting that the files are not releasable prior to application of disclosure avoidance techniques.

series of data preparation and processing steps are completed and after applying several proprietary disclosure avoidance techniques to comply with Title 13, including identifying a sub-sample of records for release. *Id.* By contrast, the data files that Plaintiff has requested have not undergone these types of data preparation steps, have not had identifying data removed, and have not been assessed for disclosure risk. *Id.* ¶ 25.[12] Indeed, the very materials Plaintiff cites make clear that the Census Bureau applies disclosure avoidance techniques after the raw data is coded and weighted and before the files are released to the public. *See* U.S. Census Bureau, *Am. Cmty. Survey & Puerto Rico Cmty. Survey Design & Methodology*, at 2-4, 13-7, 13-8 (Dec. 2024), https://perma.cc/S7KQ-CATY. Plaintiff thus has proffered no evidence to refute Defendants' detailed showing that the SOGI files contain raw census data. Indeed, in reply, Plaintiff does not dispute Defendants' argument that the SOGI files contain raw census data prohibited from disclosure, thereby abandoning the point. *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *Doe v. Indyke*, 465 F. Supp. 3d 452, 466 (S.D.N.Y. 2020) ("Defendants do not respond to this argument in reply, and the Court deems them to have abandoned the argument.").[13]

[12] Plaintiff also points to the fact that the Bureau has previously released web paradata from other SOGI collections under FOIA—such as from the National Survey of College Graduates ("NSCG")—without issue. Dkt. No. 1 ¶¶ 16, 18. But the NSCG data were summary-level statistics, which Plaintiff does not seek here. Dkt. No. 29 ¶ 30. Moreover, Plaintiff's argument that the fact that the SOGI data in question was collected pursuant to a "testing effort" is of no moment. Dkt. No. 31 at 23. The Bureau may well have a practice of releasing individual-level data like ACS PUMS files, but that data is indisputably subjected to disclosure avoidance techniques prior to release as discussed.

[13] Plaintiff relies on *Seymour v. Barabba*, 559 F.2d 806 (D.C. Cir. 1977). In that case, the court held that the names and addresses of private companies gathered by the Census Bureau and assembled for Census Bureau purposes were protected from disclosure notwithstanding that they

The parties next spar over whether Defendants have satisfied their obligation to disclose reasonably segregable portions of the SOGI Test responses. Plaintiff argues that, to satisfy its segregation obligations, the Census Bureau "can and should apply reasonable disclosure avoidance techniques to segregate and release a substantial amount of important data within the requested data files." Dkt. No. 31 at 26–27. Plaintiff further argues that with the suppression of numerous data fields, the Bureau should be able to release some data while protecting the confidentiality of respondents and that at a minimum, the Bureau should be able to produce records in a format that shows the field names or column headings of the requested data sets. *Id.* at 25. Defendants respond that (i) Plaintiff did not request summary statistics or tabulations; (ii) the Census Bureau is not required to apply disclosure avoidance protocols, and to require it to do so would require it to generate a new record or document; and (iii) even application of the disclosure avoidance techniques to the requested data files would not yield a statistical product releasable under *Baldrige*. Dkt. No. 28 at 9–11.[14] Defendants assert that "[t]o produce a statistical product for which disclosure is permitted by 13 U.S.C. § 8(b), the Census Bureau would . . . need to perform statistical analysis of the data and then subject it to disclosure avoidance [which] is not simply the removal of personally identifiable information, but instead

were not furnished under the Census Act. The court held that the reference in Section 8(b) to "tabulations and other statistical materials" which may be disclosed referred to "tabulations and statistical materials of a numerical nature," adding that the authority of the Secretary "to disclose is an authority to disclose numerical statistical data which does not identify any person, corporation, or entity in any way." *Id.* at 809. The dicta in *Seymour* cannot be read to give the Secretary authority to disclose data that does identify a person simply because that data is recorded in numerical rather than word form.

[14] Specifically, Defendants argue that Section 8(b) "contemplates an aggregation, estimate, or other summary data product." Dkt. No. 28 at 10. Here, Plaintiff seeks individual-level deidentified self-response and web paradata from ACS SOGI Test respondents, *see* Dkt. No. 29 ¶ 6, not totals or aggregations. Moreover, Defendants assert that "[b]ecause these files are wholly comprised of raw census data, disclosure review would not result in a 'tabulation' and would not eliminate raw census data." Dkt. No. 28 at 11.

requires the exercise of additional expertise and discretion in the selection and application of statistical methods." *Id.* at 11 (citation omitted). Defendants further assert that the entire data file is protected from disclosure and that "even if certain data fields are removed," it would be impossible for the Census Bureau to segregate the information "as releasing any field in the data files would reveal information protected by Title 13 and/or require the creation of a wholly new data file." Dkt. No. 29 ¶ 26.[15]

FOIA's segregability provision instructs that "[a]ny segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). The FIA directs that agencies "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible" and to "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii). Non-exempt information is not reasonably segregable when it is "inextricably intertwined" with the exempt information in a document. *Hopkins*, 929 F.2d at 86. "To meet this standard, 'the agency must provide a "detailed justification" for its non-segregability' but need not 'provide so much detail that the exempt material would be effectively disclosed.'" *Austin Sanctuary Network*, 2022 WL 4356732, at *23 (quoting *Johnson*, 310 F.3d at 776). Moreover, "FOIA imposes no duty on [an] agency to create records." *Forsham v. Harris*, 445 U.S. 169, 186 (1980). "[I]t only obligates [an agency] to provide access to those which it in fact has created and retained." *Kissinger v. Reps. Comm. for Freedom of the* Press, 445 U.S. 136, 152 (1980); *accord Pierce & Stevens Chem.*

---

[15] Defendants state that "the Census Bureau cannot undertake any further processing of the gender identity portion of the ACS test" because of the Executive Order. Dkt. No. 29 ¶ 23. But as Plaintiff rightly points out, FOIA imposes a reasonable segregation obligation on agencies, 5 U.S.C. § 552(a)(8)(A)(ii), and "[o]f course, an executive order cannot supersede a statute," *Marks v. C.I.A.*, 590 F.2d 997, 1003 (D.C. Cir. 1978).

*Corp. v. U.S. Consumer Prod. Safety Comm'n*, 585 F.2d 1382, 1388 (2d Cir. 1978) (FOIA requires an agency only to "disclose[] existing documents, which it has already prepared"). In addition, "the 'time and resources' that an agency must commit to retrieve electronic records may be pertinent to identifying the efforts that can reasonably be expected to retrieve responsive agency records." *Am. C.L. Union Immigrants' Rts. Project v. U.S. Immigr. & Customs Enf't*, 58 F.4th 643, 662 (2d Cir. 2023) (quoting *Cook v. Nat'l Archives & Recs. Admin.*, 758 F.3d 168, 178 (2d Cir. 2014)). A court may "decline to order an agency to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content," *Mead Data*, 566 F.2d at 261 n.55.

Defendants have demonstrated why the Bureau cannot "modestly adjust existing code to apply an algorithm to the requested data to protect respondent confidentiality with a reasonable amount of effort and enable release." Dkt. No. 31 at 30. The declaration of Michael Hawes, the Senior Survey Statistician for Scientific Communication at the Census Bureau, explains that to ensure that a Census Bureau information product does not reveal respondent information, the analyst must first gain a deep understanding of the product's content, scope, granularity, precision, and context (including all other related available data products). Dkt. No. 42 ¶ 5. There is no one-size-fits-all formula. *Id.* The Census Bureau must also "evaluate the disclosure risk of a proposed information product not just on its own, but in the context of prior and anticipated future releases from the same source data and in the context of related and third-party data sources that could be leveraged in combination in a privacy attack." *Id.* ¶ 7. In addition, disclosure risk often is not uniform across the population represented in a data set. *Id.* Some data subjects, especially those with unique or uncommon combinations of characteristics that

make them easier to differentiate from their neighbors, are often at greater risk for reidentification. *Id.*

The agency must then decide the best process among a wide range of possible disclosure avoidance methods. "Suppression-based approaches seek to reduce the risk of disclosure by removing information from the product to be released (e.g., removing entire tables, cells, or columns) or from the underlying data used to generate the product (e.g., removing the records of data subjects at greater risk of reidentification)." *Id.* ¶ 13. Coarsening-based approaches, on the other hand, "seek to reduce disclosure risk by creating uncertainty about the exact value of the published statistics, thereby making it more difficult to single out particular data subjects or to infer their confidential response information with certainty." *Id.* ¶ 14. The Bureau might coarsen income values, for example, by rounding them to the nearest $10,000 or reporting them in ranges "to make it more difficult to single out a particular individual from others that share the same coarsened value." *Id.* Noise infusion "preserves the overall patterns in the data while reducing outside actors' confidence that they have singled out or correctly inferred something about a particular data subject." *Id.* ¶ 15. An example would be to apply a random number multiplier to a set of data. The stated values would no longer reflect the reported values but the relation among each item of data would remain the same. "Most disclosure avoidance methods alter the content (through noise infusion), coverage (through suppression), and/or precision (through coarsening) of the data file sufficiently that the resulting file would be considered new or substantially different." *Id.* ¶ 16. Agencies will tailor their disclosure avoidance solutions depending on "the anticipated value of the information product, how it will likely be used, and how it fits within the broader disclosure risk landscape." *Id.* ¶ 17.

In assessing the reasonableness of proposed segregation efforts, courts have consistently rejected techniques that would alter the substantive content of an exempt record or would require the exercise of judgment and analysis in effecting the technique. In *Yeager v. DEA*, for example, the plaintiff sought the application of a disclosure avoidance technique to certain DEA records then referred to as "collapsing" or "compacting," whereby specific place and date information would be expressed "in more general terms, such as a ten-year span or a geographic region." 678 F.2d 315, 319 n.9 (D.C. Cir. 1982). In affirming denial of access to the records, the court reasoned that, in enacting FOIA, Congress did not intend "any manipulation or restructuring of the *substantive content* of a record when it commanded agencies to 'delete' exempt information." *Id.* at 323 (emphasis added). Likewise, in *ACLU v. DOJ*, the Second Circuit determined that the district court had exceeded its authority under FOIA by proposing a disclosure "compromise" under which redacted information regarding the application of enhanced interrogation techniques to detainees would be replaced by "a purportedly neutral phrase composed by the court." 681 F.3d 61, 71 (2d Cir. 2012). The court held that "FOIA does not permit courts to compel an agency to produce anything other than responsive, non-exempt records," and that requiring an agency to "alter[] or modif[y]" existing records "would effectively be 'creating' documents—something FOIA does not obligate agencies to do." *Id.* The proposed compromise was particularly problematic because the district court would substitute its own judgment in crafting text that it believed "would avoid the harms that could result from disclosure of the information in full" for the judgment of the Executive. *Id.* at 71–72.

Defendants have demonstrated that they could not "segregate" the materials exempt from disclosure without effectively creating a new document or running afoul of Exemption 3. Plaintiff suggests in his opening memorandum that the Census Bureau could, without risking the

disclosure of the individual respondents, release "*only* columns containing data regarding respondents' sex assigned at birth, current gender identity, and whether the respondent lives in a rural or urban region—omitting all other geographic data, income information, and other variables." Dkt. No. 31 at 26. Suppression is akin to redaction or blurring; it deletes information or obscures information while leaving the remaining disclosed content unaltered and would not result in the creation of a new document. *See Stahl v. Dep't of Just.*, 2021 WL 1163154, at *6–7 (E.D.N.Y. Mar. 26, 2021) (holding that BOP could satisfy its segregability burden by blurring staff's faces, cropping frames, or isolating screenshots rather than withholding the videos entirely); *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 587 (D.C. Cir. 2020) (vacating withholding where BOP failed to explain why widely available techniques, such as blurring faces or isolating screenshots, could not segregate exempt from non-exempt footage). But it would not satisfy Exemption 3. Exemption 3 protects from disclosure "raw data reported by or on behalf of individuals," *Baldrige*, 455 U.S. at 355, 358, and not just information that would permit the public to identify the particular respondent. Thus, Defendants could not comply with Plaintiff's FOIA request simply by suppressing one or more of the columns of reported data. Each column of reported data would still constitute self-response data protected from disclosure under Exemption 3. *See* Dkt. No. 31 at 26. For example, the Census Bureau could redact all data except for age, but disclosure of the age of the respondents would still violate Sections 8(b) and 9 of the Census Act. Likewise, release of any single column of reported information in the web paradata file would also reveal raw data reported by or on behalf of individuals. Moreover, even if the test for Exemption 3 were whether the public could identify the individual respondent, Plaintiff's suggestion would send the Census Bureau on a fool's errand. Plaintiff's FOIA request did not specify that he sought a single particular column of data, such as gender identity. His

proposal thus would have the Census Bureau produce a single column of data only to be told by Plaintiff that it was the wrong column of data. And Defendants have persuasively demonstrated that the production of two or more columns of reported data would risk the disclosure of the identity of the respondent, especially in view of "prior and anticipated future releases from the same source data and in the context of related and third-party data sources that could be leveraged in combination." Dkt. No. 42 ¶ 7; *see id.* ¶¶ 21–22 (citing 2006 study in which "researchers were able to reidentify 'anonymized' Netflix users' watching histories, by linking the users' ratings and dates for a handful of movies to auxiliary information that included names and other identifying information").

Plaintiff likens the application of disclosure avoidance techniques to the substitution approved in *ACLU v. USCIS*, 58 F.4th 643 (2d Cir 2023). But that case is inapposite. There, the plaintiff sought the release of the same event-centric data regarding individual non-citizens contained in the files of the United States Immigration and Customs Enforcement ("ICE") that ICE could and did itself access. *Id.* at 655. ICE used Alien Identification Numbers ("A-Numbers") as "a sort of key or code" to retrieve the underlying immigration and detention-related data that the plaintiff sought. *See id.* at 654–55. The A-Numbers themselves, however, were exempt from disclosure. *Id.* at 651. The court held that ICE could replace the protected A-Numbers with anonymized unique identifiers without creating a new document and was required to do so in order to comply with FOIA and to give the Plaintiff access to the same records to which ICE had access. In so doing, the court drew a distinction between a key or code that could be used to gain access to a database and the database itself. *Id.* at 655–56. The court reasoned that "A-Numbers are simply a tool—a sort of key or code—chosen by ICE to access its event-centric databases in such a way as to obtain existing datapoints." *Id.* at 654–55. The A-Numbers

were the electronic counterpart to the code on a combination lock in the physical world. *Id.* at 656–57. An agency could not place "non-exempt, person-centric records in a vault, the lock of which could be opened only with a combination of exempt numbers," and then "decline to produce documents from the vault by invoking the exemption afforded to the lock combination." *Id.* at 656. The agency would have to open the vault itself or "change the combination to non-exempt numbers and thereby afford public access." *Id.* Likewise, the court reasoned that "ICE must itself use A-Numbers to produce a spreadsheet of person-centric data for ACLU, or, as ACLU here requests, ICE must change the 'lock' combination numbers so that ACLU can itself access records in a person-centric manner." *Id.* at 656–57 (citation omitted). The replacement of the A-Numbers with anonymized unique identifiers that were "meaningless in themselves but able to perform the same access function as A-Numbers" made no changes to the substantive data that the plaintiff had requested and "simply preserv[ed] the access function A-Numbers perform within ICE's computer system." *Id.* at 655, 660.[16]

In this case, by contrast, the data that Plaintiff would have Defendants suppress, coarsen, or manipulate through the introduction of noise does not operate as a key or code to the

[16] Courts have since looked to the reasoning of *ACLU v. USCIS* in determining whether a request requires the creation of a new record. *See, e.g.*, *Silverman v. Ariz. Health Care Cost Containment Sys.*, 532 P.3d 762, 766–67 (Ariz. Ct. App. 2023) (relying on *ACLU v. USCIS*'s distinction between an electronic record's content and its assigned function to hold that "[u]sing redaction-by-encryption to replace the protected information with an otherwise-meaningless hashed value does not add or change any information, it simply masks the protected information without forfeiting the access function AHCCCS has chosen to have it perform"); *Reclaim the Recs. v. U.S. Dep't of State*, 2024 WL 3728979, at *8 (S.D.N.Y. Aug. 7, 2024) (finding that fulfilling the plaintiff's FOIA request would require creation of a new record where, unlike ICE, which could access immigration data in a person-centric manner in the regular course of business, "the Department has shown that it does not have a similar ability to pull an index of PCZ birth and death records from PIERS"); *Rutila v. U.S. Dep't of Transp.*, 72 F.4th 692, 698 (5th Cir. 2023) (per curiam) (rejecting reliance on *ACLU v. USCIS* where the plaintiff sought FAA records that the agency did not "actively maintain in any format," so that production would require the agency to "produce a new record—a screenshot—of information it does not store").

requested records. The data is part of the records themselves. Thus, unlike in *ACLU v. USCIS*, disclosure avoidance for the individual response and web paradata at issue here would necessarily involve altering the substantive content of the records themselves. Plaintiff requests not just suppression or deletion of fields but the use of an algorithm to allow "limited, systematic adjustments" to the data in the remaining columns. Dkt. No. 31 at 27. Plaintiff's own declarant acknowledges that disclosure avoidance would require Bureau employees to make discretionary choices regarding the magnitude of noise to introduce into the dataset, and that such noise infusion would result in "shifting individual data values by a small amount." Dkt. No. 32 ¶¶ 14, 17, 20. FOIA does not obligate the Bureau to undergo this process in responding to Plaintiff's FOIA request.[17] For those reasons, Defendants properly withheld all of the raw data reported by respondents in response to Plaintiff's FOIA request.

The Court reaches a different result, however, with respect to Plaintiff's request that Defendants produce the field names and column headings of the requested datasets. Plaintiff asserts that "[t]here is no argument to be made that these field names—devised by Census personnel—are 'raw census data reported by or on behalf of individuals' precluded from disclosure under §§ 8(b), 9(a), or *Baldrige*." Dkt. No. 31 at 25. Defendants do not claim that the

---

[17] Plaintiff also relies upon *Phillips v. U.S. Bureau of Census*, 2024 WL 230854 (S.D.N.Y. Jan. 22, 2024), where the Census Bureau "announced it would be creating and releasing to the public" a file comparable to the one sought by the FOIA requester and, in consideration of the Bureau's decision, the parties stipulated to the dismissal of the case with prejudice. *Id.* at *1. The case stands at most for the uncontroversial proposition that the Census Bureau can apply disclosure mitigation protocols to release data to the public—not that FOIA requires it to do so. Plaintiff's reliance on *Baser v. Dep't of Veterans Affs.*, 2014 WL 4897290 (E.D. Mich. Sept. 30, 2014)—an unpublished, out-of-circuit decision—is similarly misplaced, but for the distinct reason that the court denied summary judgment only because competing expert declarations created a factual dispute over the agency's own discretionary Exemption 6 balancing judgment concerning redacted data; it did not hold that the agency failed to satisfy its segregability burden as a matter of law. *Id.* at *4–*6.

field names and column headings themselves are protected from disclosure under Exemption 3. Nor do they assert that there would be any challenge to redacting or suppressing all of the data fields and producing the field names and column headings alone. They instead argue that requiring the Bureau to segregate the files by removing all of the response data would effectively amount to a different request, as Plaintiff originally sought the response data itself, not field names. Dkt. No. 40 at 11. The Court disagrees.

Plaintiff's FOIA request asked for the "Self-Response File" and "Web Paradata File." Dkt. No. 29 ¶ 6. The Court is required to liberally construe that request. *See Immigrant Def. Project v. U.S. Immigr. & Customs Enf't*, 208 F. Supp. 3d 520, 526 (S.D.N.Y. 2016) (agencies must "construe [FOIA requests] liberally" (quoting *Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 498 (S.D.N.Y. 2010))); *see also Miller v. Casey*, 730 F.2d 773, 776–77 (D.C. Cir. 1984) ("The agency was bound to read [the request] as drafted, not as . . . agency officials . . . might wish it was drafted."). Plaintiff did not request the individual-level data in isolation. Rather, he referred to the "individual-level" data to define the identity of the files that he sought—the files that contained the individual-level data. *Id.* It follows then that Plaintiff's FOIA request encompassed the field names and column headings. So viewed, Plaintiff's argument that Defendants should be required to produce at least the field names and column headings does not amount to a request that Defendants produce records not part of the FOIA request. Plaintiff seeks only that Defendants withhold those portions of the Self-Response File and Web Paradata File that are exempt and produce those portions—the field names and column headings—that are not exempt.

Courts have held that a FOIA requester may not broaden a FOIA request partway through litigation. *See, e.g.*, *Am. Oversight v. U.S. Dep't of Just.*, 401 F. Supp. 3d 16, 34 (D.D.C. 2019)

("An agency must liberally construe a FOIA request . . . but it is not obligated to rewrite the request to ask for more than the requester did." (internal quotation marks and citations omitted)); *Coss v. U.S. Dep't of Just.*, 98 F. Supp. 3d 28, 34 (D.D.C. 2015) ("Although FOIA requires an agency to produce all records 'reasonably described,' a FOIA plaintiff may not expand the scope of his request once his original request is made."); *Kenney v. U.S. Dep't of Just.*, 603 F. Supp. 2d 184, 189 (D.D.C. 2009) ("Plaintiff cannot allege that the agency failed to produce responsive records, when the records he now identifies fall outside the scope of his . . . request"). Allowing a requester to broaden his request would frustrate FOIA's exhaustion requirement. *See* 5 U.S.C. § 552(a)(6)(A); *Wilbur v. C.I.A.*, 355 F.3d 675, 677 (D.C. Cir. 2004) (in FOIA cases, "[e]xhaustion of administrative remedies is generally required before seeking judicial review 'so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision.'" (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 61 (D.C. Cir. 1990))). A court also is not required to entertain a revised and narrowed request for records identified for the court for the first time at summary judgment, *see Serv. Women's Action Network v. Dep't of Def., U.S.*, 570 F. App'x 54, 56 (2d Cir. 2014) (summary order), though nothing prohibits a FOIA requester from narrowing their request for records, particularly when they had reported such narrowing in joint status reports submitted in advance of summary judgment, *see, e.g.*, *Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*, 325 F. Supp. 3d 162, 168 (D.D.C. 2018); *People for the Am. Way Found. v. U.S. Dep't of Just.*, 451 F. Supp. 2d 6, 11–12 (D.D.C. 2006); *Zorn v. U.S. Dep't of Just.*, 2025 WL 35929, at *4 (D.D.C. Jan. 6, 2025). In this case, however, Plaintiff has neither enlarged nor narrowed his request. He has simply asked that the agency redact or suppress those columns that contain exempt material, leaving him with the information from the record that is not exempt.

Defendants have admitted that the self-response file that Plaintiff requested "can be visualized like an Excel data file, with one row for every person whose data was collected in the interview and columns for every question asked and answer provided." Dkt. No. 41 ¶ 20. Plaintiff asserts that knowing what was studied during field testing of the SOGI questions would carry independent informational value. *See* Dkt. No. 31 at 26 n.46 (asserting that "[r]eleasing the column headers within the requested data files would indicate what categories of information were collected from respondents" and "would be informative of what the Bureau compiled before purportedly ceasing work on its SOGI test data"). Defendants make no showing that producing such information would impose a burden on the agency. There is no reason why Plaintiff should be denied access to such information. Summary judgment therefore is granted to Plaintiff for the field names and column headings from the self-response file.

The Court denies summary judgment to both sides with respect to field names or column headings for the web paradata file. According to the Poehler declaration, the web paradata file is not visualized like an Excel spreadsheet in the same way as the self-response file; rather, it is "unstructured data" in XML format and "requires a parser to be able to process." Dkt. No. 41 ¶ 21. The parties do not address what this means for Plaintiff's request for field names and column headings only. Accordingly, the parties are directed to meet and confer to discuss whether information akin to field names and column headings can be produced for the web paradata file consistent with the principles laid out in this opinion. If the parties are unable to reach agreement, the Court will entertain renewed motions for summary judgment directed to the web paradata file alone.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED as to his FOIA requests seeking the RTI Report as reviewed by the Disclosure Review Board and the

field names and column headings from the self-response file, and the motion is otherwise DENIED. Defendants' motion for summary judgment is DENIED. Defendants are directed to transmit a copy of the RTI Report as reviewed by the Disclosure Review Board and the field names and columns headings from the self-response file to Plaintiff within two weeks from the date of this Order.

The Clerk of Court is respectfully directed to close Dkt. Nos. 27 and 30.

SO ORDERED.

Dated: September 25, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge